Filed 12/26/24  P. v. Franco CA6

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SIXTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE, | H047195, H047398, H047442 |
| Plaintiff and Respondent, | (Santa Clara County Super. Ct. Nos. 212692, C1070209, C1239875) |
| v. | |
| GABRIEL FRANCO et al., | |
| Defendants and Appellants. | |

In case No. H047195, a jury found defendants Gabriel Franco and Hugo Chavez guilty on two counts of attempted murder and one count of first degree murder.  The jury found Franco guilty on two additional counts of attempted murder and one count of shooting at an inhabited dwelling house.  The jury found the attempted murders were deliberate and premeditated, and the jury found true gang and firearm allegations.  As to Franco, the trial court imposed an aggregate sentence of 170 years to life consecutive to one year in prison.  As to Chavez, the trial court imposed an aggregate sentence of 105 years to life in prison.

Franco and Chavez raise numerous claims on appeal.  First, Chavez contends the trial court erred by denying his motion to bifurcate the trial to try the gang allegations separately.  Second, both defendants contend the trial court erred by denying their motions to discharge a juror for cause.  Third, they contend the trial court erred by admitting gangster rap lyrics based on a retroactive application of Evidence Code section 352.2.  We conclude these claims are without merit.  Chavez further claims the

trial court's admission of gangster rap lyrics violated Evidence Code section 352. We conclude the trial court did so err, and we further conclude Chavez was prejudiced by the error. We will reverse the judgment and vacate Chavez's convictions and sentence.[1]

Franco contends the gang enhancements must be vacated based on a retroactive application of Assembly Bill No. 333. We conclude the retroactive application of that legislation does not require us to vacate the gang enhancements as to Franco. He further contends his conviction on one count of attempted murder must be vacated because the trial court erroneously instructed the jury on a "kill zone" theory of liability. We conclude this claim requires us to reverse the conviction on this count.

Franco also raises claims concerning resentencing on remand, corrections to the abstract of judgment, and corrections to the minutes of his sentencing hearing. The Attorney General concedes these claims in part or otherwise declines to contest them on the merits. We will grant relief on these claims as Franco requests.

Accordingly, we will reverse the judgments, vacate Chavez's sentence and convictions on all counts, vacate one count of attempted murder as to Franco, and remand the matter for further proceedings.

Case No. H047398 and case No. H047442 concern judgments as to Franco only. He requests corrections to the abstract of judgment and the minutes of a sentencing hearing. We will affirm the judgments and order the trial court to make the requested corrections.

## I. FACTUAL AND PROCEDURAL BACKGROUND (CASE NO. H047195)

### A. Procedural Background

A grand jury first indicted defendants in 2012, but at trial the jury deadlocked on all counts charged against both defendants. In 2018, the prosecution filed a six-count consolidated indictment and information. The prosecution charged Chavez and Franco

---

[1] Chavez raises additional claims, but because we conclude his convictions must be vacated, we do not reach those claims.

with three counts: count 1—attempted murder of Ricardo Padilla with premeditation (Pen. Code, §§ 187, 189, 664, subd. (a))[2]; count 2—murder of Raul Islas Lopez (§ 187); and count 3—attempted murder of Victor Razo with premeditation (§§ 187, 189, 664, subd. (a)).

As to each count, the prosecution further alleged Chavez and Franco committed the offense for the benefit of, at the direction of, and in association with a criminal street gang. (§ 186.22, subd. (b)(5).) As to count 1, the prosecution alleged Franco personally used a deadly and dangerous weapon in the commission of the offense. (§ 12022, subd. (b)(1).) As to count 2, the prosecution alleged that Franco personally and intentionally discharged a firearm, causing the death of Raul Lopez (§ 12022.53, subd. (d)) and that Chavez was a principal in the commission of an offense in which at least one principal personally and intentionally discharged a firearm, causing the death of Raul Lopez (§ 12022.53, subds. (d) & (e)(1)). As to count 3, the prosecution alleged that Franco personally and intentionally discharged a firearm, causing great bodily injury to Razo (§§ 12022.53, subd. (d), 12022.7) and that Chavez was a principal in the commission of an offense in which at least one principal personally and intentionally discharged a firearm, causing great bodily injury (§ 12022.53, subds. (d) & (e)(1)).

The consolidated indictment and information further charged Franco with three additional counts: count 4—attempted murder of Gilberto Medina with premeditation (§§ 187, 189, 664, subd. (a)); count 5—attempted murder of Chanda Newton with premeditation (§§ 187, 189, 664, subd. (a)); and count 6—shooting at an inhabited dwelling house (§ 246). The prosecution alleged gang enhancements on all three counts (§ 186.22, subds. (b)(4) & (b)(5)). As to both counts 4 and 5, the prosecution further alleged Franco was a principal in the offense, and that at least one principal personally discharged a firearm in the commission of the offense (§ 12022.53, subds. (c) & (e)(1)).

---

[2] Subsequent undesignated statutory references are to the Penal Code.

The second jury trial began in July 2018. In November 2018, the jury rendered guilty verdicts on all counts as charged and found all enhancements true. As to count 2, the jury convicted both defendants of first degree murder committed with premeditation "and/or" by lying in wait.

As to Franco, the trial court imposed an aggregate sentence of 170 years to life consecutive to one year in prison. The sentence consisted of consecutive terms of 50 years to life on count 2 (25 years to life for the murder conviction, plus 25 years to life for the firearm enhancement under section 12022.53, subdivision (d)); 15 years to life consecutive to one year for the weapon enhancement under section 12022, subdivision(b)(1) on count 1; 40 years to life on count 3 (15 years to life consecutive to 25 years for the firearm enhancement under section 12022.53, subdivision (d)); 35 years to life on count 4 (15 years to life consecutive to 20 years for the firearm enhancement under section 12022.53, subdivisions (c) and (e)(1)); 15 years to life on count 5 (after striking the firearm enhancement under section 12022.53, subdivision (h)); and 15 years to life on count six.

As to Chavez, the trial court imposed an aggregate sentence of 105 years to life in prison. The sentence consisted of consecutive terms of 50 years to life on count 2 (25 years to life for the murder conviction, plus 25 years to life for the firearm enhancement under section 12022.53, subdivision (d)); 15 years to life under section 186.22, subdivision (b)(5) on count 1; and 40 years to life on count 3 (15 years to life under section 186.22, subdivision (b)(5) consecutive to 25 years for the firearm enhancement under section 12022.53, subdivision (d)).

## B. Facts of the Offenses

### 1. Factual Overview

The charges arose from three violent incidents in 2008 at separate locations in San Jose:

Reed Street stabbing (count 1): Ricardo Padilla was walking home in the evening when a passing car stopped in front of him and two men got out. The men stabbed Padilla multiple times, but he escaped and survived. The prosecution alleged Chavez was driving the car, and that Franco was one of the two men who stabbed Padilla.

Dobern Avenue shooting (counts 2 and 3): Later that same evening, Victor Razo and Raul Lopez were in a car stopped at a stop sign on Dobern Avenue when a gunman fired multiple shots into the car, striking both occupants. Razo managed to drive the car away from the shooter and survived. Raul Lopez, who was sitting in the passenger seat, died one week later. The prosecution alleged Franco was the shooter and that Chavez drove him to and from the scene.

McCreery Avenue shooting (counts 4, 5, and 6): Two weeks later, a group of adults and children were outside a house on McCreery Avenue when two cars pulled up in front of the house. Men from one of the cars fired 11 or more gunshots at the group. Two persons in the group were shot but survived. The prosecution alleged Franco was one of the shooters. Chavez was not involved.

### 2. The Mob Gang and Members

The prosecution alleged Chavez and Franco ("Trigger") were members of the Mob, a subset of the Norteño gang, and that Chavez and Franco were motivated by a desire to kill members of rival Sureño gangs.

### a. Background Expert Testimony

Investigator Mike Whittington, an expert in Hispanic criminal street gangs, testified for the prosecution as follows: In 2007 and 2008, the two principal groups of Hispanic criminal street gangs in San Jose were the Norteños and the rival Sureños. The two groups have historical origins in two rival prison gangs formed by prison inmates in the 1950s and 1960s. Norteños are street gangs loyal to the Nuestra Familia prison gang, and Sureños are street gangs loyal to the Mexican Mafia prison gang. The two groups of street gangs basically split the state of California: Norteños (or Northerners) in the North,

5

and Sureños (or Southerners) in the South.  In 2007 and 2008, the vast majority of gang members in San Jose were Norteños, but there were still Sureño gangs, and the two groups were at war.  When Norteños and Sureños cross paths on the street, they will attack each other with deadly force.

Norteños are associated with the color red, the letter "N," the number "14" or Roman numeral "XIV," and Aztec numbering consisting of two lines and four dots.  Norteño-related symbols include the huelga bird, a five-point star, and for Norteños in San Jose, sharks.  Norteños use derogatory terms like "scraps" and "scrapas" to refer to Sureños.  There are more than 40 subset Norteño street gangs in San Jose based on particular neighborhoods or other origins, and while they are all affiliated with each other, some develop rivalries.  "Red-on-red violence" refers to violence between members of different Norteño subsets, and it is "frowned upon" by the higher-ups, i.e., Nuestra Familia.  Nuestra Familia is the "upper management" or "executive management" of the Norteño organization, and while they are a smaller contingent of people, they have vast amounts of power because they control prison systems.[3]  The street gangs sell drugs and commit other crimes for money, and the money flows up to the Nuestra Familia.  They may give "clearance" to red-on-red violence between street gang subsets, or they may dispense discipline—including murder—if the violence is unapproved.

The Mob was a Norteño gang in San Jose that came together from five neighborhood-based subsets:  West Side Mob, Eastbound Locos Mob, San Carlos Boys,

---

[3] This court has adjudicated numerous appeals arising out of state and federal investigations of Nuestra Familia's criminal activities in Santa Clara County during the relevant period.  (See, e.g., *People v. Ochoa* (2016) 248 Cal.App.4th 15.)  "The Nuestra Familia organization operated as a hierarchy with three 'generals" at the head.  The generals—inmates at Pelican Bay State Prison and a supermax prison in Colorado— issued orders to the commanders of multiple street regiments operating in Santa Clara County and nearby areas."  (*Id.* at p. 22.)

Varrio Alma Locos, and Varrio Libre.  Mob gang members use the letters "MOB" to refer to "My Only Brothers."

Whittington opined that Franco was a Mob gang member.  In 2008, Franco had numerous gang-related tattoos, including a large "MOB" tattoo on his neck, a huelga bird across the back of his head, "Mobstero" above his right eye, and "North" and "Side" on the backs of his hands, among others.  In 2005, Franco was documented as wearing a Mongolian hairstyle, which was worn by San Jose Norteños to indicate the person is a "torpedo."  This means they are a "warrior" who is "committed to doing violence," and "expected to be in the first round of the assault."  In 2006, Franco was documented as wearing a red belt with a "14" buckle.  The expert reviewed numerous photos of Franco with other Mob members.

Whittington also opined that Chavez was a gang member in 2008.  When the prosecutor asked Whittington what his opinion was based on, Whittington responded, "I base it on the facts I've seen from this case, the context he's had with other individuals, the fact that he was the one who produced the lyrics or was a part of the production of Norteño-related propaganda, as well as information I have heard in this case as far as his status on the main lines, his shadowing and his participation in the assaults in this case."[4]

On cross-examination, Whittington conceded he had never seen any photos of tattoos on Chavez.  Nor had Whittington seen any photos of Chavez hanging out with West Side Mob members, making gang signs with his hands, or wearing obvious gang colors.  Whittington relied on Chavez's contacts and associations with gang members,[5] a roster of names found in his car, and his participation in this case.  Whittington conceded

---

[4] A county jail guard testified for the prosecution that he had seen Chavez "shadowing" another inmate in 2016, which referred to Northerners in jail monitoring new inmates until the new inmate is deemed to be in good standing with the gang.  "Main line" referred to the general population in prison.

[5] Whittington specifically referenced Chavez's associations with Cody Chavez and Javier Garcia, discussed below in sections and I.B.7 and II.C.3 respectively.

7

that other than the crimes charged in this case, he had no evidence Chavez had committed crimes on behalf of the Mob.

### b. *Mob Member Allen Ruby*

Allen "Little Man" Ruby, a former Mob gang member, testified under a grant of immunity as a witness for the prosecution. As set forth in detail below, Ruby testified that he and Franco were the two stabbers at Reed Street and that Chavez was driving the car. Ruby testified that later that night, Chavez drove him and Franco to Dobern Avenue, where Franco shot Razo and Raul. Ruby further testified that he and Franco were two of the shooters at McCreery Avenue.

Ruby had known Franco since 2006, and he knew Franco "[v]ery well." Ruby described Franco as "crazy," and he "likes to put in work," meaning that if he "sees a Sureno he's going to do something."[6] Ruby testified that Chavez would "come around," and "kick it with us, you know, we're brothers." But Ruby had "never seen him put in work." Ruby testified that Chavez was a Mob member because "he's from the Mob himself, you know, because he grew up there, you know, he knew a lot of older people. So he's from the Mob." Chavez did not have any gang tattoos, and he had never been "jumped in." Ruby testified that someone had to be "jumped in" to be a Mob member, but Chavez "kicks it with us" and "[h]e is like a mobster." Ruby had known Chavez for a long time, and they were "always together." Ruby testified, "We always had a bond together," and he felt like Chavez was a brother.

On cross-examination, Ruby conceded he had previously told the police Chavez was not really a Mob member, and that Chavez was just "a pretty boy" who was "pretty much Mob" because he had grown up around them. Ruby could not remember the names of Chavez's sister, brother, or grandmother. Chavez did not have a gang moniker, but Ruby said he called Chavez "DJ" because he recorded music for the neighborhood. A

---

[6] The prosecution's gang expert testified that "putting in work" was a phrase gang members used to mean "doing crime."

police officer who interviewed Ruby in 2011 testified that when Ruby was shown a photo of Chavez, Ruby identified him as "Hugo" but did not know his last name.

Among other tattoos, Ruby had "Mob" and "Life" tattooed on his eyelids, and "MOB" tattooed on his stomach in large block letters. In 2009, he was convicted of assault with a deadly weapon and making criminal threats, and he admitted gang allegations as to both offenses.

On cross-examination, Ruby admitted engaging in numerous shootings, attempted shootings, stabbings, and other violent crimes in addition to the offenses charged in this case.[7] Ruby also admitted to numerous lies he told to the police in the course of his interactions with them. He admitted he had lied to the "big homies" in the gang about committing violent killings and stabbings he did not actually commit.[8] He told these lies to protect his own life and preserve his standing in the gang. He would search through newspapers and the Internet to learn the facts and circumstances of crimes others had committed so that he could report them for himself. Ruby told Sammy Ramirez, a Nuestra Familia regiment commander, that he (Ruby) had committed a murder he did not commit.

In July 2010, Ruby was arrested and put in county jail for charges he feared might result in a "three strike" conviction with a life sentence. Ruby knew Sammy Ramirez was in protective custody at that point, and Ruby believed Ramirez was providing information to law enforcement. Ruby decided he needed to protect himself, so he contacted the police and the prosecutor to cooperate with them. Ruby and the prosecution entered into a proffer agreement on July 26, 2010. He knew he would have

---

[7] As discussed in section II.D below, Ruby admitted to more than a dozen different shootings, stabbings, and other assaults on different occasions, in addition to the charged offenses.

[8] Gang members used the phrase "big homies" to refer to the elders or leaders of the gang.

to give them names of other people, and not only admit to his own participation in criminal offenses, if he wanted to assure his freedom.

A detective told Ruby, "Hey, you're going to have to do some time, because it would look pretty bad to a jury if you're up there talking about all this stuff you did and you did no time at all." Ruby knew he would be sentenced for robbery convictions, but he also knew that sentence would be far less than what he could have been sentenced to if he had not cooperated with law enforcement. The detective told Ruby, "But it ain't gonna be like you're going away for a very long time." Ruby pleaded guilty to an offense even though he did not believe he was guilty. Ruby knew the police and the prosecutor were controlling his freedom so he was willing to take a deal and go along with what they wanted. Ruby received a sentence of nine years eight months for two robberies, and he was not prosecuted for any other offenses.

### c. Monique Lopez

Monique Lopez[9] testified that she drove the car from which the shooters opened fire at the group on McCreery Avenue. She also testified that Franco made incriminating statements about his involvement in the Dobern Avenue shooting.

Monique got involved with the West Side Mob when she met Ruby at the beginning of March 2008. Based on her experiences with him, Monique testified that Ruby was dishonest, he could not be trusted, and he is a "masterful manipulator." Monique was with the Mob for about three months until she was arrested on May 22, 2008. Monique committed crimes with Ruby and other Mob members, and she considered herself an "associate." The Mob did not accept women as members, and she was never "jumped in." She got four stars tattooed behind her ear in 2008.

Monique had a white Nissan Altima with tinted windows, and she drove Ruby and other gang members around from place to place. On April 24, 2008, she drove Franco to

---

[9] We refer to Monique Lopez as "Monique" to avoid confusion.

Bonita Avenue, where he fired a shotgun at a house. Monique went to Franco's house on multiple occasions. Franco had a nine-millimeter firearm he kept in a briefcase under his bed. Monique testified that Franco had bragged about committing five homicides.

Monique did not recognize Chavez in court. She testified that she did not know him, and she had never seen him before.

### d. *Sammy Ramirez*

Sammy "Black" Ramirez, a former Nuestra Familia regiment commander, testified under a grant of immunity as a witness for the prosecution. His entire body was covered in tattoos. Ramirez testified as follows: When he was 19 years old, Ramirez was sentenced to 19 years in prison for voluntary manslaughter and other offenses. There happened to be a lot of high-ranking Nuestra Familia members in jail while he was fighting his case, and Ramirez knew he had to "make a name for myself." Ramirez "had somebody stabbed" and was put in a Security Housing Unit (SHU) for a 24-month term.

Prisoners in the SHU were in solitary confinement except for an hour and a half each day—or three hours a week at Pelican Bay—when they would be released into a prison yard with other Northerners as well as members of the Aryan Brotherhood, Nazi Lowriders, Sureños, and other prison gangs. The prison guards would bet on the outcome of fights and shoot at the prisoners in the yard. Ramirez estimated he got into 12 or 13 "physical altercations" in this manner, and he rose in the ranks of the Nuestra Familia by proving his worthiness.

Ramirez was put in charge of "making weaponry, making weapons, breaking down razors," and ordering other Northerners to stab rivals. Ramirez estimated that he ordered around 15 stabbings. He ended up spending 12 and a half years in the SHU— two and half years at Corcoran and 10 years at Pelican Bay.

In March 2005, Ramirez was paroled to San Jose. He had orders from Nuestra Familia to create a street regiment—i.e., Norteños "that are out here on the streets selling drugs, being pimps, robbing banks, whatever it is how they get money," with a

11

percentage of the money sent to the Nuestra Familia generals. Charlie Campa was already in command of a Nuestra Familia regiment selling drugs in the San Jose area, and they reached out to Ramirez to work out an arrangement. Ramirez testified that he was put in charge of his own regiment, and he "worked out a system where [Campa] was the main drug supplier, he was turning in the money, and the people that I had with me at that time, basically I was the muscle and getting people to get in line and do what had to be done for the benefit of the [Nuestra Familia]."

Over a couple months, Ramirez put together his own regiment of street gang members. Some of them were Mob and some were Palmas members.[10] In-fighting between these gang members became "a nuisance, a headache," and got in the way of making money.

Ramirez's mother was living in downtown San Jose at the time. One morning, Ramirez got a phone call from his brothers telling him his mother's house had been shot up. Ramirez called around and learned that "Trigger from the Mob" (Franco) had done it. Ramirez's brother had gotten into a fistfight at a party the night before. His brother "got the best of the other guy," so the "West Side Mob got all butt hurt" and ended up shooting at Ramirez's mother's house. Ramirez asked another Mob member, "What the fuck is this guy thinking?" The member told Ramirez that Franco wanted to meet with him, and that "Trigger offered to bring me two bodies. Basically he would kill two people for me if I spared his life."

Ramirez had his brothers, another Mob member, and a couple of guys from West Side Mob meet with Franco at a park, "And they beat the shit out of him." Franco was apologetic and offered to bring Ramirez two bodies. Franco also did not want to say who else was involved in shooting up Ramirez's mother's house. Ramirez testified, "I know it's kind of weird, but it's a stand-up thing to do. He offered to make it right. [¶] . . . [¶]

---

[10] El Hoyo Palmas (Palmas) was another Norteño gang subset in San Jose separate from the Mob. Michael "Silent" Trujillo was a Palmas member.

As much as I was upset behind it, it is one of those things that I had to respect." Ramirez passed Franco's offer on to Campa and others, so that "if they wanted something done, then they could utilize this guy and have some people killed."

Ramirez testified that "red-on-red was prohibited. People will get killed for that. And that was [Nuestra Familia] policy." But the members of West Side Mob and other subsets continued to engage in red-on-red violence. Ramirez testified, "[T]here was always just dumb kid shit, crossing out [gang tags], and that is just how a bunch of fighting starts," and "it's causing a riff where it is affecting money coming in. So . . . it is an issue." Ramirez held meetings where all the gang members met in one room, "they all shook hands, and they all agreed they're going to stop with this kid shit. But it just continued to happen." Ramirez testified that this went on for six or seven months, and "at a certain point I just had my second in commands dealing with it. I just quit going to them." Ramirez heard that Franco had shot at another gang subset member at a car wash, and Franco said he had shot somebody at a party as well.

Ramirez decided the gang members needed to be disciplined, so he "put a greenlight on the West Side Mob and the EBLM."[11] This was shortly after his mother's house had been shot up. Ramirez testified, "[T]he way I seen it, these youngsters did not want to listen." He explained, "A greenlight is anybody from those gangs, from those neighborhoods are open game. You guys could shoot at them, you guys could stab them, whatever. If they happened to die, then hopefully some of the other street gangs and other members of other street regiments will understand . . . that there's repercussions, if you don't want to listen, there's consequences for your actions." The greenlight was against both the Eastbound and West Side subsets of the Mob.

Ramirez was arrested in February 2008, at which point the in-fighting had not been resolved. The greenlight stopped at some point when Palmas gang member Carlos

---

[11] Eastbound Locos Mob was a Mob subset. Ramirez testified that "EBLM" stood for "Eastbound Locstero Mobsters or something like that."

13

"Laughing Boy" Ramirez "stepped up," took responsibility for the in-fighting, and promised it would not continue. Ramirez testified that he thought he might have lifted the greenlight in the summer of 2007, but he was not sure. Laughing Boy's cousin had been killed by Sureños, and he wanted to use the greenlight on the Mob to get them to focus on Sureños. So another greenlight order was put out about doing kills of Sureños. Mob members were expected to kill Sureños so no more red-on-red violence would happen to the Mob members. There was no set number of Sureños that had to be killed; Laughing Boy just wanted payback.

After he was arrested in February 2008, Ramirez faced a possible sentence of 175 years to life consecutive to 36 years in state prison if he was convicted on all charges. Ramirez conceded that while he was in jail, he knew he had a lot of information that law enforcement would be interested in, and that he could save himself from a life sentence. He entered a plea and cooperation agreement in 2009 and was released from custody in 2013.

### e. Joseph Tarango

Joseph "Blinky" Tarango was a former Mob member who testified for the prosecution. As set forth below, he testified that Franco confessed to the Dobern Avenue shooting, and that Franco took him to the scene of the shooting to give him a "play by play" of what happened. Tarango also testified that Chavez asked Tarango if he had heard "about the one that Trigger had got."

Tarango had prior felony convictions for driving a stolen car and vandalism in December 2006, both with gang enhancements. In 2007, he stabbed a Sureño, but he was never charged for it. In December 2007, he went to a car wash with another Mob member to "stir stuff up" with another Norteño mob subset. Tarango was under the impression the greenlight had been lifted. He was approached by 10 or 12 members of the other subset and he was shot in the hand and foot.

14

In April 2008, Tarango stabbed a Sureño in the back or head at a 7-Eleven. In May 2008, he assisted Monique and another gang member in a robbery. In June 2008, he assisted another person in stabbing two young girls. He checked the newspaper the next day to see if he could claim credit for it.

In his testimony, Tarango admitted he had lied to the police about his and others' involvement in the stabbing, and he attempted to get others to destroy evidence of it. Tarango also admitted he had lied under oath about the 7-Eleven stabbing when he testified before a grand jury about it.

In July 2008, Tarango was arrested and put in custody in county jail. He learned he was facing two counts of attempted murder with gang enhancements and other allegations for the June 2008 stabbings. He faced a possible sentence of 34 years eight months in prison if he was convicted of all charges.

Tarango was at the Santa Clara County jail from 2008 until 2013. He still functioned as a Northerner in jail, and he was a part of its formal leadership structure. While he was in the general population, he became a "squad leader" and "building channel" as part of "tier security." It was his job to clear new inmates who were arriving in his area. He would get information from them about what they were charged with, and he would look at their paperwork and discovery to make sure they were not a snitch. Tarango acted as a channel for information about them for the rest of the chain of command. Tarango knew how to communicate with other inmates using kites. They would pass kites and mail through doors, in court visits, or during any kind of movement where they would come into contact with an inmate from another pod.

Tarango was cellmates with Eddie "Rascal" Sandoval, who was one of the shooters at McCreery Avenue, and Tarango looked at his discovery. It included statements made by Monique. Sandoval had a "master log" of everything she was telling the police, but Tarango did not think it was complete at that time. In 2008, Allen Ruby was housed in the same jail as well. Tarango and Ruby were friends, and they had

committed crimes together. Tarango denied that he ever communicated with Ruby about the Dobern Avenue or McCreery Avenue shootings.

In March 2009, Tarango wrote a letter to the prosecutor for his case. Among other things, Tarango claimed he had found God and that "I now have a one-on-one relationship with our Father and resulted in positive change. I no longer desire the lifestyle I once led." Toward the end of the letter, Tarango wrote, "I hope that this upcoming court date we can discuss settlement. Not for the reason of my supposed guilt, but for the prospect of this all being over with soon so . . . I could return to my daughter and wife and live a righteous lifestyle." Tarango testified that the letter was not true, and that he was still functioning as a gang member at the time.

Tarango did not receive a response to his letter. In April 2011, as the time for his trial was approaching, Tarango called a law enforcement officer. Tarango was looking to trade information for leniency. He wanted to "bounce"—i.e., to go home. The officer explained that he did not want secondhand information, because Tarango was reciting case numbers to the officer. Tarango had gotten them from a combination of "gang supplementary info," discovery in his case, and Sandoval's discovery. One of the case numbers was for the McCreery Avenue shooting.

Tarango spoke to law enforcement, and he was given use immunity for his statements. In 2012, he entered into a plea and cooperation agreement with the prosecution. He pleaded guilty to two counts of assault with a deadly weapon and admitted gang enhancements. He was sentenced to 10 years eight months in prison.

In his testimony, Tarango admitted he had wanted to kill Monique because she knew a lot of information about gang members. He conceded he would be willing to commit murder to ensure he could remain free, and he agreed he was also willing to lie under oath to remain free.

16

### 3. *The Reed Street Stabbing (Count 1)*

Ricardo Padilla testified that he lived on Reed Street near Almaden Avenue in March 2008. On the night of March 28, he was walking north on the right side of Almaden Avenue under Interstate 280 approaching Reed Street when a Dodge Intrepid drove past him. Padilla testified that the car was silver or gray with two doors, and the model year was between 1999 and 2001. The prosecutor asked Padilla if he had previously told police the car had four doors, but he did not recall telling them that.

Padilla testified that the car came from behind him on Almaden Avenue, turned right onto Reed Street, and parked a little way down Reed Street in front of him. Padilla saw two people in the car. The prosecutor asked Padilla if he had previously told the police he had seen three people in the car, and Padilla testified that he did not remember telling that to the police. He insisted repeatedly that he told the police he had only seen two people in the car.

After the car turned and parked on Reed Street, Padilla kept walking on Almaden Avenue and turned right onto the Reed Street sidewalk. As he approached the parked car on Reed Street, someone got out of the passenger's side door, grabbed something from the seat, and told Padilla, "I'll kill you motherfucker." The man was about 5 feet 8 inches tall with a thin build, he was wearing a hooded jacket, and Padilla thought he might have been Hispanic-American but Padilla was unsure. The man started making stabbing motions toward Padilla, and Padilla saw that the man had a knife. The knife was about six and a half to seven inches long and looked like a "house knife."

The man approached Padilla, and Padilla tried to run but the man stabbed Padilla in the left thigh and Padilla fell to the ground. Padilla, who was on his back, started kicking and moving his hands, but the man stabbed him in the foot area. Padilla then saw a second person, who started making stabbing motions toward Padilla's neck. Padilla thought the man might be Hispanic but Padilla did not get a good look at him. The man had a smaller knife like some kind of a switchblade, and he was making stabbing motions

17

at Padilla's neck. Padilla was kicking and flailing his arms, and when he kicked the man in front of him, the man almost fell. At that point, the men ran away, and Padilla was able to run to his apartment. As Padilla was running away, he saw the car driving down Reed Street toward First Street.

Padilla had numerous stab wounds around his body, including two cuts on his legs, one on the sole of his foot, one on his thumb, and two large cuts with smaller scratches around his chin and throat area. Padilla worked with a sketch artist from the police department to make a drawing of the first man who approached him. The police also showed Padilla photos of various cars, and Padilla identified one as having a color similar to that of the car driven by the attackers. In court, the prosecutor showed Padilla a photo of an exemplar vehicle—a gray-silver 2000 Dodge Intrepid—and Padilla testified that it did not look like the attackers' car. The prosecutor then showed Padilla a photo of Chavez's car taken from the rear, and Padilla testified that it looked similar to the attackers' car. On cross-examination, counsel for Chavez asked Padilla if he had ever seen Chavez before, and Padilla responded that he had not.

Patrol Officer John Hoge was dispatched to Padilla's apartment around 8:24 p.m. on the night of the attack. Officer Hoge observed a blood trail leading from the sidewalk on Reed Street up to the apartment, and he found Padilla inside the apartment bleeding from multiple lacerations. Officer Hoge interviewed Padilla later that night at a hospital emergency room. Padilla told Officer Hoge the attackers' vehicle was a newer gray Dodge Intrepid. Officer Hoge testified that Padilla said he saw three males inside the Dodge Intrepid, but Officer Hoge conceded his police report only included descriptions for two suspects. The police report indicated that the Dodge Intrepid had a raised suspension.

### a. *Allen Ruby's Testimony About the Reed Street Stabbing*

Ruby testified that he and Franco had stabbed Padilla, and that Chavez was driving the car. Ruby could not remember where they were going before the stabbing. Franco

18

was in the front, and Ruby was in the back. Ruby had a razor like a box cutter, and Franco had a "big old knife" about 10 inches long from the tip of the blade to the tip of the handle. This was during the greenlight, so Ruby was looking for a Sureño to kill. They drove under a bridge, and Franco spotted a pedestrian he believed to be a Sureño. Franco said, "That's a scrap," and Ruby told Chavez to stop. The man started running, and Ruby and Franco got out of the car. Ruby and Franco tripped the man, and Ruby tried to slice his face with the box cutter while Franco tried to stab him in the stomach. Ruby was trying to slice him in the throat because he and Franco wanted to kill him. The man was on the ground trying to kick with his legs, and Franco was pounding him in the stomach with the knife. Ruby slashed the man in the throat, and they got back in the car to get away. Ruby saw the man hanging onto a pole, and he was having trouble breathing.

Ruby testified that Chavez stayed in the car during the attack. Franco said, "Let's go get my gun, finish this night off." All three were laughing about the attack, and Chavez was asking questions about the stabbing. Franco said, "I stabbed him in the stomach. I got him." Ruby said, "Me too. I got him too. . . . you know, in the face." Then Chavez drove them to Franco's aunt's house.

### 4. The Dobern Avenue Shooting (Counts 2 and 3)

At 9:54 p.m. on March 28, 2008, Victor Razo was driving his Acura Integra with his cousin Raul Lopez in the front passenger seat when they stopped at a stop sign on Dobern Avenue. Razo testified that around eight gunshots were fired into the car from the left side, but he did not see who was shooting. He saw gun muzzle flashes when he turned around to look, but he could only see the shadow of a person shooting. Razo testified that he also saw a dark or black Chevy Silverado truck in front of him on Dobern Avenue, but he did not see any shots fired from the truck. The truck turned right and sped away after the shots were fired, but Razo did not see anyone get into it. Razo immediately accelerated, turned left, drove past a stoplight, pulled over, and parked on

the side of the street.  He saw a police car behind him and started gesturing with his hands, whereupon the police car pulled up behind Razo's car.  When the officer saw Razo was bleeding, the officer sat Razo down on the curb and called an ambulance.

Razo had gunshot wounds in both legs and another wound in the back of his head.  Lopez suffered two gunshot wounds to the head and died a week later.  The police found numerous bullet holes and bullet fragments in the Acura, along with shattered glass.  On the street where the Acura had stopped at the stop sign, police found 10 nine-millimeter cartridge cases on the ground.

### a.  *Allen Ruby's Testimony About the Dobern Avenue Shooting*

Ruby testified that after the Reed Street stabbing, Chavez drove him and Franco to Franco's aunt's house, where Franco retrieved a Heckler & Koch nine-millimeter gun.  Chavez then drove Ruby and Franco to Dobern Avenue to look for Sureños.  They drove down a dead-end street off Dobern Avenue and spotted a crowd of people gathered outside in a front yard.  Chavez then turned the car around and parked out of sight around a nearby corner.  Ruby testified that they were going to shoot at the crowd but there were babies and children there.  Instead, Ruby and Franco got out of the car to look for a specific person they could shoot while Chavez stayed in the car.  At that point, Ruby and Franco spotted a car leaving the gathering, so they "waited in the corner" while the car drove out of the dead-end street toward Dobern Avenue and stopped right in front of them.  Franco then ran across the street and started shooting at the car.  After the car drove away, Franco and Ruby ran back to Chavez's car and he drove them away.

### b.  *Joseph Tarango's Testimony About the Dobern Avenue Shooting*

Joseph Tarango testified that in March 2008, prior to the shooting, Franco had asked him to go "scrap hunting" in the area of Dobern Avenue.  Tarango declined because his hand had been shot and he was not confident about his ability to shoot a gun.  A couple days after the shooting, Tarango and Franco were hanging out when Franco said he and Chavez "had gone out and found someone" while they were "scrap hunting."

20

Franco proceeded to tell Tarango the details of the shooting and how it happened. Franco said he went to Dobern Avenue with Chavez. Franco said they were driving past a car when they saw suspected Sureños inside it. Franco said they drove past it, and he got out, walked up to the driver's side window, and fired into the car, hitting the driver and passenger.

Tarango testified that he and Franco were hanging out about a month later when Franco took him to the scene of the shooting and gave him a "play by play" of how the shooting took place. In his statements to the police in 2011, Tarango drew a picture of what Franco told him about it, including the location where Chavez's car was parked, and the path Franco took when he approached the victims' car, among other details. Franco said that after the shooting, he got back in Chavez's car, and they drove off. Franco said he used a Hechler & Koch nine-millimeter pistol. Franco never said anything about Ruby being there.

Tarango testified that he had seen Franco with the gun before. Franco kept it at his residence along with a .22-caliber pistol and Sandoval's Tec-9. Franco was trying to clean the Tec-9 because it jammed a lot.

After Franco first told Tarango about the shooting, Tarango saw Chavez at Timothy Casarez's house a week or two later. On direct examination, Tarango testified that he and Casarez were hanging out on the porch facing the street when Chavez came by. Chavez stayed in his car, which was black. The car reminded Tarango of a Dodge Intrepid or a late model Chrysler 300. The prosecutor then asked Tarango if Chavez approached him, and Tarango responded, "Um, I don't -- I think he did. He may have approached me -- to me." Chavez said he was coming by to pick up some weed from Casarez. They were just sitting around talking and shaking hands. Tarango testified, "And then his conversation directed toward me. *Timothy* was, like, did you hear about the one me and Trigger got. And I already knew what he was talking about so I indicated yes." (Italics added.)

21

The prosecutor then questioned Tarango about this conversation again. Tarango testified that he and Casarez were on the porch when Chavez came up to them to buy weed. The prosecutor asked Tarango to recall the "exact words" Chavez used, and Tarango responded, "He asked if we had heard about *the one that Trigger had got*." (Italics added.) Tarango testified that he joked around and acted like he did not know about it, but then responded that Franco had already told him. Chavez said nothing.

On cross-examination, Tarango testified that Chavez told him, "Did you hear about *the one me and Trigger got*?" Tarango testified that Chavez said nothing else about it, did not use the word "Dobern," and did not say what "getting one" meant. Tarango conceded that when he testified about this event in the prior trial, he testified that Chavez had stayed in the car, and that the conversation took place by the curb. When asked to clarify which version was accurate, Tarango testified that he had walked up to Chavez's car, shook hands, handed him the weed, and Chavez asked the question. Tarango conceded that in the first trial in 2016, he testified that Chavez said, "Did you hear about Trigger and I getting that -- that one, that juicy one." Tarango conceded that in 2012, he testified to the grand jury that Chavez said, "Did you hear about me and Trigger and me and Gabriel Franco?"

Tarango agreed that he had testified he did not hang out with Chavez; that they were not friends and did not have a relationship; and that Tarango did not talk with Chavez about gang business. Tarango testified that he did not recall Chavez ever coming to any gang meetings or gang parties, and Tarango had never been to Chavez's music studio. Tarango testified that he had seen Chavez at the Alma Community Center on occasion, and Tarango reiterated, "I don't really remember hanging out with Hugo or ever associating with him."

### c. *Monique Lopez's Testimony About the Dobern Avenue Shooting*

Around the middle or end of March 2008, Monique was at Franco's house with Ruby when Franco bragged about using the nine-millimeter firearm to shoot someone at

22

close range.  Franco said he was on foot, and that he walked up to the victim and shot him in the chest.  Monique saw a printout of a news article about the shooting posted on the wall in Franco's room, and the victim had not yet died at that point.

### 5.  *The McCreery Avenue Shooting (Counts 4, 5, and 6)*

On April 6, 2008, Norteño gang member Ronald "Kane" Gomez was shot in the arm and abdomen, but he survived the shooting.  On the night of April 11, Franco, Ruby, and other Mob members met at a member's house to plan retaliation.  They split up into three cars to look for Sureños, and two of the cars drove to McCreery Avenue.  Monique (Ruby's girlfriend) was driving her white Nissan Altima with Ruby in the front passenger's seat, Franco in the back behind the driver's seat, and one or two other persons in the back.  The second car followed behind Monique's Altima.

Monique drove down McCreery Avenue two or three times and Ruby spotted a group of people standing outside in the front yard of a house.  Ruby told Monique to stop in front of the house and ask someone in the group for the location of a nearby gas station.  Monique did so, and a member of the group approached the car to direct Monique to a gas station.  As the person was approaching, Ruby got out of the passenger's side front door and started shooting over the roof of the car at the crowd of people.  He fired about 10 or 11 shots.  Franco and Eddie "Rascal" Sandoval also opened fired on the crowd as well.  Sandoval, who was in the rear passenger's side seat of the car, opened the door and fired at the crowd over the roof of the car with a .22-caliber pistol.  (Monique initially testified that Sandoval had a Tec-9 but she later changed her testimony and testified that Franco had the Tec-9).  Nobody in the car behind Monique's car fired any shots.

Two persons standing outside the house were struck by bullets.  Gilberto Medina was struck in the right temple, and Chanda Newton was struck in the right ankle.  Both survived.

23

The police found 10 nine-millimeter shell casings and one .22-caliber shell casing at the scene. The prosecution's firearms expert opined that they were fired from three different guns. Nine of the nine-millimeter casings were fired from one gun. The expert opined that they were fired from the same gun as the 10 nine-millimeter shell casings police found at Dobern Avenue.

Police investigators found numerous bullet strikes at the McCreery Avenue crime scene. A Buick parked on the street in front of the house was struck four times: on the rear driver's side door, the roof, the hood, and the windshield. A wrought iron fence with masonry posts stretched across the front of the property. Investigators found bullet strikes in three locations on the fence: two on the separate iron rods of the fence, and a third on one of the masonry posts. A white Dodge Stratus was parked in the front yard area—in front of the house and behind the fence—and there was a tarp hanging down between the car and the street. A bullet struck a window of the car on the passenger's side facing the street, and there were two or three bullet holes in the tarp. The front of the house had also been struck near the front door.

A bloody sandal was found in the driveway of the McCreery Avenue house with blood on the pavement next to the sandal. Newton was wearing a sandal when the police interviewed her that night. A baseball cap with a bullet hole in it was found in front of the white Dodge Stratus in the yard on the side of the car opposite the driveway.

### a. Testimony of Gilberto Medina

Medina testified that he was a Sureño gang member in 2008. He was at the house on McCreery Avenue on the night of the shooting. He was standing next to the driveway behind a metal gate when he saw a white car like a Nissan Altima with tinted windows stopped on the street. In the white car, Medina saw a girl in the driver's seat smiling and looking in his direction. Medina testified that "[s]he got our attention" when she smiled at him, and then another car pulled up behind her with two or three people inside. At that point, Medina's attention switched to the car behind her, and the shooting started.

24

Somebody leaned out of the window on the front passenger's side of the white car, sat on the door, and started shooting over the car towards Medina.

As soon as Medina saw the gun, he threw himself onto the ground. There was a white Dodge Stratus parked in the yard in front of the house, behind the front gate. Medina was right next to the Dodge Stratus. While the shooting was happening, he crawled around the side of the car (between the car and the front gate) to the other side of the car (between the car and the house). While Medina was on the side of the car between the car and the house, the shooting stopped.

When the shooting stopped, Medina got up, and the shooters were gone. He felt a warm wet sensation on his right temple. When he touched it, he saw blood, and he realized he had been shot in the right temple. He started walking back and forth in the driveway area, leaving blood on the ground there.

Medina only saw one shooter. He did not see anyone shooting after he hit the ground. He heard around eight to 10 shots.

### b. Testimony of Petra Cabrera

Petra Cabrera testified that she was at the McCreery Avenue house on the night of the shooting. Her mother and three siblings lived there. Cabrera was outside sitting next to a door on the side of the house in the driveway area. Before the shooting started, Cabrera saw the white Nissan Altima driving by "really slow," at around five or ten miles per hour. She saw it go by two times. The driver was a woman with long hair.

When the shooting started, Cabrera was sitting on the steps in front of the door with her infant son and her nephew in the driveway area around her. Her nephew was three or four years old. Three of the neighbors' kids were also in the driveway, as well as an adult woman who was visiting.

Cabrera testified that the white car was driving by for the third time when a man came from out of the window on the passenger side of the car and started shooting. He was sitting on the window and shooting over the top of the car. The car was moving

25

forward at all times.  There was also a second car.  After the shooting started, Cabrera grabbed her son and ran inside.  She put him down and ran back out to grab her nephew; she did not wait for the shooting to stop.  Cabrera still heard gunshots while she was inside.  She stayed inside with the children until the shooting stopped.

When Cabrera went back outside, the adult woman was screaming that she had been hit.  The woman's ankle was bleeding.  The car was gone.

Cabrera knew who Medina was.  They were not friends but they went to the same high school together.  Cabrera did not know whether Medina was near the property when the shooting happened, but he came running and opened the gate to come inside.  He was bleeding from his head.

### c.  Allen Ruby's Testimony About the McCreery Avenue Shooting

Ruby testified there was a meeting at Michael "Silent" Trujillo's house before the shooting.  Franco, Sandoval, Trujillo, Monique, and two others were there.  They planned to go hunting for Sureños as revenge for the shooting of Kane.  They left in three cars.  Ruby, Franco, and Sandoval were with Monique in her car.  Ruby was in the front passenger's seat, Franco was in the back behind Monique, and Sandoval was behind Ruby.  Trujillo and one of the others were in a second car.

Monique drove to McCreery Avenue, and they saw Trujillo's car in the area.  Monique drove past the house on McCreery Avenue, and Ruby saw "some dudes" there but he did not think they were Sureños.  Then someone called from Trujillo's car and said they had seen "guys outside chillin' and drinking."  Ruby told Monique to drive back to the house, and Ruby saw some guys in the front yard drinking.  Ruby testified, "[W]e seen some dude chillin' in the front yard.  They're grouped up, one bald-headed dude, and just, you know, it was, you know, a Sureño neighborhood.  So we just thought they were Surenos."  Ruby testified that he believed they were Sureños because "[t]hey were chillin' in the front," and they looked like Sureños because they were drinking and they were bald-headed.

26

Ruby testified that he told Monique to stop in front of the house and ask the Sureños if there was a gas station nearby. Ruby put his seat down so that they could not see him. Monique called to them, and one of them came closer to the car to tell them there was a gas station around the corner. Ruby then stood on the door, and started shooting over the roof. Franco and Sandoval "followed suit" and started shooting too. Sandoval started to shoot over the roof, but he later told Ruby that the gun would not shoot. Franco fired three shots with an Uzi. They saw "guys running around, running, dodging, dodging the bullets."

Ruby testified that he fired about 10 or 11 shots using the Heckler & Koch nine-millimeter gun that Franco gave him after the Dobern Avenue shooting. When the prosecutor asked why Franco did not fire more shots, Ruby testified that Franco said, "I guess it stopped with three shots." He was upset that he could not get more shots off. Ruby testified at times that Franco was using a Tec-9, and at other times Ruby testified that it was an Uzi. Nobody from the other car did anything.

After the shooting, they went back to Ruby's aunt's house to drop off the guns. Trujillo and the other man who was in his car wanted the Heckler & Koch nine-millimeter because they wanted to go out and try again after failing to do anything at McCreery Avenue.

The prosecutor questioned Ruby as follows:

"[Q.] You were trying to kill?

"[A.] Yes.

"[Q.] Trying to hit as many of those guys as you could?

"[A.] Yes.

"[Q.] Was that the plan, to kill?

"[A.] Yes.

"[Q.] Shoot to kill?

"[A.] Yes.

"[Q.]  The plan for everybody?

"[A.]  Yes."

Franco's counsel questioned Ruby about the shooting on cross-examination.  Ruby testified that the plan was "finalized" at Trujillo's house, and that Ruby had agreed with others to go out and kill people.  Counsel questioned Ruby as follows:

"[Q.]  [T]here was a crowd of people out in front of that house; correct?

"[A.]  Yes.

"[Q.]  And you were just shooting wildly at the crowd of people out in front of McCreery Street; is that correct?

"[A.]  Yes, where I seen the men.

"[Q.]  Where you see the men.  And there were women out front too; correct?

"[A.]  I didn't see them."

After a break, Franco's counsel continued questioning Ruby on this topic:

"[Q.]  Did you see children in front of . . . McCreery when you were shooting into this crowd of people that were scattering?

"[A.]  No.

"[Q.]  Did you care if children were in this crowd of people who were scattering?

"[A.]  Yes.

"[Q.]  You did care?

"[A.]  Yes.

"[Q.]  And so you wouldn't have shot at this crowd if you knew there were children?

"[A.]  There was no children around the crowd I was shooting at."

On further questioning, Ruby agreed there were women and children there, but he insisted again that he did not know they were there at the time of the shooting, and testified that he was shooting at a crowd of Sureños.  He agreed that the crowd was scattering, and that he was shooting "randomly."

28

#### d. Monica Lopez's Testimony About the McCreery Avenue Shooting

Monique testified that she drove her white Nissan Altima for the McCreery Avenue shooting. The shooting was in retaliation for the shooting of Kane. Monique was at the meeting at Trujillo's house prior to the shooting. They split up into three cars. The plan was for Monique to drive her car to a shooting on McCreery Avenue and another car would do a shooting at another location. Monique drove to McCreery Avenue knowing they would be shooting to kill a Sureño. They had three guns: one gun was a Tec-9, another was a nine-millimeter, and the third was a revolver.

Ruby was in the front passenger seat, and Franco and Sandoval were in the rear seats with Franco on the driver's side behind Monique. Monique drove up and down McCreery Avenue two or three times. She saw a group of people standing out in the front of the house. She did not see any children there. Ruby told her to stop and try to lure over one of the people standing in front of the house to get them closer to the car. One of the other cars was behind Monique's car.

Ruby, Franco, and Sandoval all fired shots. Ruby opened the door and fired over the hood of the car with a handgun. Sandoval also opened the door and fired over the car, but as to Franco, Monique only knew that he opened the door. Monique testified at one point that Sandoval had a Tec-9, but she later testified that Franco had it.

### 6. The Uncharged Cadillac Drive Shooting

Ruby testified that in November 2007, he, Chavez, and Jose "Joser" Garate were involved in a shooting on Cadillac Drive in San Jose. Ruby testified that Chavez drove them to the area, parked, and stayed in the car. Ruby and Garate were on foot. Ruby got the attention of some Sureños by pretending like he was a Sureño, and Garate started shooting at them. Later, Ruby looked it up on the Internet and learned three people had been shot—two of them fatally. Ruby had previously told police Chavez was driving a new brown Impala at the time.

29

Chavez denied driving Garate and Ruby in either a brown Impala or a gray Dodge Intrepid near Cadillac Drive at any time in 2007 or 2008. Chavez testified there was never any occasion on which they talked in his car about shooting Sureños.

In his defense, Chavez called two victims of the shooting to testify at trial: Maria Luz Milla Corona Moralez and Elizabeth Solorio, who were sitting in Moralez's car on Cadillac Drive when two of their relatives were shot. Moralez was in the driver's seat and Solorio was in the passenger's seat. The car was on a driveway with the front of the car facing Cadillac Drive.

Solorio testified that she saw her brother Ricardo, her cousin Pedro, and some other persons on a patio about 25 feet away outside the building next to the driveway. Solorio called to Ricardo, and he came to the passenger's side window to speak with her briefly before returning to the group. As he was walking back, Solorio saw two men walk by on the sidewalk in front of the car. As the men got close to Ricardo, one of them pulled out a gun and shot Ricardo in the back of the head. As they were walking, the shooter kept firing and shot Pedro. The two men then ran toward Winchester Boulevard. Ricardo survived, but Pedro died. A third person was also shot.

Solorio gave descriptions of the two men to the police that evening, and some months later she looked at photographs of possible suspects that the police showed her. Solorio testified that she picked a photograph of someone that looked familiar, and she became very emotional because, "I remembered. Everything flashed back." At trial, Solorio did not recognize Ruby in photos of him that defense counsel showed to her.

A police officer who interviewed Solorio testified that he had information from two other officers that Palmas gang member Carlos "Laughing Boy" Ramirez was a suspect in the shooting. The officer put a photo of Carlos Ramirez in a photo lineup for Solorio to view, and she responded very emotionally, telling the officer that Ramirez's photo looked like the person she saw that night with the shooter. The officer testified that Solorio stated she "truly felt that she was positive that it looked like the person."

30

Moralez testified that she was in the driver's seat of her car with Solorio sitting in the passenger's seat when the shooting happened. Ricardo was talking with them, they said their goodbyes, and he left. Two men walked past the front of the car on the sidewalk, and Moralez heard several gunshots. The two men ran toward Winchester Boulevard. Solorio got out of the car, and Moralez drove after the two men. Moralez saw the two men cross Winchester Boulevard and get into a light gray or light brown Dodge Neon. She could not see if there was anyone else in the car. Moralez did not follow them. Moralez recalled telling the police the two men got into a small light brown sedan. The police showed her photographs of different cars, including a Dodge Intrepid, but she told them the Intrepid was too long compared to the car she saw.

The prosecution did not prosecute Ruby or Chavez for these shootings.

### 7. *Testimony of Hugo Chavez*

Chavez testified in his defense. He denied any involvement in either the Reed Street stabbing or the Dobern Avenue shooting.

Chavez was 26 years old in March 2008. He was working full time as a lab technician at a biomedical technology company. He testified that he was not a gang member. He never had any gang tattoos and he did not have any gang clothing. In 2004, Chavez suffered a misdemeanor conviction for possession of marijuana. He had no prior felony convictions.

Around the end of 2007, Chavez bought a silver 2002 Dodge Intrepid. The height was standard, not raised. Chavez would let people borrow the car to go to the store while he was recording in his music studio, but he never loaned it to Ruby or Franco. Around 2010, the engine blew out. Chavez would let people sleep in it sometimes.

Chavez grew up in San Jose in neighborhoods with gang members, and he was aware of the Mob when he was as young as five years old. Chavez's mother was murdered when he was seven, and his father died of HIV/AIDS when Chavez was around 12 or 13. In his father's last year, he told Chavez it was okay to have friends, but made

31

Chavez promise that he would never get into a gang. After his father passed, Chavez lived with his elderly grandmother on Sanborn Avenue. The Alma Community Center was nearby, and there were gang members hanging out there. Chavez went there frequently and hung out with gang members. He knew a lot of Mob members, and he knew a lot of people from the neighborhood who were involved in the gang, but he was not always sure who was a gang member and who was not. He knew some West Side Mob members because they were in the neighborhood where he grew up.

Chavez had a music recording studio in his grandmother's backyard on Sanborn Avenue. Word spread about the studio, and lots of people would come over to record music and hang out. Chavez occasionally lived and slept in the studio, and he let gang members hang out and party there. He did favors for gang members like helping them get work, or giving them a ride somewhere, but he did not drive his car for any gang missions by Mob members against Sureños.

Chavez knew the Mob was a violent gang. On cross-examination, the prosecutor asked Chavez if, when he was a young adult, he was okay with hanging out with gang members who had committed violent crimes. Chavez responded, "I've had to be, yes, because I grew up in the environment of a violent area." He conceded that he had not reported to the police about a Mob attack he had witnessed on the street. He testified that reporting gang crime to the police would be an act of suicide, explaining, "I guess I've created my own instincts to survival growing up in a neighborhood like that. It is one of the survival skills that you have -- that are embedded in you growing up." "[I]n the community we live in, if you call the police, you know, you could put your life in danger. People frown upon it. The community frowns upon it. Sometimes the police are not the good guys." Chavez admitted that he let Mob members use his place as a hiding spot when they were running from the police or rival gang members.

The prosecutor cross-examined Chavez at length about his attitudes toward the police. The prosecutor asked Chavez if he disliked law enforcement, and he responded,

"No," but he distrusted law enforcement. The prosecutor asked if Chavez had a bias against law enforcement, and he responded, "A little." He testified that he had been harassed and physically threatened by police officers. A police sergeant once put his foot on Chavez's face. Another officer threatened him with a "beat down." Chavez had also seen the police harass and abuse other people in the neighborhood for no reason. The prosecutor asked Chavez whether he had a bias for gang members, and he responded, "Yes, a little," adding, "[T]here's bad apples in both groups," and he said he had almost been victimized by gang members as well.

Chavez knew Ruby from the neighborhood since Ruby was around 12 years old. Chavez did not know whether Ruby was officially a gang member then, and he did not have the tattoos until he was older. Chavez saw his tattoos when he was older, and Chavez assumed he was a gang member. Ruby hung out at Chavez's music studio sometimes, but Ruby was not a rapper. Chavez gave Ruby rides on occasion, but he did not drive his car for any gang missions by Mob members against Sureños. He did not drive anyone to a stabbing on Reed Street, and he did not know whether Franco, Ruby, or Tarango were there. Chavez was not present at Dobern Avenue on the evening of March 28, 2008, and he did not know whether Ruby or Tarango were there. Chavez testified that Ruby's claims about Chavez's involvement in these crimes were false.

In January 2007, Chavez was driving to a convenience store when he saw Ruby on the street, and Ruby waved him down for a ride. Chavez was driving with Ruby in the car when Chavez saw a police car behind them with its sirens on. Chavez turned right and was about to pull over when Ruby started panicking and told Chavez not to pull over. Chavez made a right turn, drove slowly for about two or three blocks, and pulled over. Ruby then jumped out of the car and started running. Chavez did not know Ruby had a knife on him when Chavez picked him up.

Chavez did not personally know Franco, but he was in the "background." Chavez was not close to him. Franco may have come to Chavez's studio once or twice, and

33

Chavez had seen him around the neighborhood, but he could not specifically recall talking to Franco, and he did not know whether Franco was a gang member at the time. Chavez only got to know Franco after they were both housed together in county jail. Chavez never met Monique or Trujillo.

Chavez did not know Joseph Tarango and never talked with him. Chavez never owned a black Dodge Intrepid, a black Chrysler 300M, or any black car. Tarango's testimony about Chavez driving up to buy marijuana at Casarez's house was false. Chavez never told anyone, "Trigger and me got one," or anything to that effect.

In June 2010, Chavez was warming up his car to go to work when he heard gunshots and saw people running out of a neighbor's house. He waited until the runners left, and Chavez walked toward the house. Chavez saw Cody Chavez in the driveway.[12] Chavez was not close friends with Cody, but they were friends, and Chavez had let Cody sleep in his car and his room a few times. Chavez did not know whether Cody was officially a Mob member, but Cody hung out with them and Chavez suspected he might be.

Cody had been shot in the stomach. He was panicking and trying to leave as quickly as possible. Cody told Chavez, "I can't be here, I'm on parole, I don't want to get arrested." Chavez saw two other friends who had also been shot. One of them was lying on the ground with blood coming from his head, and the other was yelling that he couldn't move. Cody left. Chavez testified that he did not tell Cody that he could hide in Chavez's music studio.

Neighbors were coming out of the other houses, and Chavez told them to call the police because the gunshot victims needed medical attention. The police came, and Chavez gave them a description of what he saw, but he did not tell them about Cody.

_____

[12] We refer to Cody Chavez as "Cody" to avoid confusion.

The police took Chavez to the police station to interview him further. Chavez never told them about Cody.

After interviewing Chavez, the police dropped him off at his house at 3:39 p.m. Chavez testified that the area was blocked off by the police, and he could not get back inside until later, around 6:00 p.m. or 8:00 p.m. He found a bloodstain on the carpet in his studio, and there was Windex, peroxide, and a brush next to the bloodstain. Chavez denied that he had tried to clean up the bloodstain. His grandmother and sister were living at the house at the time.

Police conducted an extensive yard-to-yard search of the area. At approximately 6:15 p.m., they searched Chavez's studio and photographed the interior. They did not see Chavez there. One of the photos showed the Windex, peroxide, and a brush next to the bloodstain on the carpet.

Chavez was arrested for the charged offenses in November 2012. When the police questioned him, Chavez agreed with the statement that he was an "associate" of Mob members, but he understood that to mean he associated with them in a social sense. Chavez testified that he was not a "gang associate" in the law enforcement sense. He did not have any kind of status in the gang, and he did not commit crimes for them.

Police photos taken of Chavez's bedroom and living area after the Cody Chavez shooting in June 2010 showed clothing lying on furniture, sitting in piles, and hanging in closets. Chavez had a pair of black shoes with a red stripe on the bottom, and there were several red clothing items amongst numerous other clothing items and shoes of other colors. There was also a red hat on a shelf.

None of the photos in evidence show Chavez having any tattoos or throwing gang signs, and he was not identified in any photos of gang members.

### 8. *Testimony of Gabriel Franco*

Franco categorically denied any involvement in the charged offenses, and he denied that he had shot at a house in April 2008. He also denied that he had shot at

Ramirez's mother's house, but he admitted he told Ramirez he had. Franco testified that he lied to Ramirez about the shooting because he wanted to protect another person and he believed he would get "street credit" by doing so.

In the Spring of 2008, Franco was 20 years old. He grew up in the San Jose and Milpitas areas, and he was exposed to gangs when he was around 10 or 11. He admitted he was a member of the West Side Mob starting around 2006, but he testified that he started separating himself from the gang when his son was born in January 2008. He got the Mob tattoo on his neck around the middle of 2008 because he was transitioning out of the gang, and people were questioning his loyalty. He got the tattoo to avoid confrontation and to show he was still loyal to them. He had seven prior juvenile adjudications through 2005, and three misdemeanor convictions through 2008. In 2010 he was convicted of felony car theft and obstruction of justice, and he admitted a gang enhancement. In his testimony, he denied the truth of the gang allegations and testified that his attorney advised him to admit it as part of the plea agreement.

Franco denied ever committing a shooting or a stabbing, and he testified that he bragged about committing violent crimes because the gang would be less likely to pressure him into committing one. Franco testified that Ruby had admitted shooting Sureños at Dobern Avenue and that Tarango was with him. Franco denied telling Monique he had killed someone or showing her a newspaper article about it. He denied inviting Tarango to go scrap hunting and denied telling Tarango anything about the Dobern Avenue or McCreery Avenue shootings. Franco testified that Ruby, Monique, Trujillo, and another witness had all lied about his (Franco's) conduct.

## II. DISCUSSION

### A. *Denial of Motion to Bifurcate the Trial*

Both defendants moved pretrial to bifurcate trial on the gang enhancements, and the trial court denied the motion. Chavez contends the trial court erred under section 1109, which mandates that gang enhancements be tried in a separate phase if the

36

defendant requests bifurcation. Section 1109 was enacted as part of Assembly Bill No. 333 (Assembly Bill 333) and took effect on January 1, 2022, after the conclusion of defendants' trial. (Stats. 2021, ch. 699, § 5.) Chavez argues it applies retroactively to his case under the doctrine of *In re Estrada* (1965) 63 Cal.2d 740 (*Estrada*). While this appeal was pending, the California Supreme Court held section 1109 applies only prospectively because the law did not include an " 'express declaration of retroactivity or a clear and compelling implication that the Legislature intended' " to apply it retroactively. (*People v. Burgos* (2024) 16 Cal.5th 1, 20 (*Burgos*).) Because section 1109 had not been enacted at the time of trial and does not apply retroactively, this claim is without merit.

## B. *Denial of Motion to Discharge a Juror for Cause*

Both defendants contend the trial court erred by denying their midtrial motion to discharge a juror for cause after the juror expressed concern for her safety. The Attorney General contends the trial court acted within its discretion by denying the motion to discharge the juror.

### 1. *Procedural Background*

Three weeks into trial, Juror No. 11 spoke up in open court at the end of the day just before the jury was sent home. The juror addressed the court as follows: "I don't know if this is possible, and I'm only speaking for myself. I am wondering, given the nature of the testimony and recurring people in the audience that, based on descriptions of what gang members look like and tattoos and so on, look possibly as if they're gang members, and it makes me uncomfortable. I don't know if it's required that the audience be open but --" The court told the juror court was required to be open, and the juror continued, "You know, when we first came, [the clerk] called us by name, first name, last name up here, and I was very unsophisticated and said where -- what I do and where I work, and it is -- it is a little bit -- especially when people come in with notebooks taking notes, I mean, it is -- and again, I am only speaking for myself." The court stated that the

37

courthouse had a metal detector and that two bailiffs were present in the courtroom at all times. The juror responded, "I understand you can't do anything. We are walking across the street to that parking lot by ourselves."

The prosecutor then asked the court to confirm that transcripts of the entire voir dire and jury selection were sealed, and the court stated they were.[13] Juror No. 11 then added, "The defendants were here." The record shows the juror sighed audibly. The court reassured the juror about courtroom security, mentioned the possibility of having the jurors escorted to their cars, and told her to inform the bailiffs about any additional concerns. The jury was then sent home for the day.

The next morning, counsel for Franco expressed concern that Juror No. 11 may have formed opinions about the case and requested that the court bring her into court to ensure she could remain fair and impartial. Counsel for Chavez stated that the juror's comments appeared to show she had already made judgments about the case.

The court then called Juror No. 11 into the courtroom in the absence of the other jurors and alternate jurors and asked her if she had any additional concerns. The juror stated she had "really tried to listen to every single thing that the attorneys have said," and that "a curtain has been pulled back on a different population" with different norms from what she had expected. She stated, "I'm not a fearful person in general, but I am risk averse," explaining that she was just asking "an honest question about what was possible." She described the testimony as "very spooky" and "very frightening" but also stated, "I am not frightened." She explained that she just wanted to know if it was possible to close the courtroom, but that if it were not possible, she would be "perfectly fine with that." The court responded that courtrooms in the United States are required to be open and sent the juror out.

_____

[13] The court later clarified that the transcripts had not yet been sealed officially, but that they would be sealed later and nobody could obtain them.

Counsel for Chavez reiterated his concern about Juror No. 11's ability to remain impartial and argued that nothing in her comments had alleviated that concern. Counsel for Chavez requested that the court question Juror No. 11 about whether she could remain fair and impartial. The court stated its belief that she was simply expressing safety concerns and that nothing she said indicated she could not remain fair and impartial.

Five days later, counsel for Franco reiterated his concern about Juror No. 11's impartiality and requested that the court question her as well as the other jurors and alternates given that she made her initial comments in their presence. Counsel added that he was moving to discharge Juror No. 11 for cause, and counsel for Chavez joined the motion. The prosecution argued there was no basis for excusing Juror No. 11 or questioning all the jurors about their ability to remain impartial. The court agreed to question Juror No. 11 but not the other jurors and alternates.

The next day, the court questioned Juror No. 11 in the absence of the other jurors and alternates. The court asked her whether she had formed any opinions about the case, and she responded that she had not. The court also asked her whether she was keeping an open mind and whether she would follow the court's instructions, and she responded affirmatively. The court then asked whether any other jurors had talked to her about how they felt, and she stated there were three other jurors who said they had been similarly concerned. She said they had simply stated that they agreed with her, and that was the end of the conversations. The court asked whether any of them told her they had formed opinions about the case, and she responded that they had not, but "they were similarly worried about the audience being open."

Outside the juror's presence, counsel for Franco requested that the court ask Juror No. 11 to identify the three jurors who agreed with her and that the court question them as well. The court then asked Juror No. 11 for the numbers of the three jurors who agreed with her. She identified one other juror and one alternate juror, but she could not remember who the third person was. She explained that "it was just sort of in the context

39

of a group discussion" that the third person spoke up, and that it might have been someone who just said, "Yeah."

The court then agreed to question each of the other 17 jurors and alternates individually. As to each of them, the court referred to Juror No. 11's initial comments without repeating what she said, and the court asked whether they had formed any opinions, whether they could remain fair and impartial, and whether they could follow the court's instructions. Each juror responded they had not formed any opinions, that they would remain fair and impartial, and that they would follow the court's instructions. Several jurors generally expressed having some concerns about their safety, but none of them had engaged in any extended discussions about the matter.

Counsel for Franco renewed his motion to discharge Juror No. 11 for cause based on her prior statements, adding that it appeared she had discussed the case with other jurors in violation of the court's admonition not to do so. Counsel for Chavez joined the motion, and the prosecution objected. The court denied the motion.

### 2. *Legal Principles*

" 'Under state and federal constitutional principles, a criminal defendant has the right to be tried by an impartial jury.' [Citations.]" (*People v. Mataele* (2022) 13 Cal.5th 372, 394.) The right to a fair trial is also a basic component of due process under both federal and state constitutions. (*Skilling v. U.S.* (2010) 561 U.S. 358, 378; *People v. Ramos* (1984) 37 Cal.3d 136, 153.) "An impartial jury is one in which no member has been improperly influenced [citations] and every member is ' "capable and willing to decide the case solely on the evidence before it." ' " (*In re Hamilton* (1999) 20 Cal.4th 273, 294.) Because the requirement of impartiality applies to each of the 12 jurors, " ' "it is settled that a conviction cannot stand if even a single juror has been improperly influenced." [Citations.]' " (*People v. Nesler* (1997) 16 Cal.4th 561, 578.) That requirement further "imposes upon each juror a duty to maintain impartiality throughout

the trial." (*People v. Mora and Rangel* (2018) 5 Cal.5th 442, 483.) "The loss of impartiality requires dismissal of the juror." (*Ibid.*)

Under section 1089, the trial court may discharge a juror at any time if good cause exists to find the juror is unable to perform their duty. (*People v. Lopez* (2018) 5 Cal.5th 339, 365.) " 'The trial court's decision whether or not to discharge a juror under section 1089 is reviewed for abuse of discretion and will be upheld if supported by substantial evidence; to warrant discharge, the juror's bias or other disability must appear in the record as a demonstrable reality.' [Citation.] A reviewing court does not reweigh the evidence but 'must be confident that the trial court's conclusion is manifestly supported by evidence on which the court actually relied.' [Citation.]" (*Ibid.*)

### 3. *Denial of the Motion to Discharge Juror No. 11 Was Not an Abuse of Discretion*

Both defendants contend Juror No. 11's statements demonstrate she was biased against them. Defendants emphasize her response to the trial court informing her the transcripts of voir dire and jury selection would be sealed, to which she responded, "The defendants were here." Defendants argue that her comments were not merely expressions of general concern for her safety but specifically showed she feared them, implying she had already formed the opinion they were guilty. The Attorney General points out that Juror No. 11 stated she would be "perfectly fine" with continuing to serve; that she confirmed she could remain impartial and follow the court's instructions; and that she had not formed any opinions about the case.

The caselaw does not support defendants' arguments. In a death penalty case where a juror expressly stated she feared the defendant after she discovered her name was revealed to the defendant's family, the California Supreme Court rejected the premise "that a juror's fear of [the] defendant establishes bias or other grounds for discharge." (*People v. Manibusan* (2013) 58 Cal.4th 40, 56 (*Manibusan*).) Manibusan was charged with two counts of first degree murder, one count of attempted murder, and other

41

offenses. (*Id.* at p. 47.) During deliberations in the guilt phase, the jury foreperson sent a note to the trial court stating that her anonymity had been compromised because someone she knew was a close friend of the defendant, and she discovered her name was revealed to members of the defendant's family. (*Id.* at p. 51.) She then stated, " 'As you may understand, this does not make me feel comfortable to continue as a juror in this case. My safety and the safety of my family may be in jeopardy because of this incident. Please accept my request to step down as a juror on this case.' " (*Ibid.*) The trial court questioned the foreperson about the details of her situation in the absence of the other jurors, and she explained how she had discovered her anonymity had been compromised. She stated that her husband had expressed concern and asked her to step down, but she further stated the situation would not affect her verdict, impact her ability to be impartial, or impact her ability to consider the evidence objectively. (*Id.* at p. 52.) She told the court she had become less concerned about the possibility of retribution and rescinded her request to be excused. Defense counsel requested that the trial court replace her with an alternate juror on the ground her statements raised substantial doubt about her ability to remain fair, but the court denied the request. (*Ibid.*) The jury later sent a note asking to replace her as foreperson, and the defense again moved for her discharge on the ground this demonstrated her inability to serve as a juror because of her fear. The trial court again denied the motion.

On appeal, Manibusan argued the trial court abused its discretion by failing to further investigate the possibility of juror bias after the second note from the jury. (*Manibusan*, *supra*, 58 Cal.4th at p. 53.) The Supreme Court rejected this claim, holding that the note did not establish good cause to doubt the foreperson's ability to perform her duties. The Supreme Court further held that even if the note supported an inference that the juror did not want to act as foreperson because of her safety concerns, that inference did not give the trial court reason to doubt her assurances that the situation would not

affect her verdict or impact her ability as a juror to be impartial or to consider the evidence objectively.  (*Ibid.*)

The Supreme Court rejected a similar claim in another death penalty case.  (*People v. Navarette* (2003) 30 Cal.4th 458 (*Navarette*).)  During the prosecution's case in the guilty phase, a juror sent the trial court a note asking whether the defendant had seen or had access to the jurors' questionnaires, explaining that he was concerned for his property and family.  (*Id.* at pp. 499-500.)  Additionally, the clerk told the trial court that the juror had also indicated other jurors shared the same concern.  Defense counsel raised the issue of the juror's ability to remain impartial, but the trial court declined to question the juror individually.  Instead, the trial court told the entire jury that "no one other than the court, the clerk, and counsel had seen the questionnaires, that they would be placed under seal, and that the identities of specific jurors would not be public information."  (*Id.* at p. 500.)  The trial court also encouraged the jurors to inform the court if any of them felt unable to be fair and unbiased.  On appeal, the Supreme Court rejected Navarette's claim that the juror's expression of safety concerns demonstrated he was biased against Navarette.  (*Ibid.*)  The Supreme Court held that the record belied this inference of bias because the juror did not pursue the matter after the trial court informed the jury the questionnaires would be sealed and jurors' identities would not be made public, suggesting the juror was satisfied by these assurances.

*Manibusan* and *Navarette* are both on point.  In both cases, a juror explicitly stated safety concerns based on the possibility the defendant would discover their identity, and in both cases the Supreme Court found no abuse of discretion by the trial court declining to take further action once the juror indicated they could remain impartial.  In both cases, the Supreme Court rejected the inference that a juror's expression of safety concerns showed bias toward the defendant or demonstrated that the juror could not remain impartial.  Neither Chavez nor Franco addressed these cases in their opening briefs, and their attempts to distinguish the cases in their reply briefs are unpersuasive.  And neither

defendant cites a case in which a court of review held it was error for a trial court not to discharge a juror based on the juror's expression of fear or concern for safety in connection with the defendant learning their identity.

Defendants rely instead on cases concerning a trial court's discharge of a juror who prejudged the credibility of law enforcement officers testifying as witnesses. (See *People v. Barnwell* (2007) 41 Cal.4th 1038, 1053 (*Barnwell*) [trial court's discharge of juror who prejudged credibility of testifying police officers was not erroneous]; *People v. Feagin* (1995) 34 Cal.App.4th 1427, 1437 [same]; *People v. Thomas* (1990) 218 Cal.App.3d 1477, 1485 [same].)

Chavez also cites *People v. Powell* (2018) 6 Cal.5th 136, in which the trial court discharged "an emotionally fragile, frightened, and confused juror whose past experiences led her to identify herself both with [a] prosecution witness . . . and with the defendants. At the same time, she became fearful of the defendants when they looked at her." (*Id.* at p. 156.) The Supreme Court held it was within the trial court's discretion to discharge the juror based on a finding that she was "emotionally unable to discharge her duty to decide the case impartially." (*Ibid.*)

None of these cases are based on comparable facts, and in all of them, the reviewing court deferred to the trial court's findings to hold that discharging a juror was not an abuse of discretion. Here, defendants ask that we reject the trial court's credibility determination and hold that refusal to discharge was an abuse of discretion. None of these cases support that position.

The trial court found Juror No. 11 could remain impartial towards both sides based on the juror's assurances to the court that she could do so. Defendants contend the trial court should have disbelieved her based on the other comments she made, but on review we generally defer to the trial court's factual determinations. (*Barnwell, supra*, 41 Cal.4th at p. 1053.) The trial court's determination that Juror No. 11 was impartial was supported by substantial evidence in the form of her assurances to the court, and the

44

record shows no "demonstrable reality" of bias. (*Ibid.*) We conclude the denial of defendants' motion to discharge Juror No. 11 was not an abuse of discretion. This claim is therefore without merit.

### C. *Admission of Gangster Rap Lyrics*

Both defendants contend the trial court erred by admitting gangster rap lyrics from two compact discs (CDs) that included music Chavez recorded and mixed. Both defendants argue the lyrics were inadmissible under a retroactive application of Evidence Code section 352.2, which was added to the Evidence Code by Assembly Bill No. 2799 (Assembly Bill 2799) effective January 1, 2023. (Stats. 2022, ch. 973, § 2.) Chavez further contends the lyrics had little or no probative value and were unduly prejudicial, such that their admission violated Evidence Code section 352 and his due process rights. Franco does not raise any claims based on the admission of the lyrics under Evidence Code section 352.

The Attorney General contends Evidence Code section 352.2 does not apply to this case retroactively, and that Franco forfeited the claim by failing to object. The Attorney General further contends admission of the lyrics for use against Chavez was not an abuse of discretion under Evidence Code section 352.

For the reasons below, we conclude Evidence Code section 352.2 does not apply retroactively. We then address the admissibility of the evidence for use against Chavez under Evidence Code section 352 and related law.

### 1. *Evidence Code Section 352.2 Does Not Apply Retroactively*

Evidence Code section 352.2, subdivision (a) provides, "In any criminal proceeding where a party seeks to admit as evidence a form of creative expression, the court, while balancing the probative value of that evidence against the substantial danger of undue prejudice under Section 352, shall consider, in addition to the factors listed in Section 352, that: (1) the probative value of such expression for its literal truth or as a truthful narrative is minimal unless that expression is created near in time to the charged

45

crime or crimes, bears a sufficient level of similarity to the charged crime or crimes, or includes factual detail not otherwise publicly available; and (2) undue prejudice includes, but is not limited to, the possibility that the trier of fact will, in violation of Section 1101, treat the expression as evidence of the defendant's propensity for violence or general criminal disposition as well as the possibility that the evidence will explicitly or implicitly inject racial bias into the proceedings."  Subdivision (b) sets forth three nonexclusive categories of evidence the trial court shall consider in this analysis if such evidence is proffered and relevant to the issues.

The Legislature enacted Evidence Code section 352.2 in Assembly Bill 2799, effective January 1, 2023.  Evidence Code section 352.2 was not in effect at the time of trial, but both defendants contend it applies retroactively to their case, and that under this section the trial court erred by admitting the rap lyrics.  The Attorney General does not dispute that the rap lyrics at issue in this case would constitute "a form of creative expression" as defined in subdivision (c) of that section.  Rather, the Attorney General contends Evidence Code section 352.2 does not apply retroactively, and that even if it did, any error was harmless.

Neither Assembly Bill 2799 nor Evidence Code section 352.2 contain any express statement of retroactive application.  "Ordinarily, statutes are presumed to apply only prospectively, unless the Legislature expressly declares otherwise.  This well-settled principle is codified at section 3 of the Penal Code and appears in other codes as well." (*Burgos*, *supra*, 16 Cal.5th at pp. 7-8.)  However, under the doctrine of *Estrada*, *supra*, "an amendment to a statute that reduces the punishment for a particular criminal offense gives rise to an inference that the statute applies retroactively to all judgments not yet final on appeal." (*Burgos*, at p. 12.)

Defendants contend the *Estrada* doctrine makes Evidence Code section 352.2 retroactive, citing the Legislature's statement of intent as follows:  "It is the intent of this Legislature to provide a framework by which courts can ensure that the use of an accused

46

person's creative expression will not be used to introduce stereotypes or activate bias against the defendant, nor as character or propensity evidence; and to recognize that the use of rap lyrics and other creative expression as circumstantial evidence of motive or intent is not a sufficient justification to overcome substantial evidence that the introduction of rap lyrics creates a substantial risk of unfair prejudice." (Stats. 2022, ch. 973, § 1.) The Legislature preceded this statement by finding, "[A] substantial body of research shows a significant risk of unfair prejudice when rap lyrics are introduced into evidence," with citations to three social science journal articles on the topic. (*Ibid.*) Defendants argue the Legislature's statement of intent together with the potential for reduced culpability and thereby lesser punishment under the new section demonstrate its ameliorative nature.

Defendants rely on *People v. Venable* (2023) 88 Cal.App.5th 445 (*Venable*), review granted May 17, 2020, S279081. In *Venable*, the Court of Appeal for the Fourth District, Division Two, held Evidence Code section 352.2 applies retroactively. In addition to the above legislative statements, the *Venable* court cited comments on the Assembly floor stating, " ' "[R]ap lyrics and other creative expressions get used as 'racialized character evidence: details or personal traits prosecutors use in insidious ways playing up racial stereotypes to imply guilt.' The resulting message is that the defendant is that type of Black (or Brown) person . . . . 'There's always this bias that this young Black man, if they're rapping, they must only be saying what's autobiographical and true, because they can't possibly be creative.' " ' " (*Id.* at pp. 454-455.) The court concluded Evidence Code section 352.2 operates retroactively because it "provides defendants of color charged with gang related crimes an ameliorative benefit, specifically, a trial conducted without evidence that introduces bias and prejudice into the proceedings, limitations designed to increase the likelihood of acquittals and reduce punishment for an identified class of persons." (*Id.* at p. 456.)

47

The Attorney General relies on *People v. Ramos* (2023) 90 Cal.App.5th 578 (*Ramos*), review granted July 12, 2023, S280073. In *Ramos*, the Court of Appeal for the Fourth District, Division One held Evidence Code section 352.2 only operates prospectively. The court concluded the section is not ameliorative under *Estrada*: "Even though Evidence Code section 352.2 may, in many instances, end up being beneficial to a criminal defendant in that it may result in the exclusion of evidence favorable to the People, it is not a statute that creates the possibility of *lesser punishment* or any other type of more lenient treatment. It is also not a statute that *reduces criminal liability*, such as by altering the substantive requirements for a conviction or expanding a defense. Instead, the Legislature's findings and declarations show that Evidence Code section 352.2 was enacted to prevent the admission of unfairly prejudicial evidence when not warranted in the circumstances of a particular case." (*Ramos*, at pp. 595-596.)

The Court of Appeal for the Third District agreed with *Ramos* in *People v. Slaton* (2023) 95 Cal.App.5th 363, 372-373 (*Slaton*), review granted Nov. 15, 2023, S282047. The *Slaton* court reasoned that Evidence Code section 352.2 is not ameliorative under *Estrada* because it "does not alter the punishment or other consequences for an offense. It does not, by design or function, reduce the possible punishment for an offense. It does not change the substantive offense or penalty enhancement for any crime." (*Slaton, supra*, 95 Cal.App.5th at pp. 372-373, review granted Nov. 15, 2023, S282047.)

The California Supreme Court's retroactivity analysis in *Burgos* persuades us that the analyses in *Ramos* and *Slaton* are correct about the prospective-only operation of Evidence Code section 352.2. The *Burgos* court held the recently amended version of section 1109, which gives defendants the option to demand a bifurcated trial on gang enhancements, did not operate retroactively. (*Burgos, supra*, 16 Cal.5th at p. 20.) The court concluded the statute was not ameliorative for the purposes of the *Estrada* doctrine because, "By its terms, section 1109 does not directly or potentially reduce the punishment for an offense. Nor does it change the elements of a substantive offense,

48

defense, or penalty enhancement. Likewise, it does not create an alternative avenue for certain individuals to receive lesser or no punishment." (*Burgos,* at p. 21.) The court considered the legislative findings and statements of intent in the enacting law and concluded they did not demonstrate the Legislature intended for section 1109 to apply retroactively. Rather, the Legislature amended section 1109 "[i]n an effort to minimize the potentially prejudicial impact of gang evidence." (*Ibid.*)

The legislative findings and statements in Assembly Bill 2799 may be characterized identically. And like section 1109, Evidence Code section 352.2 does not reduce the punishment for an offense, change the elements of an offense or enhancement, or create an alternative avenue for persons to receive lesser or no punishment. These similarities compel the conclusion that Evidence Code section 352.2 only operates prospectively.

Even assuming Evidence Code section 352.2 applied retroactively, we would conclude Franco's claim does not merit relief. In the first place, it is not clear that all the lyrics were inadmissible against Franco. Whereas Chavez did not write or perform any of the lyrics, Tarango identified Franco's voice in one of the rap tracks admitted into evidence. The rapper in that track also identified himself as "Trigger loc," referencing Franco's gang moniker, "Trigger." Furthermore, as set forth below in section C.II.3, the track featuring Franco was published in 2007. By contrast, with the exception of one track, most of the lyrics used as evidence against Chavez were written, recorded, and published in 2004 or earlier, around four or more years before the charged offenses took place. Thus, as to the track featuring Franco, the lyrics of that track had somewhat more probative value for use against Franco as compared with Chavez. (See Evid. Code, § 352.2, subd. (a) [the trial court shall consider whether the creative expression was created near in time to the charged offense].)

In any event, any error with respect to Franco was harmless. The other tracks not featuring Franco had less probative value as to the charges against him, but other

49

evidence of his guilt was much stronger than the evidence against Chavez. Monique, who drove the car for the McCreery Avenue shooting, testified as an eyewitness to Franco's active participation in the shooting, and she corroborated the testimony of Ruby and Tarango with respect to Franco's involvement in the other offenses. And the evidence that Franco was a Mob member was overwhelming. He admitted he was an active Mob member at least until January 2008, and his claim that he was transitioning out of the gang at the time of the charged offenses was belied by evidence that he got a Mob tattoo on his neck in the summer of 2008. While the rap lyrics may have been cumulative evidence on that point, it is unlikely the jury's finding of Franco's gang status was affected by the admission of the lyrics. Finally, the prosecutor's use of the rap lyrics evidence was far more focused on Chavez, such that any prejudicial impact of the lyrics on Franco was much weaker by comparison. We would conclude that even if undue prejudice from the lyrics substantially outweighed their probative value with respect to the charges against Franco, it is unlikely the jury's findings as to his guilt were influenced by the lyrics.

Accordingly, even assuming the trial court erred under a retroactive application of Evidence Code section 352.2 by admitting the lyrics as evidence against Franco, there is no reasonable probability the outcome of the trial with respect to him would have been more favorable had the rap lyrics been excluded. We conclude any error with respect to Franco was harmless beyond a reasonable doubt, such that he was not prejudiced under either the state law standard or the federal standard. (See *Chapman v. California* (1967) 386 U.S. 18, 24 (*Chapman*) [the reviewing court must reverse the conviction unless, after examining the entire cause, including the evidence, and considering all relevant circumstances, the court determines the error was harmless beyond a reasonable doubt]; *People v. Watson* (1956) 46 Cal.2d 818, 836 (*Watson*) [the error requires reversal if it is reasonably probable that a result more favorable to the appealing party would have been

50

reached in the absence of the error].)  As to Chavez, we set forth our reasoning below in the application of Evidence Code section 352.

### 2. The Denial of Chavez's Motion to Exclude the Lyrics Under Evidence Code Section 352

Chavez contends the trial court's admission of the lyrics was an abuse of discretion under Evidence Code section 352 and a violation of his due process rights.  He argues the lyrics had little or no probative value because he did not write or sing any of them, and he points to the highly prejudicial nature of the content of the lyrics, which included many references to violence against the police as well as violence more generally.  The Attorney General contends admission of the lyrics for use against Chavez was not an abuse of discretion under Evidence Code section 352 because the lyrics were probative of Chavez's motive, intent, participation in a common plan, and identity.  The Attorney General does not dispute that Chavez was not the author or singer of the lyrics.  Rather, the Attorney General maintains Chavez was a "driving force" behind the creation of the music because it was recorded in his studio, produced under his label, and featured Chavez's background "beats."

### a. Evidence Code Section 352 and General Legal Principles Governing the Admissibility of Gangster Rap Lyrics

"The court in its discretion may exclude evidence if its probative value is substantially outweighed by the probability that its admission will (a) necessitate undue consumption of time or (b) create substantial danger of undue prejudice, of confusing the issues, or of misleading the jury." (Evid. Code, § 352.)  "An appellate court reviews a court's rulings regarding relevancy and admissibility under Evidence Code section 352 for abuse of discretion.  [Citations.]  We will not reverse a court's ruling on such matters unless it is shown ' "the trial court exercised its discretion in an arbitrary, capricious, or patently absurd manner that resulted in a manifest miscarriage of justice." [Citation.]' [Citation.]" (*People v. Merriman* (2014) 60 Cal.4th 1, 74.)

51

"Evidence of the defendant's gang affiliation—including evidence of the gang's territory, membership, signs, symbols, beliefs and practices, criminal enterprises, rivalries, and the like—can help prove identity, motive, modus operandi, specific intent, means of applying force or fear, or other issues pertinent to guilt of the charged crime. [Citations.]" (*People v. Hernandez* (2004) 33 Cal.4th 1040, 1049.) Courts have recognized, however, that some gang evidence, "even as it relates to the defendant, may be so extraordinarily prejudicial, and of so little relevance to guilt, that it threatens to sway the jury to convict regardless of the defendant's actual guilt." (*Ibid.*) "Trial courts must 'carefully scrutinize' gang-related testimony before admitting it into evidence, because the content of such testimony 'may have a highly inflammatory impact on the jury.' " (*People v. Flores* (2020) 9 Cal.5th 371, 402 (*Flores*).) (See also *People v. Mendez* (2019) 7 Cal.5th 680, 691 ["We recognize that gang-related evidence 'creates a risk the jury will improperly infer the defendant has a criminal disposition' and that such evidence should therefore 'be carefully scrutinized by trial courts.' "]; *People v. Albarran* (2007) 149 Cal.App.4th 214, 224 (*Albarran*) ["[E]ven if the evidence is found to be relevant, the trial court must carefully scrutinize gang-related evidence before admitting it because of its potentially inflammatory impact on the jury."])

### 3. Factual and Procedural Background for Admission of the Lyrics

Chavez had a music studio in his grandmother's back yard where he made and recorded music. Others in the neighborhood would come to the studio to record music with his assistance. Some of the participants were members and former members of the Mob who would record gangster rap at the studio. Chavez would provide background beats and rhythms, and other people would rap lyrics over them while Chavez recorded them. Chavez did not rap himself, and he did not write any rap lyrics.

In 2003, Chavez and former Mob member Javier Garcia formed a business called "Beat Down Records" for the purpose of making, producing, and selling music CDs. In

2004, Chavez and Garcia made a CD labeled "Prisonors of War" [*sic*] on one side and "What Goes Around Comes Around" on the other side.[14]

In 2007, another rapper published a CD titled "City of Sharks," which was a compilation of 21 gangster rap tracks created by various artists. Chavez is credited as having "produced" three of the tracks on the "City of Sharks" CD, but the lyrics for only one of those three tracks ("4 dots") were offered into evidence. In 2011, police searched Chavez's car and found copies of a promotional flyer for the "City of Sharks" CD.

### a. The Contents of the Lyrics

The lyrics on both CDs generally consist of violent bragging from a gangster's perspective about how dangerous and dominant he and his gang are, while incorporating rhyme, wordplay, gangster lingo, and Spanish. For example: "Gucci's got a gang that will silence your armada. Motherfuckers you die. Chavalas you ain't nada. Rot if I gotta. In the end you shotta." The lyrics are voiced mostly in the present tense, for example: "All the homies in the hood, they are stepping it up. And these punk ass pigs still waiting for blood. If everybody wanting to know, there ain't no love. Pistol whipping [unknown] splittin' and all of the above." However, the lyrics include occasional references to the past, for example: "I was thirteen years old when I got this strap and busted bitches I'm jumping out of cars and fucked up these snitches I make them bleed and suffer like a Northern Holocaust." Some statements are general threats of future violence, for example, "Guns don't kill punks, thugs do, so that's exactly what I'm gonna do," and, "Shoot your shot cause I'm going to shoot mine." General references to killing and violence are ubiquitous, often with the victims described by generic derogatory terms like "punks," "suckers," or "motherfuckers."

---

[14] The record does not indicate which of these phrases was the actual title of the CD. The parties used both phrases as the title at different times, often with the correct spelling of the first word, e.g., "Prisoners of War." The prosecution also referred to it using an abbreviated version of the longer phrase ("What Goes Around"). We will refer to it as the "Prisonors of War" CD.

The lyrics include multiple references to violence towards "scraps" specifically, for example: "Northern Cali where I reside, any question try to kill a scrap, strangle that mother fucker and I just don't give a fuck," and "City where the scrapas lost. North is home. Murders come with smiles," and "In the hood we murder scraps." In all, the lyrics contain nine references to scraps or "scrapas."

The lyrics also contain multiple references to shooting and killing the police, as typified by a line repeated several times in "4 dots" on "City of Sharks": "Bloody - shot, two shots watch them watch them all bleed, fuck the cops three shot watch them all run give the Mob four guns." Similarly, in "The City of Sharks (Remix)," a track from the same CD, the gangster exclaims, "Shots and sirens are the only sound, Rats get scraped off my block, Save a few shots for the cops, In any situation I'm facing altercations, murder, death, kill, my only motivation."[15]

The lyrics reference the Mob in six tracks, and of those six tracks, four also reference the "West Side." For example, a track on "Prisonors of War" includes the lines, "Everybody know in the city this is mob. Fuck plain we lain motherfuckers in the casket." Another track on that CD mentions "the war zone of the Alma," an apparent reference to Alma Avenue. In three tracks, the rapper self-identifies as "Frank Gucci" or "Gucci."

### b. The Trial Court's Denial of the Motion to Exclude the Lyrics Under Evidence Code Section 352

Chavez moved pretrial to exclude the CDs, transcripts of their lyrics, and the promotional flyer based on several sections of the Evidence Code and the First Amendment. He argued the CDs and their contents were irrelevant because he did not

---

[15] The reference to "Rats" is ambiguous. The prosecution's gang expert testified that Norteños sometimes referred to Sureños as "sewer rats," but gang members also used the term to refer to informants for the police. One line from another track also included the verb form of the term: "So many killings in the hood they rat on our rivals. If they talk the talk, walk the walk, no talking to 5-0s."

author any of the lyrics; that they would constitute inadmissible propensity evidence under Evidence Code section 1101; and that the danger of undue prejudice from the violent, gang-related nature of the lyrics outweighed any probative value under Evidence Code section 352. He further argued that admission of the CDs would violate his First Amendment rights to free speech and free assembly.

The prosecution argued the evidence was highly relevant to show Chavez's motive and intent, and that it would corroborate Ruby's testimony that Chavez participated in the Reed Street stabbing and Dobern Avenue shooting. The prosecution asserted the lyrics in the music specifically referenced the Mob and its members' hatred for Sureños, and that Chavez's involvement in making the CDs was relevant to show he shared the same motives. As to the fact that Chavez did not write the lyrics, the prosecution argued it was sufficient that he produced the music and promoted the CDs.

The trial court denied the motion on the grounds the evidence was relevant to intent and motive. The court told Chavez he could argue to the jury that he did not write the lyrics, but the court ruled the evidence was admissible, finding, "A producer plays a great role in . . . making sure music gets to the public."

Chavez later renewed his motion to exclude the CDs and lyrics at the close of evidence as the trial court was ruling on the admissibility of various exhibits. Chavez argued again that he did not author any of the lyrics. He further argued that the lyrics for some tracks had never been authenticated and the author of the lyrics for the "City of Sharks" tracks had never been identified. Franco joined the motion.

The court denied the motion again and admitted transcripts of the lyrics for ten tracks selected from the two CDs: eight tracks from "Prisonors of War" and two tracks from "City of Sharks." The trial court also admitted photos of the cover and inner sleeves for "City of Sharks," which listed the track titles and credits, and the court admitted an audio clip from a track titled "City of Sharks (Remix)" from the "City of

55

Sharks" CD. Except for that audio clip, the audio tracks of the CD were not offered into evidence. Finally, the court admitted a promotional flyer for the "City of Sharks" CD.

The prosecution played the audio clip from "City of Sharks (Remix)" for the jury and provided jurors with a transcript of the lyrics. The clip featured the voices of three different rappers. Joseph Tarango testified that he recognized one of the voices as Franco's. The lyrics for that portion of the track included, "Trigger loc, catch them if you can, I'm like the gingerbread man[.] With the gauges in my hand, doing dirt putting in work with the homies from the hood, Still up to no good, leaving enemies defenseless as I'm leaving the scene."

### c. Gang Expert Testimony Concerning Gangster Rap and the Contents of the Lyrics in Evidence

Whittington, the prosecution's gang expert, bought the "City of Sharks" CD from a local music shop on Amazon. He testified that he listened to the "4 dots" track from the CD. He opined that the title "4 dots" was Norteño-related, and that some of the lyrics in the track were related to the Mob. The expert recited several portions of the lyrics aloud in his testimony. Among other things, he explained how the references to "Northern" related to the Norteño gang, and how some of the lingo used in the lyrics related to the Norteño gang structure, history, and symbology. He opined that the lyrics in "4 dots" were "geared towards San Jose Nortenos."

Whittington testified that in his experience gang members listen to this kind of music because it glorifies their lifestyle and sends a message of violence to the community. He testified, "This is basically something to motivate people to fear the Mob as well as motivate members of the Mob to do violence." Based on his experience with gangs generally, Whittington opined that gangs use rap lyrics for recruitment and to "mobilize their foot soldiers." He added that they were used "for the purpose of spreading violence," and "to get gang members revved up prior to an assault, to get them ready to go into battle."

56

Whittington also testified that gangster rap is a genre of music that some people listen to purely for entertainment. He conceded he did not have any evidence that there were more gangsters who used it to get "revved up" than there were nongang persons who listened to it for enjoyment.

Whittington opined that Javier Garcia's "affiliation" was with the Mob in 2008. As to Chavez, Whittington opined that Chavez was a "member" of the Mob in 2008. Whittington testified that one of the factors he relied on in forming this opinion was "the fact that [Chavez] was the one who produced the lyrics or was a part of the production of Norteno-related propaganda."

### d. *Testimony of Javier Garcia About His Role in Making the Music*

The prosecution introduced testimony from Javier Garcia, Chavez's partner in the Beat Down Records business. Garcia first got involved with the Mob when he was "jumped in" against his will at the age of 12 or 13. He left the Mob in 1997 and was no longer active in the gang in 2004. Garcia conceded he was convicted of a gang-related assault in 2004, but he asserted it was a wrongful conviction.

Garcia met Chavez through a cousin around November or December 2003 when Garcia heard about Chavez making music. Garcia was 28 or 29 years old at the time, and he was about ten years older than Chavez. Garcia's only contacts with Chavez involved making music. By 2003, gangster rap had started "catching on generally in society," and Garcia saw it as a business opportunity. He had been working on writing songs and thought he could make money off them, but the studio recording people he was working with were unreliable. Garcia had heard about Chavez's studio, so Garcia went there to see if he could record his songs. When he saw Chavez's equipment and heard the music he was making, Garcia realized Chavez had the necessary knowledge and skill, so Garcia proposed that they collaborate to make and sell music.

Garcia came up with "Beat Down Records" as the name of the business. In 2003, Garcia filled out a fictitious business name form for "Beat Down Records" listing himself

57

and Chavez as co-owners, and Garcia filed it with the county. Both Garcia and Chavez signed the form, and for the principal place of business, Garcia listed Chavez's address at his grandmother's house on Sanborn Avenue where the studio was located. The intent of the business was to make money by selling CDs. Garcia testified he sold CDs in local stores like Streetlight and Rasputin's, and eventually by digital distribution through websites like CDBaby.com, iTunes, and others.

In 2004, Garcia and Chavez published the "Prisonors of War" CD. Garcia testified that it was produced in 2003, and the CDs were pressed in 2004. Garcia used the name "Frank Gucci" for the CD. The front cover displayed the name "FRANK GUCCI" in large black letters using a red font dripping with blood, and the reverse side of the cover showed a photograph of Garcia in 1996 standing between two large men with menacing expressions. Garcia testified that they were Northerners who had been incarcerated with him. He knew one of them only as Curtis, and he did not know the other person but referred to him as "E." When the prosecutor asked Garcia why he would feature a photo of someone unknown to him on his CD, Garcia replied, "It's all propaganda. Just an image."

The back cover of the CD credited Frank Gucci as the "Executive Producer." The back cover featured a drawing of two men using weapons to attack a third man lying on the ground. Garcia testified that he produced the CD, and he had an artist create the drawing. The credits stated, "All songs written and performed by Frank Gucci," and "All Tracks Mixed and Engineered by Juice," except for one track. Garcia testified that "Juice" was Chavez. The credits further stated that all tracks were recorded at "Beat Down Facilities," and the CD was mastered at another studio.

Garcia testified that he wrote all the lyrics; Chavez did not write any of them. Chavez was not a rapper, he did not sing, and he did not produce the CD. Chavez created digital beats using a Roland 303 and a Roland 505, and he recorded Garcia rapping over them. Garcia explained, "[Chavez] didn't really create none of my album at all. All he

58

did was push a button and record me and make some of the beats.  Outside that, the -- the artwork, the people who mix and mastered it for me, the guy who did the graphics -- those are all different people."  Garcia testified that, as the executive producer, he paid for all those services with his own money.

The prosecutor questioned Garcia at length about the lyrics.  Garcia testified that "a good portion" of the lyrics were about the Mob, and that the word "scraps" in the lyrics was a derogatory term used "in a hateful way" against Southerners.  When asked whether the lyrics were bragging about the Mob being violent, Garcia replied, "The whole album is bragging about being violent."  He characterized it as specific to his own personal experiences with the Mob, not the Mob more generally, explaining that it was "[a]bout me, not West Side Mob.  About all my stuff.  Me.  I talk about me.  This my album.  This album is about me.  About my past."  Garcia testified that the lyrics were an expression of what life was like for him as a gangster in the 1990s, and they were not about current events.  He characterized some of the lyrics as exaggerations.

When the prosecutor asked about the literal meaning of terms like "war zone," Garcia stated it was "just a saying," and "it's smoke.  It's music promotion."  Garcia agreed that "Alma" referred to a real street—Alma Avenue, where he grew up, and which was controlled by the Mob.  Garcia agreed that the Mob was a real gang, and that the lyrics bragged about killing Southerners, who are a real gang.  But Garcia denied that he had actually killed anyone and stated he was writing for entertainment purposes.  He added, "It's just music. . . . you're making into . . . real life. . . . Arnold Schwarznegger is being the Terminator.  It's just a song."

When the prosecutor asked whether Chavez had any problem with the lyrics, Garcia replied, "To be honest with you, he would have no say so over my album."  Garcia stated the partnership did not give Chavez any rights over the lyrics, adding, "This is still my album. . . . [D]oing business together as partners and music does not give him any kind of say so on my album."

Apart from "Prisonors of War," Garcia and Chavez did not make any other CDs together. Chavez later abandoned the venture, and Garcia took over Beat Down Records as sole owner by filing paperwork to put it under his own name.

### e. Hugo Chavez's Testimony About the Music and the Lyrics

Chavez testified that when he was a young kid, he had seen Garcia around the neighborhood. Chavez assumed Garcia was involved in a gang based on his appearance, and Chavez was aware Garcia had a reputation as a Mob member. Garcia was older than Chavez, so they "didn't really build a relationship" until sometime around 2002 when Garcia came over to Chavez's studio and asked him to make a rap beat. Garcia never talked to Chavez about Garcia's criminal history or gang membership.

Chavez testified that he was only interested in working with Garcia for the music and the possibility of making money from it. Chavez had grown up on rap, listening to the music of Snoop Dog, Jay-Z, Tupac, and other rappers. When he was young and first started making music, he found it rewarding just to create something, and "all of a sudden" he was creating "something sounding very nice, very cool." Chavez knew there was a huge national and international market for gangster rap; people would buy it just because it was coming from California. He saw the rappers coming to his studio as trying to "come up" and make money the same way rappers like Snoop Dog and Tupac had. Chavez testified, "I think we had a dream of just becoming -- making money and maybe becoming rich off of making music CDs, you know."

Chavez testified that the "Prisonors of War" CD was mostly Garcia's project, and Chavez assisted him with it. Chavez just created the instrumentals and recorded Garcia for the most part. Chavez testified that the purpose of creating the CD was monetary, not to promote the Mob. He had nothing to do with making any of the artwork on the cover of the CD. Garcia did all the marketing for it, but Chavez was aware it was sold on iTunes. Chavez and Garcia did not make any more CDs together because they had some disagreements and a "fall-off" after that CD, so they split up.

The rapper who produced the "City of Sharks" CD went by the name "Mr. 21." The CD is a compilation of tracks from artists all around the San Jose area, and Chavez gave Mr. 21 three tracks that he included on it. Chavez did not write any of the lyrics in them. In 2007, Mr. 21 gave Chavez the "City of Sharks" promotional flyers that the police later found when they searched Chavez's car in 2011. Chavez agreed that he had an "interest" in promoting the CD because he was listed in the credits and it would "get my name out there," but he "didn't really put effort" into promoting it.

Chavez never personally made or produced a whole CD. Chavez did not rap either; he only provided the music for other people, and they controlled the other aspects. A variety of people came to Chavez's studio, and some played other kinds of music like modern rock guitar and reggaeton. Chavez opened the door to anyone, and people heard about the studio through word-of-mouth. Chavez named several other artists who paid him for recording services or purchased his background beats. When asked if he was ever concerned about the subject matter of the rap lyrics people were singing, Chavez replied that it was "just not my place" to tell them not to make a certain kind of art, and it would be disrespectful to tell someone they cannot express themselves a certain way. So when Garcia and others rapped about violence, Chavez did not talk with them about it.

Chavez listened to the words as he was recording Garcia, but at the time, Chavez did not think the words were promoting violence. Chavez agreed that some of the lyrics were "violent in their own nature," but he did not take the words as literal truth, or as things that were actually going to happen. Chavez conceded that Garcia's lyrics referred to the Mob, which was a real gang; that the lyrics referenced Alma Avenue, which is a real street; and that the lyrics talked about shooting Southerners, who are a real group of people. But Chavez said he saw it as word play for the most part, adding, "A lot of it's a façade, trying to sell an image" to sound cool and gain sales.

On cross-examination, the prosecutor asked Chavez whether the name of the business made it seem like "a business that is oriented toward violent hard-core gangster

rap," and Chavez conceded that it did. Chavez conceded that in previous testimony he had said the lyrics from some rappers promoted violence, but he did not feel that was absolutely true after hearing other people and their explanations. Chavez conceded that in prior testimony, when the prosecutor had asked Chavez if he "made it a business of yourself to make money off promoting violence," he had answered "yes." Chavez testified that it was his goal to make more commercial music, and that there was a process a lot of rappers go through: They would start out rapping about their background on the streets to gain credibility, and then progress into making more commercial music, as Jay-Z had done.

Chavez testified that he was aware some gang members got pumped up and excited when they rapped along to the music, but he did not believe the music he recorded was going to be used to carry out actual violence on the street. He had never seen anyone listen to gangster rap and start committing acts of violence. He never sat in a car with gang members listening to gangster rap getting pumped up before they got out to beat down or kill a Sureño.

Chavez testified that it was his idea to file for a fictitious business name for Beat Down Records. When asked how they came up with the name, Chavez replied that it was mostly him who came up with it but that Garcia liked it. Chavez liked the double-meaning and how it reflected Chavez's musical background, while Garcia liked how it reflected his background of having grown up involved in gangs. The graphic on the CD was Garcia's creation. Chavez had his own logos made to emphasize the musical aspect by using an image of an equalizer, and he used them when advertising the business on social media.

### f. The Testimony of Edward Kelley

Edward Kelley was a regional sales manager for a technology company, and he also had experience in DJ'ing and music production. His musical alias was "D.J. Phonic." Kelley met Chavez through a mutual friend around 2000 or 2001. Based on

their shared skills and interests in making music, Kelley and Chavez decided to collaborate. They made music together at Chavez's studio for about three years from 2001 to 2004. Various singers, lyricists, and rap artists would request music that Chavez or Kelley had made, and they would record the artists singing the vocals to it. Javier Garcia occasionally came by to record vocals for various projects he was working on.

Chavez and Kelley had "kind of like a catalog" of music instrumentals they had created, and the artist would listen to them. If the artist found one they liked, they would buy it for $50 or $100, and Chavez would also get paid for his time mixing and engineering the recording. Kelley described Chavez as a "producer," meaning he would make the instrumentals and use his digital audio workstation to record the artists.

Kelley testified that he (Kelley) "produced" one of the tracks on "Prisonors of War." Kelley confirmed that the credits on the CD sleeve for that track, stating "Mixed and engineered by D.J. Phonic," referred to him. It was mainly Chavez who mixed and recorded the artists on the CD, and sometimes Kelley would assist him by "giving it a better set of ears," but Kelley mixed and engineered that specific track.

On cross-examination, the prosecutor asked Kelley about a portion of the lyrics for the track he produced on "Prisonors of War." The lyrics included a reference to "our rivals" followed by, "I'll kill those motherfuckers when I may be too high, though." When asked whether he believed it was fictional or an "actual shared belief of a real gang member," Kelley testified that he believed it was fictional. Kelley knew that Javier Garcia was associated with the Mob. Kelley testified that he would not participate in it if he knew it was actually calling for murdering someone. He did not believe that any of the lyrics on the CD had any real connotations.

### g. The Testimony of Benjamin Campbell

Benjamin Campbell was a building inspector for San Mateo County. He had known Chavez for 27 or 28 years. Campbell's family had tried to adopt Chavez when he was a child, and Campbell considered Chavez to be like a cousin. Campbell considered

Chavez to be a gentleman and believed he was courteous, loving, intelligent, ambitious, and thoughtful.  Campbell testified that he did not listen to the gangster rap that used Chavez's music, but the violent nature of the lyrics would not change his opinion of Chavez because Chavez only "produced" the beats, and the artist was solely responsible for the lyrics.  Campbell explained that this was part of the "rules of the rap game" because the listening audience expected the rapper to use their own words when writing lyrics.

### 4. *The Parties' Arguments and Reliance on Precedent*

Chavez argues that the lyrics were irrelevant because he did not write them, so they did not show he shared the same viewpoints expressed by the lyrics' authors. Chavez asserts that by providing the musical background for the tracks, he was "merely acting somewhat akin to the composer of music to which lyrics are written."  And as the producer or seller of the songs, Chavez argues he "was no more espousing the viewpoints expressed by the rap artists with whom he worked than the executives at Sony Music or any other entertainment company who cannot and would not be charged with advocating the opinions or views voiced by the artists on those labels."  Chavez also points to the sheer volume of the lyrics admitted into evidence, their cumulative nature, and the highly inflammatory contents of the lyrics, which included multiple references to killing police officers and other graphic descriptions of violence perpetrated on unspecified victims. He argues the lyrics were so prejudicial and so lacking in probative value that their admission violated his due process rights.

The Attorney General contends the trial court did not abuse its discretion.  The Attorney General does not dispute that other people authored and voiced the lyrics in the music, but he characterizes Chavez as "a driving force behind its creation" because it was made in his studio, produced under his business label, and featured his beats.  He argues Chavez "produced gangster rap albums promoting the Mob and its violent activities" and that the albums demonstrated hostility toward Sureños in particular.  The Attorney

64

General contends this was highly probative evidence that Chavez "did indeed participate in the Reed Street and Dobern Avenue attacks on perceived Mob enemies with a shared intent and motive."

Furthermore, the Attorney General contends the lyrics were probative of identity and participation in a common plan. He asserts the lyrics demonstrated Chavez endorsed and participated in Mob culture, explaining why he accompanied Franco and Ruby on their violent missions. The Attorney General argues this evidence corroborated Ruby's testimony that Chavez was a participant in the Reed Street and Dobern Avenue attacks.

Chavez relies on *People v. Coneal* (2019) 41 Cal.App.5th 951 (*Coneal*). In *Coneal*, the court of appeal held the admission of gangster rap lyrics was an abuse of discretion under Evidence Code section 352 because the significant prejudicial impact of the lyrics substantially outweighed their minimal probative value. (*Id.* at pp. 953-954.) Coneal, a member of the Taliban gang, was convicted of murdering a rival gang member. (*Id.* at pp. 954-958.) The evidence included multiple rap videos found on YouTube, including several that showed Coneal rapping. A gang expert for the prosecution testified that the Taliban and their rival gang used rap music to insult their rivals and brag about the crimes they had committed. (*Id.* at p. 961.) The expert testified that gang members rap about " 'real-life events,' including 'real-life individuals who have been murdered,' " but on cross-examination he testified that rap lyrics can also describe made up or inflated events. (*Ibid.*) He interpreted various lyrics in the Taliban videos as threatening violence, promoting violence, bragging about violence, shooting rivals, and committing murder without getting caught, among other conduct. (*Ibid.*)

On appeal, Coneal challenged the admission of five rap videos that had been made prior to the murder. (*Coneal*, *supra*, 41 Cal.App.5th at p. 965.) The court of appeal held that the rap videos were cumulative for some of the purposes the prosecution had offered them—e.g., to prove Coneal and others were gang members, and as evidence of the rivalry between the gangs. (*Id.* at pp. 966-968.) As to the probative value of the lyrics,

the court noted that the prosecution's arguments "rely on construing them literally, as statements of fact or actual intent." (*Id.* at p. 968.) The prosecution argued that Coneal's "raps about killing rival gang members, catching his victims by surprise, and employing driveby shootings were evidence of appellant's actual strategies and intent. And they relied on lyrics describing or advocating violence as evidence that the rapper in fact committed and/or advocated such acts." (*Ibid.*)

The *Coneal* court declined to credit the prosecution's literal interpretation of the lyrics. The court cited *In re George T.* (2004) 33 Cal.4th 620, in which the California Supreme Court observed, "In general, '[r]easonable persons understand musical lyrics and poetic conventions as the figurative expressions which they are,' which means they 'are not intended to be and should not be read literally on their face, nor judged by a standard of prose oratory.' " (*Id.* at pp. 636-637.) The *Coneal* court also found support in *People v. Melendez* (2016) 2 Cal.5th 1, which considered the trial court's exclusion of rap lyrics in which the author assertedly confessed to shooting the victims. The California Supreme Court held the exclusion was not error, in part because "it appears the words were merely rap lyrics. No reason appears to assume they relate actual events. . . . [I]f, hypothetically, a piece of paper were found in Don McLeans home containing the handwritten words, 'Drove my Chevy to the levee but the levee was dry,' that would not mean that McLean personally drove a Chevrolet to a levee and discovered it lacked water." (*Id.* at p. 24.)

Based on these and other authorities, the *Coneal* court held, "Absent some meaningful method to determine which lyrics represent real versus made up events, or some persuasive basis to construe specific lyrics literally, the probative value of lyrics as evidence of their literal truth is minimal." (*Coneal*, *supra*, 41 Cal.App.5th at p. 968.) The court added, "We do not mean to suggest that lyrics are never probative of their literal truth. For example, where lyrics are written within a reasonable period of time before or after the charged crime and bear a sufficient level of similarity to the charged

66

crime, their probative value as a statement of fact is increased." (*Id.* at p. 969, fn. omitted.)

The Attorney General relies on *People v. Olguin* (1994) 31 Cal.App.4th 1355 (*Olguin*) and *People v. Zepeda* (2008) 167 Cal.App.4th 25 (*Zepeda*). In *Olguin*, two defendants (Olguin and Mora) charged with a gang-related murder challenged the admission of handwritten rap lyrics found in a search of Mora's home three weeks after the murder. (*Olguin*, at p. 1372.) Mora asserted the lyrics were not authenticated, but the court of appeal rejected this claim based on the content and location of the document and held the lyrics were "adequately authenticated as the work of Mora. As such, they demonstrated his membership in [the gang], his loyalty to it, his familiarity with gang culture, and, inferentially, his motive and intent on the day of the killing." (*Id.* at p. 1373.)

The *Olguin* court also rejected Mora's argument that the lyrics were inflammatory and inadmissible under Evidence Code section 352 because they contained "general threats of violence." (*Olguin, supra,* 31 Cal.App.4th at p. 1373.) Because the murder was gang-related, the court held that evidence of Mora's membership in the gang was highly relevant, and "[t]he mere fact the lyrics might be interpreted as reflective of a generally violent attitude could not be said 'substantially' to outweigh their considerable probative value." (*Ibid.*) The court concluded admission of the lyrics was not an abuse of discretion under Evidence Code section 352. (*Ibid.*) Codefendant Olguin argued the lyrics amounted to inadmissible character evidence, but the court rejected this claim because the trial court had specifically admonished the jury not to consider the lyrics as evidence against Olguin. (*Id.* at pp. 1373-1374.)

In *Zepeda*, the defendant was convicted of murder and attempted murder, among other charges, in the shootings of a rival gang member and the rival's son. (*Zepeda, supra*, 167 Cal.App.4th at p. 28.) On appeal, Zepeda argued the trial court erred under Evidence Code section 352 by admitting two tracks from a gangster rap CD that Zepeda

had written.  (*Id.* at p. 32.)  Police found the CD in a "makeshift sound studio" in Zepeda's home.  The packaging contained symbols and coloring consistent with his gang, his picture was on the inside cover, and the picture showed him making a hand gesture relating to his gang.  The CD packaging credited Zepeda with six tracks on the album. The prosecution played two of those tracks for the jury and provided them with transcripts of the lyrics.  (*Id.* at pp. 32-33.)  The trial court overruled Zepeda's objection under Evidence Code section 352 because those two tracks were identified as his, their presentation was not cumulative, and the presentation would not unduly consume time. (*Id.* at p. 33.)

On appeal, Zepeda argued the evidence was cumulative because his membership in the gang, the gang's violent character, and their animosity toward the rival gang was not disputed.  (*Zepeda*, *supra*, 167 Cal.App.4th at p. 34.)  He further argued the evidence was prejudicial, and that the lyrics were works of fiction that did not necessarily reflect his state of mind or intent to commit a crime.  Citing *Olguin*, *supra*, the *Zepeda* court held the evidence was probative of Zepeda's state of mind and criminal intent, as well as his membership in a criminal gang and his loyalty to it.  (*Zepeda*, at p. 35.)  The songs also showed that Zepeda's gang had the motive and intent to kill rival gang members. (*Ibid.*)

The *Zepeda* court acknowledged that "lyrics and poems do not often establish their author's true state of mind," but in this case, Zepeda's lyrics were neither ambiguous nor equivocal.  (*Zepeda*, *supra*, 167 Cal.App.4th at p. 35.)  "These lyrics, coupled with the other evidence of defendant's gang membership and his animosity towards [rival gang members], go beyond mere fiction to disclosing defendant's state of mind, his motives and intentions, and his fealty to furthering his criminal gang's activities."  (*Ibid.*)  The court also held the lyrics were not unduly prejudicial.  The prosecution had presented only two of the six tracks by Zepeda, and they provided noncumulative evidence of his state of mind and gang association.  The court of appeal held, "The language and

substance of the lyrics, although graphic, did not rise to the level of evoking an emotional bias against the defendant as an individual apart from what the facts proved." (*Ibid.*) The court of appeal concluded the trial court did not abuse its discretion by admitting the lyrics.

Chavez argues that *Olguin* and *Zepeda* are distinguishable from his case because he did not author the lyrics at issue. By contrast, the relevant holdings in both *Olguin* and *Zepeda* hinged on the critical fact that the lyrics were used solely as evidence against a defendant who had authored those lyrics. In *Olguin,* for example, the codefendant Mora challenged the trial court's authentication of the evidence. (*Olguin*, *supra*, 31 Cal.App.4th at p. 1372.) The court of appeal rejected this claim as a premise to its holding that the lyrics were admissible: "[T]hey were adequately authenticated as the work of Mora. *As such*, they demonstrated his membership in [the gang], his loyalty to it, his familiarity with gang culture, and, inferentially, his motive and intent on the day of the killing." (*Ibid.*, italics added.) The court of appeal rejected a challenge raised by codefendant Olguin, who did not author the rap lyrics, because the trial court had specifically admonished the jury *not* to use the evidence against Olguin. (*Id.* at pp. 1373-1374, italics added.)

Chavez contends the significance of this distinction is further supported by *U.S. v. Gamory* (11th Cir. 2011) 635 F.3d 480 (*Gamory*).[16] Gamory worked in the music recording business at his studio, "Hush Money Entertainment." (*Id.* at p. 486.) He was charged with drug distribution and money laundering offenses. The prosecution discovered a rap video produced by Hush Money Entertainment featuring rap artist Tone Flowa. (*Id.* at p. 488.) Gamory did not appear in the video, and there was no evidence he had authored the lyrics. But the lyrics used Gamory's nickname ("JB"), the rapper wore

---

[16] *Gamory* was decided by the federal Court of Appeals for the Eleventh Circuit. Decisions of lower federal courts are not binding on us, but we may consider them as persuasive authority. (*Rubin v. Ross* (2021) 65 Cal.App.5th 153, 163.)

69

jewelry with a "JB" insignia, and the words referenced Gamory's car (a Range Rover) as well as his music studio. (*Id.* at p. 488, fn. 9.) Based on the repeated use of the phrase "drug money is Hush Money" in the lyrics, the prosecution argued the video was relevant evidence of Gamory's drug distribution and rebutted his defense that his business was legitimate. (*Ibid.*)

The court of appeal concluded the trial court's admission of the rap video was an abuse of discretion. (*Gamory*, *supra*, 635 F.3d at p. 494.) The court of appeal held the probative value of the video was "minimal at best," explaining, "We cannot ignore the simple fact that Gamory was not in the video. Neither was there any evidence that Gamory authored the lyrics or that the views and values reflected in the video were, in fact, adopted or shared by Gamory." (*Id.* at p. 493.) The video was also cumulative of other evidence on certain points, and its probative value was substantially outweighed by the prejudicial nature of the lyrics, which dealt with drugs, sex, profanity, degradation of women, firearms, and threats of violence against the police and public. (*Ibid.*)

### 5. *Application of Evidence Code Section 352 and Related Caselaw to the Admission of the Lyrics*

The evidence was undisputed that Chavez did not write any of the lyrics, and he did not sing or rap in any of the tracks on the CDs. The Attorney General does not contest those facts. He nonetheless asserts Chavez's role in making and selling the CDs was so central that it shows he harbored the same violent hostility towards Sureños that the lyrics expressed, even though he did not write them.

A prefatory note is necessary to address the ubiquitous usage of the terms "produce," "produced," and "producer" in the record as well as the briefs on appeal. When issuing its ruling, the trial court said of Chavez, "[I]t was his business, he was part and parcel. A producer plays a great role in, like I say, making sure music gets to the public." Implicit in the trial court's statement is a finding that Chavez was a "producer," but neither the court nor the parties explained what they meant by using that term.

70

Similarly, the prosecution's gang expert testified that his opinion Chavez was a member of the Mob was based in part on his belief that Chavez "produced the lyrics," or was part of the "production of Norteno-related propaganda." But the expert did not explain what he meant in using those terms.

The term "producer" refers to a specific role or profession as a "music producer" in the music industry, but there was no testimony from any expert describing what a "music producer" does, or what is involved in "producing" music or music CDs. The participants in the proceedings below used the term loosely, as do the briefs on appeal. The attorneys' usage of the term when questioning witnesses resulted in confusion at times. In its direct examination of Garcia, for example, the prosecution asked who produced a certain track on one of the CDs, prompting Garcia to ask, "[W]hen you say 'produced,' produce meaning what? Do you know what produced means?" When defense counsel asked Garcia on cross-examination what "produce" meant, Garcia gave a somewhat muddled answer, but in substance he testified that it involves more than simply performing and recording the music; it also requires mixing and mastering the tracks to prepare them for production on "an actual, tangible album that you can sell to people." However, Garcia was never offered as an expert witness on the matter, and neither the court, nor the attorneys, nor any other witnesses indicated that they were using the term with that meaning.

We therefore use quotes when citing occurrences of the terms "produce," "produced," and "producer" in the record when they appear in the context of creating music. In describing the conduct in question, we rely on the facts as set forth in plain language to the extent the record includes such facts.[17]

---

[17] The record also includes multiple references to "engineering" the recordings and "mastering" the CDs as part of the creative process, but there was no evidence in the record as to the meaning of these terms. According to Wikipedia, sound engineering concerns the "technical aspect of recording—the placing of microphones, pre-amp knobs,

71

### a. Application of Precedent Concerning the Admissibility of Gangster Rap Lyrics

The cases the Attorney General relies on—*Olguin*, *supra*, and *Zepeda*, *supra*, provide little support for his position, as both cases were limited to the admissibility of lyrics written by the defendant. In contrast to the lyrics at issue in those cases, the lyrics in this case do not directly reflect Chavez's state of mind because he did not write or perform them. The Attorney General's argument is premised instead on the assertion that Chavez had such a central role in the creation and promotion of the music that it shows he shared the anti-Sureño sentiments expressed in the lyrics. The Attorney General argues the lyrics therefore have probative value because they show that Chavez had the motive and intent to attack or kill Sureños at the time of the Reed Street and Dobern Avenue attacks.

The Attorney General cites no case holding that rap lyrics were admissible under this theory of relevance. The only case cited by either party that addresses the Attorney General's theory of relevance is *Gamory, supra,* which supports Chavez's position. In *Gamory*, the prosecution used a rap video as evidence against the owner of the studio that produced the video. But the *Gamory* court concluded the probative value of the evidence was "minimal at best" under that theory.

Furthermore, as the *Coneal* court recognized, the probative value of musical lyrics depends on whether they may be construed literally, as statements of fact or actual intent rather than purely fictional artistic expressions. "Absent some meaningful method to

---

the setting of levels," and so forth. (<https://en.wikipedia.org/wiki/Audio_engineer> [as of Dec. 26, 2024] archived at <https://perma.cc/8U9U-4UQV>.)

The term "mastering" refers to "a form of audio post production," specifically, "the process of preparing and transferring recorded audio from a source containing the final mix to a data storage device (the master)" from which copies are made for distribution. (<https://en.wikipedia.org/wiki/Mastering_(audio)> [as of Dec. 26, 2024] archived at <https://perma.cc/B9BG-4ZR3>.)

We provide these definitions solely as context for the reader; we do not rely on them in evaluating the merits of this claim.

determine which lyrics represent real versus made up events, or some persuasive basis to construe specific lyrics literally, the probative value of lyrics as evidence of their literal truth is minimal." (*Coneal*, *supra*, 41 Cal.App.5th at p. 968.) "For example, where lyrics are written within a reasonable period of time before or after the charged crime and bear a sufficient level of similarity to the charged crime, their probative value as a statement of fact is increased." (*Id.* at p. 969, fn. omitted.)

Here, there was no evidence that any of the assaults or murders mentioned in the lyrics were connected to any specific crime or act of violence, much less the offenses charged in this case. For example, the lyrics include one reference to a .45-caliber firearm and repeated references to a Glock. But there were no .45-caliber casings recovered in connection with the charged offenses, and testimony from the prosecution's firearm expert ruled out the possibility that any of the nine-millimeter casings were fired from a Glock. Furthermore, the lyrics from all the tracks on the "Prisonors of War" CD were written years before the charged offenses occurred. As to the "4 dots" track from the "City of Sharks" CD, there is no evidence of when the lyrics were written, but they must have been written at least three months prior to the charged offenses because the CD was published in 2007.

The Attorney General argues the "thematic violence in the lyrics foreshadowed the manner and means of the brutal crimes Chavez was accused of committing." There are undeniably similarities between portions of the lyrics and the charged offenses, but any similarities consist of generic references to violent attacks by Mob members against Sureños, sometimes referencing the use of guns and knives in those attacks—details that unfortunately are hardly unique to the charged offenses. The record includes evidence of dozens of other equally similar attacks with no evidence or allegations that they involved Chavez. Nothing about any of the factual similarities between the lyrics and the gang's activities suggests they pertained specifically to Chavez's state of mind or his intent to commit the charged offenses. And to the extent the lyrics were relevant to establish

general facts about the Mob gang—e.g., its motives, and its use of violence against Sureños generally—the record was replete with evidence from other sources, making the lyrics entirely cumulative evidence on those points.

The lyrics also contain many nonfictional elements. Many portions of the lyrics referenced attacks on Sureños, who constituted an actual rival gang, and the references to the "Mob" obviously referred to an actual gang—specifically, the gang defendants were charged with promoting. The lyrics also included references to real locations such as Alma Avenue, where the two gangs engaged in territorial violence. It is undeniable that the lyrics generally reference the kinds of violent attacks that occur in the real world between the actual gangs involved in the charged offenses.

But the lyrics also appear to include many fictional elements. Some of the lyrics portrayed the gangster voicing them as "Frank Gucci," which was a fake name. That was a pseudonym used by Javier Garcia, who was real, but Garcia also testified that the killings and attacks described in the lyrics never actually happened. The lyrics speak of "Frank Gucci" killing Sureños, but Garcia denied that he had killed anyone, and the prosecution offered no evidence he had committed any specific murder. The lyrics also included abundant references to killing police officers, but there was no evidence that Garcia had ever attempted or committed any act of violence against the police. In other words, for many portions of the lyrics there was no evidence to distinguish them from exaggerations and braggadocio.

Nonetheless, as expressions of a general desire or intent to kill Sureños, the lyrics arguably could have probative value if the evidence supported the inference that the literal meaning of the words accurately reflected Chavez's state of mind. But creators of fictional works routinely incorporate real world elements to give their art a sense of realism. Both Chavez and Garcia testified that gangster rappers rely on the element of "street credibility" to appeal to an audience and generate a market for their music. Chavez testified to the process that rappers like Jay-Z used to grow their businesses:

74

They began their careers doing gangster rap based on their street credibility, and once they had an audience, they progressed to more commercially oriented music to reach a broader market.

The Attorney General nonetheless argues that Chavez's role in making the music was so central that it supports an inference that the lyrics were probative evidence of his motive and intent to commit the charged offenses. As set forth below, the evidence does not support that contention.

### b. *Relevance of Chavez's Role in Making the Music and the CDs*

The evidence of Chavez's involvement in making the music on the "Prisonors of War" and "City of Sharks" CDs does not support the Attorney General's description of Chavez as the "driving force" behind the music. As a general matter, with respect to Chavez's role in the creation of a musical track, the evidence establishes the following: Someone else would write the lyrics, and a rapper or vocalist who wanted to make a rap song with those lyrics would take them to Chavez's studio. Chavez created beats or "instrumentals" to use as the background for vocals, and sometimes the vocalist would select a beat from a catalog of premade beats. The vocalist would then voice the lyrics over the background beat while Chavez recorded the vocalist, and he usually (but not always) did the mixing required to combine the recorded sounds into a track.

The specific extent of Chavez's involvement depended on the track in question and which CD the track appeared on. As set forth above, the prosecution introduced lyrics from two CDs: "Prisonors of War," published in 2004, and "City of Sharks," a compilation of various artists published in 2007. The trial court admitted transcripts of the lyrics for eight tracks from "Prisonors of War" and two tracks from "City of Sharks."

As to the two CDs and the 10 tracks with lyrics in evidence, the record includes the following evidence of Chavez's role.

75

### i.   Chavez's Involvement in the "Prisonors of War" CD

Garcia testified that he "produced" the "Prisonors of War" CD.  He also wrote all the lyrics and performed all the rapping.  He testified that the lyrics were specifically about his past and generally claimed credit for the album as a whole.  He stated, "This is my album.  This album is about me."  As to Chavez's role, Garcia testified, "[H]e didn't really create none of my album at all.  All he did was push a button and record me and make some of the beats."  Garcia hired the artist who created the graphics for the cover, he hired someone else to mix and master the tracks, and he paid for these services with his own money.

The credits and other text on the CD cover and sleeves corroborate Garcia's claims that the CD was primarily his creation.  Garcia's pseudonym "Frank Gucci" is displayed prominently on the CD sleeve, and the credits list Frank Gucci as the "Executive Producer."  The photo on the CD sleeve shows Garcia standing in the middle with two other persons, and there is no photo of Chavez anywhere on the CD materials.

The CD credits state that all tracks were recorded at "Beat Down Facilities," which referred to Chavez's studio.  All tracks except for track 7 were "mixed and engineered" by "Juice," which was Chavez.  Track 7 was "Mixed and Engineered by DJ Phonic," which was Kelley, according to his testimony.  The CD was mastered by "Apocalypse Studios," but there was no evidence of who that was, and there was no evidence Chavez had any involvement with that part of the process.

Thus, as to the making of the "Prisonors of War" CD, Chavez's role was significant but secondary to Garcia's role.  The record supports the conclusion that Garcia, not Chavez, was the "driving force" behind the creation of that CD.

### ii.   Chavez's Involvement in the "City of Sharks" CD

Chavez's involvement in making the "City of Sharks" CD was far more limited.  The evidence establishes that someone else ("Mr. 21") created the CD, not Chavez or Garcia.  The CD was a compilation of 21 tracks created by various artists.  The credits

76

state the CD was mastered by "Justin Weis" and "Trackworks SSF," and the artwork was provided by "Traffic." There was no evidence Chavez worked with any of those persons or entities in making the CD, and there was no evidence Chavez played any role in selecting or compiling the tracks on the CD, mastering the CD, or making physical copies of it for sale.

The "City of Sharks" CD included three tracks recorded by Chavez, but the lyrics for two of those three tracks were never offered into evidence. The credits on the CD sleeve state that "Juice Boss" (Chavez) "produced" the three tracks, and they were recorded at "Beatdown Studio." Chavez is not credited in any capacity for any of the other 18 tracks on the CD.

The trial court admitted the lyrics for two tracks from the "City of Sharks" CD into evidence: "4 dots" and "City of Sharks (remix)." Chavez is credited as having "produced" the "4 dots" track, and the credits include "Featuring: Tha Hittah, Evil & Mr. 21." There was no evidence of who wrote the lyrics, when the lyrics were written, whether the author was a member of the Mob, or what kind of relationship Chavez had with the author. And as to the "City of Sharks (remix)" track, there is no evidence Chavez played any role in its creation.

To summarize, the trial court admitted into evidence the lyrics for a total of ten tracks taken from the two CDs. Chavez played some role in the making of nine of the ten tracks, and he had nothing whatsoever to do with the creation of the tenth track. As to the nine tracks involving Chavez, they were recorded at his studio, he provided the background beats, and he recorded other people singing their lyrics to the beats. For eight of those nine tracks, Chavez was credited with mixing and engineering seven of them, and he was credited for having "produced" one track. Someone else mixed and engineered the other track that was recorded at Chavez's studio. As to the creation of the CDs themselves, "City of Sharks" was created entirely by someone else, and Chavez's only involvement was in contributing three tracks to it. Garcia played the dominant role

in creating the "Prisonors of War" CD, while Chavez contributed the beats and recording services for the tracks on it.

Based on all available evidence in the record, the details and degree of Chavez's role in making the music provide little support for the inference that the lyrics were sincere or genuine expressions of his state of mind, or that he had any motive or intent to kill Sureños. However, the prosecution also relied on evidence of Chavez's involvement in the Beat Down Records business.

### c. Relevance of Chavez's Business Activities

The prosecution presented evidence showing that Chavez was one of two partners in operating Beat Down Records, a business engaged in selling gangster rap. That fact was uncontested. The business sold CDs through local stores and online websites, but there was no evidence of how many CDs were sold by Chavez as compared to Garcia, who later took over the business. Some of the artists who recorded in Chavez's studio paid him for his beats and recording services, but there was no evidence of how much money he earned in connection with recording the specific tracks with lyrics in evidence. Chavez testified that he formed the business because he wanted to make money, and the evidence is consistent with that testimony. There is no other explanation for why they sold the CDs from stores and websites, or why they filed for a fictitious business name. If Chavez merely wanted to promote violence against Sureños, it likely would have been more effective to give away the CDs or put the music online for free.

As to the two CDs containing tracks for which the lyrics were admitted into evidence, the record establishes that Beat Down Records was a business established for selling the "Prisonors of War" CD, although Chavez testified that Garcia was primarily the one responsible for the marketing and distribution. There is little evidence of Chavez's business involvement in the selling of the "City of the Sharks" CD, but having his name or studio listed in the credits for three of the tracks could have provided some advertising or reputational benefit for his studio business.

78

As for Chavez "promoting" the CDs in a literal commercial sense, there was little or no evidence of what role he played, if any, in marketing or advertising for either of the two CDs. The police found promotional flyers for "City of Sharks" in Chavez's car in 2011, and he testified that Mr. 21 had given him the flyers in 2007 when the CD was finalized, but there was no evidence he did anything with them. That the flyers were found in his car suggests he did nothing with them for four years, and there was no evidence he ever had other copies of the flyer. Chavez testified that he publicized the Beat Down Records business on social media, but he also provided studio services to other artists having no apparent connection to this case.

All this conduct can reasonably be attributed to monetary motives, and the evidence is consistent with Chavez's testimony that he only formed the business out of a desire to make money. That fact does not by itself imply that he shared the sentiments expressed in the lyrics of the music he sold. Chavez agreed that some of the words in the lyrics were violent in nature, and that some rappers' lyrics promoted violence. He further conceded this meant he was in the business of making money from promoting violence.

But the same can be said for vast swaths of the entertainment industry. There is an enormous market for music, movies, television shows, and other creative works that arguably promote violence, and the violence depicted in them often references real people and events. The popular rapper Eminem made songs with lyrics depicting violent acts against his ex-wife. (See *United States v. Carpenter* (E.D.N.Y. 2019) 372 F.Supp.3d 74, 79 [holding rap lyrics were admissible in criminal trial of defendant and discussing the hypothetical relevance of Eminem's lyrics about committing violence against his ex-wife].) Those lyrics might be relevant in a prosecution of Eminem for violent crimes against his ex-wife, as the court explained in that case. But no reasonable person would infer from the lyrics that anyone else who produced, marketed, sold, or profited from those songs had a motive or intent to commit violence against Eminem's ex-wife. Having a profit motive is distinct and separable from having a violent motive, even if the

79

product for sale arguably promotes violence.  And while these two motives need not be mutually exclusive, one does not imply the other.

Furthermore, the issue is not whether Chavez profited by making or selling music that promoted violence; that would constitute an improper use of the evidence to show the defendant had a violent character.  (See *Coneal*, *supra*, 41 Cal.App.5th at p. 971 [prosecution's use of rap lyrics skirted dangerously close to advocating the use of the videos as evidence of appellant's violent character].)  The only permissible uses of this evidence were premised on its relevance to the elements of the charged offenses.  But Chavez also provided paid recording services to persons who had nothing to do with the charged offenses.

The prosecution's gang expert testified that gang members use gangster rap to get "pumped up" or "revved up" before committing assaults.  But there was no evidence anyone did so using the tracks Chavez sold or contributed to, and there was no evidence anyone listened to any gangster rap before committing the charged offenses.  As to the lyrics in the tracks Chavez recorded, there was no evidence he intended for them to be used in that fashion.  Chavez testified that he knew gang members would get "pumped up" or excited when rapping, and he agreed that the Mob was a violent gang, but he did not believe they used rapping as a source of inspiration to commit acts of violence, and he had never witnessed such conduct.  The prosecution presented no evidence to the contrary.

### d.  *The Rap Lyrics Had Minimal Probative Value as Evidence Against Chavez*

In summary, Chavez did not write the lyrics in evidence, and his role in creating the music and the CDs was not as central as the Attorney General asserts it was.  The evidence establishes that, as to nine of the ten tracks at issue, Chavez created the beats that accompanied the lyrics, and he recorded the tracks in his studio, but others made substantial contributions to the individual tracks, and others played the dominant role in

creating the CDs that featured the tracks. Chavez was engaged in the business of selling one of the CDs that included the relevant tracks, but his conduct was consistent with purely monetary motives. His involvement with the music itself was not so central that one may reasonably infer the contents of the lyrics reflected his state of mind or that he had a motive or intent to attack and kill Sureños, much less the victims of the charged offenses.

Second, there is no evidence that any of the violent acts referenced in the lyrics correspond to any specific incidence of violence that actually took place, much less the offenses charged in this case. The lyrics referenced real gangs and locations, they included many generic references to killing and inflicting violence on Sureños, and they included many references to Mob members doing so on behalf of the gang, but there is also evidence showing that many portions of the lyrics should not be interpreted literally. However, even if we assumed the lyrics were entirely nonfictional, any similarities between the killings referenced in the lyrics and the facts of the charged offenses consist entirely of details that are common in gang-related offenses. The record includes evidence of dozens of such offenses with no evidence or allegation that Chavez was involved in them.

For eight of the ten tracks in evidence, the lyrics were written and the music was recorded in 2003 or 2004, four years before the charged offenses took place. As to another track, there was no evidence of when the lyrics were written or who wrote them. And as to a tenth track, Chavez had no involvement with its creation. Even assuming one could reasonably attribute the literal meaning of the lyrics to Chavez based on his role in making the music, at most this evidence would support an inference that he generally had a motive or intent to kill Sureños four years before the charged offenses occurred. Beyond that, none of the lyrics provide any support for an inference that he specifically intended to kill the victims of the offenses charged in this case.

Considering all these factors, we conclude the probative value of the lyrics was minimal at best. And with respect to one of the tracks—the "City of Sharks (remix)" track from the "City of Sharks" CD—the lyrics had no probative value whatsoever as evidence against Chavez.

The Attorney General advances other arguments for why the lyrics had probative value, but those arguments are unavailing. First, the Attorney General acknowledges the weak state of the other evidence of Chavez's connections to the Mob and his involvement in the charged offenses. The Attorney General points out that "Chavez's guilt was premised nearly exclusively on Ruby's eyewitness testimony," and, "the case against Chavez turned on jurors' evaluation of Ruby's credibility," such that "Ruby's credibility was a critical issue in this case." And because Ruby was an accomplice, the prosecution was required to present evidence independently supporting his testimony. "Given Chavez's more attenuated connection with the Mob," the Attorney General argues, the lyrics were "highly probative evidence that he did indeed participate in the Reed Street and Dobern Avenue attacks on perceived Mob enemies with a shared intent and motive." The prosecutor made the same argument below—that excluding the lyrics from evidence would "deny the jury from hearing corroborating evidence that would corroborate Allen Ruby's testimony," adding, "The law says I have to corroborate it. I have a mandatory duty to corroborate it. If I don't corroborate it, that is a count that can't be prosecuted . . . ."

This argument misconstrues the meaning of "probative." The probative value of evidence does not depend on how badly the prosecution needs it to prove its case. Evidence only has probative value to the extent it has a " ' "tendency in reason to prove or disprove any disputed fact" [citation].' " (*People v. Rivera* (2011) 201 Cal.App.4th 353, 362, quoting *People v. Prince* (2007) 40 Cal.4th 1179, 1237; Evid. Code, § 210.) A piece of evidence does not have a greater tendency in reason to prove a disputed fact

simply because some unrelated source of evidence is weak or insufficient proof of that fact.

The Attorney General also argues the lyrics demonstrated that Chavez "endorsed and participated in Mob culture, thus explaining why he would accompany Ruby and Franco on missions of gang violence." As to whether Chavez "participated" in Mob culture, he does not challenge the introduction of evidence that he engaged in the recording activities and operated a business for the purpose of selling the music. Rather, he challenges the admission of the lyrics themselves, and the contents of those lyrics do not provide any additional proof that he participated in making or selling the music. The lyrics would only show Chavez "endorsed" Mob culture to the extent one could reasonably infer the lyrics accurately represented his state of mind. For the reasons above, the evidence does not support such an inference. Furthermore, whether Chavez might have "endorsed" Mob culture more broadly is only marginally relevant to the issue of whether he had the intent the kill the victims of the charged offenses. One might heartily endorse the use of violence by one group of people against another, but that is a far cry from intentionally engaging in the act of killing.

Similarly, the Attorney General briefly argues the lyrics were evidence of Chavez's participation in a common plan and his identity as a participant in the offenses. However, the Attorney General does not explain how the lyrics might have been probative of those facts under any theory of relevance analytically distinct from the theories addressed above. Again, the central issue in this claim is not the admissibility of evidence pertaining to Chavez's conduct in creating or selling the music; the issue is whether the contents of the lyrics were admissible. Whatever theory of relevance one might assert in arguing the lyrics were evidence of a common plan or identity, the probative value of the lyrics hinges on an inference that they accurately reflected Chavez's state of mind. For the reasons above, this inference is unsupported.

83

### e. *The Danger of Undue Prejudice Presented by the Lyrics Substantially Outweighed the Minimal Probative Value of the Evidence*

"Prejudice under Evidence Code section 352 refers to ' " 'evidence which uniquely tends to evoke an emotional bias against the defendant as an individual and which has very little effect on the issues.' " ' [Citation.]." (*People v. Thomas* (2023) 14 Cal.5th 327, 363 (*Thomas*).) Gang-related evidence requires careful scrutiny due to its potential to have a " 'highly inflammatory impact on the jury.' " (*Flores*, *supra*, 9 Cal.5th at p. 402.)

The trial court admitted eight pages of lyrics replete with numerous examples of highly inflammatory statements and descriptions of killing and other violent acts. The Attorney General does not dispute this. The lyrics are not limited to references to killing Sureños; the remaining lyrics include general references to violence against unspecified victims described generically as "punks," "suckers," or "motherfuckers." And the inflammatory effect of those examples is far exceeded by the effect of the numerous explicit references to killing police officers, which outnumbered references to killing Sureños or "scraps" on some tracks. There was no allegation that Chavez was engaged in any violent conduct against the police, and those portions of the lyrics therefore had no probative value.

The lyrics to the "4 dots" track are particularly inflammatory. The song is centered around the repetition of a line about killing police officers, which is repeated eight times: "Bloody - shot, two shots watch them watch them all bleed, fuck the cops three shot watch them all run . . . ." Another line references violence against "snitches," and one refers to "an undercover shit." The lyrics include numerous expressions of violence against random unspecified victims, some of which use anti-Semitic terminology, e.g., "I make them bleed and suffer like a Northern Holocaust," "exterminating roaches turning warm bodies cold," and, "they burning and crying the

worst of the nightmare." There was no evidence or allegation that Chavez harbored anti-Semitic sentiments or motives in connection with the charged offenses.

Furthermore, the track appeared on the "City of Sharks" CD, which was created and sold entirely by other people. Chavez conceded he might have gotten some "marketing" value out of having his studio business listed in the credits, but there was no evidence his business was involved in the sales and distribution of this CD. Insofar as the credits on the CD cover might constitute meaningful evidence of Chavez being a music "producer," he is credited as having "produced" this track.[18] And the lyrics do include an introductory line referencing Chavez's studio: "The Hitta, Beat down records, let me kill with this in mind."

But even if we accept the Attorney General's asserted theory of relevance—that Chavez's involvement with this track is evidence that the literal meaning of the lyrics sincerely reflected his state of mind—this track still has minimal probative value. The lyrics are predominantly about killing police officers, snitches, and other unspecified victims; by contrast, the lyrics include only *one* identifiable reference to killing Sureños: "Northern Cali where I reside, any question try to kill a scrap, strangle that mother fucker and I just don't give a fuck." There was no evidence that any of the victims of the charged offenses were strangled, or that any of the other attacks referenced in the record involved strangling.

The lack of similarities between most of the lyrics to "4 dots" and the evidence in the record raises doubts about whether the lyrics should be interpreted literally. But even if we do interpret them literally, whatever probative value the lyrics might have had was diminished by a lack of evidence about the track's creation. As pointed out above, there was no evidence of when the lyrics were written, who wrote the lyrics, who performed

---

[18] In fact, of the 10 tracks and two CDs offered into evidence, this track is the only item for which Chavez is credited as a "producer."

the rapping, or what kind of relationship Chavez had with that person or those persons.[19] At most, then, the probative value of the lyrics for this track come from a single reference to killing Sureños, and if that is taken as evidence of Chavez's motives or intent, there is no way to know *when* he had such a state of mind. Like the lyrics from the "Prisonors of War" CD, they could have been written by someone else years before the offenses charged in this case took place. The state of the evidence in the record concerning "4 dots" compels us to conclude the extremely inflammatory nature of the remaining lyrics substantially outweighed whatever probative value they could have had.

The "City of Sharks (remix)" track from the same CD also included similar references to killing the police and other unspecified victims, e.g., "Rats get scraped off my block, Save a few shots for the cops, In any situation I'm facing altercations, murder, death, kill, my only motivation," and "Guns don't kill punks, thugs do, so that's exactly what I'm gonna do." And there is no plausible argument that these lyrics had any probative value as evidence of Chavez's motives or intent, because there was no evidence he had any involvement with the creation of that track. As to Chavez, then, it is undeniable that the inflammatory nature of the lyrics substantially outweighed any possible probative value the lyrics might have had.

Multiple violent or derogatory references to the police, "pigs," or "5-0" appear in other tracks as well, e.g., "these punk ass pigs still waiting for blood," "pigs are scraps," and, "Foes get led, but the pigs defy." One track included five repetitions of the phrase, "Fuck peace. Fuck the police," and a single reference to "scraps." And every track included expressions of violence that did not specifically refer to Sureños or "scraps." These general expressions of violence far outnumbered references to Sureños and

---

[19] The credits on the CD cover and the contents of the lyrics themselves reference "Tha Hittah," but there was no evidence of who that was. The credits also reference "Evil" and "Mr. 21" but the credits do not indicate what role any of these persons played in making the music.

scraps.[20]  The lyrics for three tracks included general expressions of violence with no identifiable references to Sureños at all.  The lyrics also included the use of the "n-word" and multiple uses of the word "bitch," e.g., "Never love a bitch or trust a trick."

In summary, the lyrics in evidence include lyrics from one track—"City of Sharks (remix)"—that Chavez played no role in creating, such that the trial court unquestionably violated Evidence Code section 352 by admitting the lyrics for use against him.  For a second track—"4 dots"—the lyrics included a single reference to killing Sureños, and whatever probative value that reference might have had, it was substantially outweighed by the highly inflammatory nature of the remaining lyrics.  We conclude the trial court violated Evidence Code section 352 by admitting the lyrics of "4 dots" and "City of Sharks (remix)" for use against Chavez.

As to the remaining tracks, the lyrics for them were written by someone else four years before the offenses charged here took place.  At most, they could have reflected a motive and intent to kill or commit violence against Sureños generally, but nothing in the lyrics had any additional probative value specific to Chavez's motives or intent in the charged offenses.  Whatever minimal probative value those lyrics had, it was substantially outweighed by the numerous instances of highly inflammatory references to violence against police and other unspecified persons.  The expressions of general violence were inflammatory by themselves, but the numerous explicit references to killing the police were particularly inflammatory with great potential to "evoke emotional bias" against Chavez.  (*Thomas*, *supra*, 14 Cal.5th at p. 363.)  There is no plausible argument that those portions of the lyrics had any probative value, as none of the charges against Chavez involved any allegation of violence against the police.

---

[20] In total, the lyrics for all 10 tracks included nine references to "scrap," "scraps," or "scrapas," one reference to "fools in the south," and several references that may reasonably be construed as references to Sureños, e.g., "rivals," or "enemies."

Given that the lyrics overall had minimal probative value at best, we conclude the probability that admission of the lyrics would create a substantial danger of undue prejudice substantially outweighed any probative value the lyrics had. The trial court's wholesale admission of the lyrics constituted an abuse of discretion.

The Attorney General offers two arguments that the lyrics were not prejudicial; neither is persuasive. First, he contends other testimony mitigated any potential prejudice from the lyrics. Specifically, he cites testimony by Garcia to the effect that the lyrics were merely artistic statements and not descriptions of real-world events. To this, the Attorney General adds, "Garcia emphasized that Chavez did not write any of the lyrics referenced by the prosecutor." The Attorney General also cites testimony by Chavez and Campbell to the effect that Chavez had no influence or control over the lyrics that others wrote. This line of argument cannot be reconciled with the Attorney General's assertion that the lyrics had probative value in the first place, because if one credits those portions of the testimony, it implies the lyrics had no probative value.

Second, the Attorney General argues that any prejudice resulting from admission of the lyrics was minimized by the minor role they played relative to the sheer length of this trial. The Attorney General cites no authority supporting the proposition that the length of the trial or the overall volume of the evidence is relevant to the assessment of undue prejudice from one source of evidence. However, that may be a relevant consideration in evaluating "prejudice" in the context of harmless error analysis, so we address it below.

Before turning to the harmless error analysis, we note that the record shows any attempt by defense counsel to argue for specific limitations on the lyrics or redactions to them likely would have been futile. For example, at the close of evidence, when the trial court was making its final rulings on the admissibility of various exhibits, defense counsel for Chavez specifically renewed his objection when the trial court ruled the lyrics for the "4 dots" track were admissible. Counsel began to address the testimony regarding

the lyrics for this track, but the trial court cut him off and summarily denied the motion to exclude. If, as seems likely, counsel was attempting to address the lack of foundation for the lyrics, the trial court made it clear that it would not consider any such argument in making its ruling. As to the lyrics for other tracks, counsel for Chavez continued to argue that the lyrics had not been authenticated and were not authored by Chavez. The trial court once again summarily denied the motion to exclude them without acknowledging or responding to counsel's arguments, and without making any findings as to any specific track or the lyrics for them.

### 6. The Erroneous Admission of Gangster Rap Lyrics as Evidence Against Chavez Requires Reversal

We assess the prejudice from an erroneous admission of evidence in violation of Evidence Code section 352 under the "reasonable probability" standard. (*People v. Marks* (2003) 31 Cal.4th 197, 227.) The error requires reversal if "it is reasonably probable that a result more favorable to the appealing party would have been reached in the absence of the error." (*Watson*, *supra*, 46 Cal.2d at p. 836.) This does not require showing that an outright acquittal would be reasonably probable; an appellant need only show it is reasonably probable a single juror might have voted not guilty, because "a hung jury is a more favorable result than a guilty verdict."[21] (*People v. Soojian* (2010) 190 Cal.App.4th 491, 521; see also *People v. Hem* (2019) 31 Cal.App.5th 218, 230 [in the context of prejudice, a mistrial is a better outcome than a conviction]; *People v. Reardon* (2018) 26 Cal.App.5th 727, 738 [a defendant need only raise a reasonable doubt in the mind of one juror to either escape liability or put the People to the burden of retrying the case, a more favorable outcome than a conviction].)

---

[21] At oral argument, the Attorney General conceded that the *Watson* prejudice standard only requires the defendant to show a reasonable probability that one juror might not vote guilty.

First, the evidence of Chavez's guilt was not overwhelming. The Attorney General concedes that the prosecution's case against Chavez "was premised nearly exclusively" on Ruby's testimony, such that Ruby's credibility was a "critical issue" in this case. As set forth above in section I.B.2.b, the defense introduced a wealth of evidence casting doubt on Ruby's credibility. The record establishes that Ruby, a longtime gang member who testified under a grant of immunity, had engaged in numerous shootings, attempted shootings, stabbings, and other violent crimes in addition to the offenses charged in this case. Ruby's testimony is rife with admissions to various lies he told to the police in the course of his interactions with them. Based on her experiences with him, Ruby's girlfriend Monique testified that he was dishonest, he could not be trusted, and he is a "masterful manipulator."

Furthermore, because Ruby was an accomplice, the prosecution needed to present evidence corroborating his testimony. The only other evidence connecting Chavez to the Reed Street stabbing was the victim's description of the car. But in his testimony, the victim repeatedly insisted he had seen only two persons in the car. And apart from Ruby's testimony, the only evidence of Chavez's involvement in the Dobern Avenue shooting was Joseph Tarango's testimony. Tarango's credibility was also highly questionable, for the reasons set forth in section I.B.2.e above. And as the Attorney General acknowledges, Chavez's connection to the gang was somewhat "attenuated." The prosecutor, acknowledging the need to corroborate Ruby's testimony, emphasized the importance of the rap lyrics in his arguments opposing Chavez's motion to exclude them.

Accordingly, the prosecution adduced a considerable volume of evidence pertaining to the lyrics. In its direct examination of the gang expert, Whittington, the prosecution questioned him about gangster rap and the lyrics in question on multiple occasions during the trial. This included questioning specifically about the lyrics to the "4 dots" track. At the prosecutor's request, the expert recited numerous portions of the

90

lyrics for "4 dots" aloud, including the highly inflammatory line identified above, which describes killing the police, as well as the anti-Semitic "Holocaust" reference. The expert also testified that Chavez was a gang member in 2008 based partly on his believe that Chavez was "the one who produced the lyrics or was a part of the production of Norteno-related propaganda."

The prosecution also called Javier Garcia, who testified at length about his involvement in creating the music, and the prosecution questioned Tarango twice about the "City of Sharks" CD. In its direct examination of Tarango, the prosecution played an audio clip for the jury and provided transcripts of the lyrics. The reporters' transcript includes approximately 124 pages of testimony elicited by the prosecution in its case-in-chief concerning the lyrics; the creation and meaning of the music; and related conduct. The prosecutor also introduced the packaging and cover materials for the two CDs into evidence, and he questioned witnesses at length about both the graphics and the text printed on these materials. Finally, the prosecutor also cross-examined Chavez about the lyrics extensively, and in the prosecutor's questioning of Chavez, the prosecutor recited aloud the line from "4 dots" about killing the police. The prosecutor cross-examined each of Chavez's character witnesses about the lyrics as well. In all, the prosecution questioned three of its own witnesses about the lyrics and cross-examined eight defense witnesses including Chavez himself.

The Attorney General characterizes this evidence as playing a "minor role," "relative to the sheer length of the trial." We disagree. The prosecutor repeatedly raised the topic numerous times with many different witnesses. And because the testimony and the transcripts of the lyrics were accompanied by audio and graphics, it is unlikely this evidence did not influence the jury's findings. The trial was undeniably long: Four months elapsed between opening statements and close of evidence, resulting in more than 17,000 pages of reporters' transcripts. But large segments of the trial were devoted to witnesses and evidence having no relevance to Chavez—e.g., evidence pertaining to the

91

McCreery Avenue shooting. Chavez could not have benefited from sitting at defendant's table while witnesses to that event testified in explicit detail about events involving an extraordinary degree of violence and sociopathy.

Moreover, these circumstances were largely a consequence of the prosecution's charging decisions—specifically, the decision to charge the McCreery Avenue shooting together with the other two offenses, as reflected in the prosecution's opposition to a motion for severance. In pretrial proceedings before the first trial, Chavez moved to sever his case from Franco's case, and Chavez also moved to sever the charges relating to the McCreery Avenue shooting, but the prosecution opposed both motions, and the trial court denied them.[22] As a matter of fairness, we will not use the volume of evidence resulting from the prosecution's charging decisions as grounds to deny Chavez relief. In any event, for the reasons above, the comparative prominence of the evidence relating to the rap lyrics made it unlikely the jury's findings were unaffected by that evidence.

Finally, the Attorney General argues the jury instructions minimized any prejudice. He points to the trial court's instruction based on CALCRIM No. 1403, limiting the use of evidence of gang activity: "You may consider evidence of gang activity only for a limited purpose of deciding whether the defendant was a member or associate of a criminal street gang, or the defendant acted with the intent, purpose, and knowledge that are required to prove the gang-related crimes and enhancements charged; or [¶] The defendant had a motive to commit the crimes charged; or [¶] The defendant acted willfully and with deliberation and premeditation in the charged crimes of attempted murder and murder; or [¶] As supporting evidence for evidence provided by

_____

[22] After the jury hung in the first trial, trial counsel for Chavez withdrew, and newly appointed counsel required further time to prepare for the second trial. At that point, the prosecution moved to sever Chavez from Franco. However, Franco opposed the motion, citing the prosecution's previous opposition to severance and its reasoning for why the McCreery Avenue and Dobern Avenue shootings were related. The trial court denied the prosecution's motion to sever.

an accomplice and/or in-custody informant.  [¶]  You may also consider the evidence when you evaluate the credibility or believability of a witness and when you consider the facts and information relied on by an expert witness in reaching his or her opinion.  You may not consider this evidence for any other purpose.  You may not conclude from this evidence that the defendant is a person of bad character or that he has a disposition to commit crime."

"Our courts have acknowledged that '[a] limiting instruction can ameliorate section 352 prejudice by eliminating the danger the jury could consider the evidence for an improper purpose.'  [Citations.]"  (*People v. Gonzalez* (2021) 12 Cal.5th 367, 409, quoting *People v. Hendrix* (2013) 214 Cal.App.4th 216, 247 (*Hendrix*).)  "We presume that the jury understood and followed these instructions."  (*People v. Lamb* (2024) 16 Cal.5th 400, 426.)  "In some circumstances, however, a limiting instruction is an inadequate means of protection."  (*People v. Anderson* (1987) 43 Cal.3d 1104, 1120.) " '[T]here are some contexts in which the risk that the jury will not, or cannot, follow instructions is so great, and the consequences of failure so vital to the defendant, that the practical and human limitations of the jury system cannot be ignored.' "  (*Ibid.*, quoting *Roberts v. Russell* (1968) 392 U.S. 293, 294.)

In this case, the Attorney General's reliance on the limiting instruction is unavailing for at least two reasons.  First, the prosecution's use of the rap lyrics in closing arguments made it difficult if not impossible for the jury to draw any logical distinction between the permissible uses of the evidence and the impermissible use as evidence that Chavez had a violent character.  As part of his argument that the rap lyrics were evidence Chavez was a gang member or associate, the prosecutor cited the lyrics as evidence of Chavez's "gang character."  The prosecutor argued Chavez "promoted violence against Sureños.  Free speech allows that.  [¶]  I am not asking you to convict him because of free speech.  But the things you do, the things you say are reflective of what's important here."  The prosecutor argued that the lyrics were evidence of Chavez's motive and intent

in committing the crimes—which were permissible uses of the evidence under the limiting instruction. But the prosecutor then veered into impermissible character attacks at several points during this portion of his closing argument.

After referring to other indications of Chavez's gang associations—e.g., a red hat found in his studio—the prosecutor stated, "These are insights into *who the person is*. [¶] And without dispute -- he tried his best. 'I just did the beats,' and he did the words as if there was this Berlin Wall between the two things. He is business partners with [Javier Garcia] and producing that. Without any doubt, Hugo is not a snitch, and by his own admissions, *he sees law enforcement as the enemy, right*? He is entitled to that opinion. That is fine. [¶] What is it indicative of? Loyalty to a criminal street gang." (Italics added.) The prosecutor argued the evidence (without mentioning the rap lyrics specifically) also impeached Chavez's character witnesses, and he continued, arguing, "Hugo's outlook on life is twisted." "Hugo is free of tattoos. The evidence, beyond any doubt, has shown that *on the inside*, he has the core of a gangster, of gang values, of *values of violence over nonviolence*, of a gang succeeding in a neighborhood, versus getting them out of there." (Italics added.) Turning specifically to the gangster rap, the prosecutor argued, "*Gangsters promote violence and fear. Hugo did that.* He promoted a CD, by his own admission, the gangsters themselves would use to pump themselves up."[23]

The prosecutor then returned to his argument that the gang evidence showed Chavez's motive and intent to commit the crimes, adding that Chavez had a motive to support "his fellow gangsters." The prosecutor then raised the Dobern Avenue killing, and argued, "Consider Hugo's roles in this crime. *This is how you rationalize being part*

_____

[23] There was no evidence that any of the participants in the charged offenses listened to any gangster rap in preparation for committing those offenses. Chavez agreed with the prosecutor's assertion on cross-examination that some gang members would get "pumped up" when rapping gangster rap lyrics, but Chavez never testified that they did so while rapping or listening to any music that he promoted.

94

*of utter violence.* He is just giving them a ride. He didn't participate in their dirty work. Can you draw that line in your mind? *I am just doing the beats. That's his lyrics. I am not part of that. He could rationalize he wasn't violent,* and you heard nothing either from other witnesses or even in his testimony on the stand." (Italics added.)

By using the rap lyrics in this fashion under the rubric of "gang character," the prosecutor weaved and folded permissible uses of the evidence—e.g., as evidence of Chavez's membership or association with the gang, or motive and intent to commit the crimes—into impermissible arguments that directly attacked Chavez's character as being violent.

Furthermore, the prosecutor argued that Chavez "sees law enforcement as the enemy." And while the prosecutor did not expressly cite the rap lyrics as evidence of that, he made this assertion in the context of discussing the rap lyrics and Chavez's business partnership with Garcia. Given the emphasis the prosecutor placed on the references in the "4 dots" lyrics about killing the police, it is reasonable to infer that the prosecutor was referencing those lyrics indirectly, and that the jury would have interpreted the argument as such.

As discussed above, the "4 dots" lyrics contained multiple references to killing police—not simply animosity towards the police, but explicit expressions of homicidal intent. Because those portions of the lyrics, written by an unknown author at an unknown point in time, constituted "irrelevant and inflammatory evidence" that "only showed a propensity to act out violently toward the police, we cannot see how the jury could understand the parameters of the limiting language in the instruction. Thus, we cannot presume the jury understood and followed that instruction." (*Hendrix*, *supra*, 214 Cal.App.4th at p. 248.)

In summary, we assume the jury *attempted* to follow the limiting instruction on the permitted uses of gang evidence, but the prosecutor's use of the rap lyrics required jurors to engage in an impossible exercise of mental gymnastics. "Discrimination so subtle is a

feat beyond the compass of ordinary minds."  (*Shepard v. U.S.* (1933) 290 U.S. 96, 104.)
It is difficult enough for this court to logically draw lines between permissible uses of the
evidence, the prosecutor's "gang character" argument, and blatantly improper character
argument.  To quote the prosecutor's argument, "Can you draw that line in your mind?"
We need not do so with any precision in this case; the prosecution's blurring of any such
lines presented an intolerable degree of risk that the jury would be unable to adhere to the
limiting instruction despite what we may assume were all best efforts.

The second reason why the limiting instruction was inadequate to mitigate
prejudice from the erroneous admission of rap lyrics has to do with the legal meaning of
prejudice: it is not limited to improper inferences about the defendant's character or
propensities.  Prejudice "refers to evidence that uniquely tends to evoke an emotional bias
against the defendant as an individual, and has little to do with the legal issues raised in
the trial.' "  (*People v. Miles* (2020) 9 Cal.5th 513, 587, 263.)  For example, the evidence
may have inspired anger or triggered other emotional responses causing jurors to
conclude Chavez should be punished for his involvement with the lyrics.  (See, e.g.,
*People v. Dryden* (2021) 60 Cal.App.5th 1007, 1024 [although a limiting instruction can
minimize the danger that a jury will consider evidence for an improper purpose, the
court's instruction did not serve that end given the issues in the case].)

Courts rarely reverse a conviction as the result of erroneously admitted evidence
under Evidence Code section 352.  (See, e.g., *Coneal*, *supra*, 41 Cal.App.5th at pp. 972-
973 [concluding erroneous admission of rap lyrics was harmless based on strength of the
evidence against defendant]; but see *Albarran*, *supra*, Cal.App.4th at p. 232 [reversing
conviction based on erroneous admission of gang evidence as violation of due process];
*Venable*, *supra*, 88 Cal.App.5th at p. 458 [reversing conviction based on erroneous
admission of gang evidence under retroactive application of Evidence Code section
352.2].)  For the reasons above, this case presents the rare circumstances under which
reversal is warranted:  The evidence against Chavez was not strong; the contents of the

96

lyrics were extremely inflammatory; and the prosecution's frequent references to them compel the conclusion that it is reasonably probable the outcome of the trial would have been more favorable to Chavez in the absence of the error. (*Watson*, *supra*, 46 Cal.2d at p. 836.) Chavez's convictions must therefore be reversed.[24]

### D. Retroactive Application of Assembly Bill No. 333

The trial was held prior to the enactment of Assembly Bill 333, so the jury instructions on the gang enhancements failed to reflect the subsequent amendments to section 186.22. Chavez and Franco contend the jury's true findings on the gang allegations must be vacated under a retroactive application of Assembly Bill 333.[25] As relevant here, the trial court's instructions on a "pattern of criminal gang activity" required to establish a "criminal street gang" under subdivisions (e)(1) and (f) of section 186.22 failed to reflect the amended versions of those subdivisions. The Attorney General concedes Assembly Bill 333 applies retroactively insofar as it amended the definition of a "pattern of criminal gang activity" under section 186.22, but he argues any instructional error was harmless beyond a reasonable doubt.

### 1. Legal Principles

As relevant here, Assembly Bill 333 "made several changes to the definition of section 186.22 gang enhancements. 'First, it narrowed the definition of a "criminal street gang" to require that any gang be an "ongoing, *organized* association or group of three or more persons." (§ 186.22, subd. (f), italics added.) Second, whereas section 186.22,

---

[24] Accordingly, we do not reach Chavez's claim that this error violated his First Amendment and due process rights.

[25] Because we are vacating Chavez's convictions for the reasons set forth in section II.C above, we must also vacate the jury's true findings on the gang enhancements. The jury's findings on the gang enhancements were infected by the same prejudicial error, and the jury could not have made findings on the gang enhancements without first finding Chavez guilty on the substantive offenses. We therefore do not address Chavez's arguments concerning this claim, but even if we did, his arguments are substantially similar to Franco's arguments.

former subdivision (f) required only that a gang's members "individually *or* collectively engage in" a pattern of criminal activity in order to constitute a "criminal street gang," the amended statute requires that any such pattern have been "*collectively* engage[d] in" by members of the gang.  (§ 186.22, subd. (f), italics added.)  Third, Assembly Bill 333 also narrowed the definition of a "pattern of criminal activity" by requiring that (1) the last offense used to show a pattern of criminal gang activity occurred within three years of the date that the currently charged offense is alleged to have been committed; (2) the offenses were committed by two or more gang "members," as opposed to just "persons"; (3) the offenses commonly benefitted a criminal street gang; and (4) the offenses establishing a pattern of gang activity must be ones other than the currently charged offense.  (§ 186.22, subd. (e)(1), (2).)  Fourth, Assembly Bill 333 narrowed what it means for an offense to have commonly benefitted a street gang, requiring that any "common benefit" be "more than reputational."  (§ 186.22, subd. (g).)' [Citation.]" (*People v. Clark* (2024) 15 Cal.5th 743, 752 (*Clark*).)  "Examples of a common benefit that are more than reputational may include, but are not limited to, financial gain or motivation, retaliation, targeting a perceived or actual gang rival, or intimidation or silencing of a potential current or previous witness or informant."  (§ 186.22, subd. (g).)

The amendment to section 186.22, subdivision (e)(1) requiring proof that the two predicate offenses "were committed on separate occasions or by two or more members" does not require that each predicate offense be committed by two or more members. (*Clark*, *supra*, 15 Cal.5th at p. 749.)  However, the prosecution must prove the gang's "members collectively engage in, or have engaged in, a pattern of criminal gang activity." (§ 186.22, subd. (f).)  "[C]ollective engagement requires a nexus between the individual predicate offenses and the gang as an organized, collective enterprise.  This organizational nexus requirement is satisfied by showing a connection between the predicate offenses and the organizational structure, primary activities, or common goals and principles of the gang." (*Clark*, at p. 749.)  As relevant here, this organizational

nexus might be shown by "evidence of a direct order from the gang to commit specific crimes"; evidence of "a more general, well-understood expectation that members must engage in certain types of offenses," e.g., when junior members receive a general order to attack rivals to support the gang and earn their status; or by evidence "demonstrating that the offenses are reflective of the primary activities of the gang, or else adhere to a common goal or plan characteristic of the gang in question." (*Id.* at p. 763.)

These amendments apply retroactively to cases that were not yet final as of the legislation's effective date. (*Tran*, *supra*, 13 Cal.5th at p. 1206.) This includes defendants' cases. To determine whether the retroactive application of these amendments requires us to vacate the jury's true findings, we apply the harmless error standard set forth in *In re Lopez* (2023) 14 Cal.5th 562 (*Lopez*) and *In re Ferrell* (2023) 14 Cal.5th 593 (*Ferrell*). "[A] reviewing court may hold the error harmless where it would be impossible, based on the evidence, for a jury to make the findings reflected in its verdict without also making the findings that would support a valid theory of liability." (*Lopez*, at p. 568.) As applied to jury instructions that omitted statutory elements added by a subsequent amendment, "such errors may be found harmless if it would be impossible, based on the evidence, for a jury to make the findings reflected in its verdict without also finding the missing fact as well." (*Ibid.*) " 'In determining . . . whether the error was harmless, the reviewing court is not limited to a review of the verdict itself.' [Citation.]" (*Id.* at p. 588.) "[A] reviewing court must be persuaded that, in light of the jury's findings and the evidence at trial, any rational juror who made those findings would have made the additional findings necessary for a valid theory of liability, beyond a reasonable doubt, if the jury had been properly instructed." (*Id.* at p. 589.)

*Lopez* relied on the harmless error standard for the failure to instruct on an element of the offense as set forth in *Neder v. U. S.* (1999) 527 U.S. 1 (*Neder*). "[W]here a reviewing court concludes beyond a reasonable doubt that the omitted element was uncontested and supported by overwhelming evidence, such that the jury verdict would

99

have been the same absent the error, the erroneous instruction is properly found to be harmless." (*Id.* at p. 17.)  The *Lopez* court emphasized that this standard requires a rigorous review of the record.  "[W]hile 'overwhelming' evidence may demonstrate harmlessness, a court's analysis of whether the evidence is 'overwhelming' in this context is not as subjective or free-ranging as that term might imply.  Instead, the analysis requires a court to rigorously review the evidence to determine whether any rational juror who found the defendant guilty based on an invalid theory, and made the factual findings reflected in the jury's verdict, would necessarily have found the defendant guilty based on a valid theory as well.  [Citation.]" (*Lopez, supra*, 14 Cal.5th at p. 568.)  "The question here is not the sufficiency of the evidence to support a valid theory, but its opposite.  To determine the sufficiency of the evidence, a reviewing court essentially asks whether any rational juror could have made the findings necessary to convict the defendant on a valid theory." (*Id*. at p. 591.)  Here, "a reviewing court essentially asks whether any rational juror who made the findings reflected in the verdict and heard the evidence at trial could have had reasonable doubt regarding the findings necessary to convict the defendant on a valid theory." (*Ibid.*)  "This test is exacting, and it requires much of a reviewing court.  '[S]afeguarding the jury guarantee will often require that a reviewing court conduct a thorough examination of the record.  If, at the end of that examination, the court cannot conclude beyond a reasonable doubt that the jury verdict would have been the same absent the error — for example, where the defendant contested the omitted element and raised evidence sufficient to support a contrary finding — it should not find the error harmless.' [Citation.]" (*Id.* at p. 581, quoting *Neder, supra*, at p. 19.)

### 2.  *Factual Background*

It was undisputed that the Mob was a Norteño "criminal street gang" in 2007 and 2008 under the version of section 186.22 in effect at the time of trial.  It was likewise undisputed that Ruby was a member of the Mob in 2007 and 2008.

100

### a. *San Jose Avenue Stabbing*

Counsel for Franco elicited testimony from Ruby about his participation in a stabbing at 135 San Jose Avenue on May 30, 2007. Ruby testified that he was there, and he was not a stabber, but he aided and abetted the stabbing by "backing up his homies."

Chavez testified that he was driving on Pomona Avenue near San Jose Avenue when he saw Ruby running toward San Jose Avenue with his shirt off. Ruby was pursuing another person further up the street. When Ruby was very close to San Jose Avenue, a car pulled up, a group of people jumped out, and they joined Ruby to attack the person. Chavez recognized Jose Garate as one of the attackers. Chavez testified that this area was claimed by the Mob; he agreed that he previously testified the victim was a Sureño; and he agreed it would be reasonable to believe this was an attack on a Sureño.

The prosecution introduced a charging document, minutes of plea and sentencing hearings, and an abstract of judgment showing Garate pleaded guilty to assault with a deadly weapon and admitted the offense was committed for the benefit of, at the direction of, or in association with a criminal street gang on May 30, 2007. Counsel for Franco adduced testimony from Ruby that Jose Garate was a member of the Mob. The prosecution's gang expert testified that Garate's conviction and his tattoo, "My Only Brother," were consistent with mob membership.

### b. *Forestdale Avenue and Jeanne Avenue Shootings*

Counsel for Franco elicited testimony from Ruby about his participation in a shooting in the area of Forestdale Avenue and Jeanne Avenue on September 22, 2007. Ruby testified that he went to that area to hunt and kill Sureños. Garate was the driver. Ruby participated in the shooting murder of one person and a premeditated attempted murder of a second man who was shot and wounded. Garate, Joseph "Speedy" Esquivel, and Juan "Spooky" Hernandez were there. Afterwards, Ruby took possession of a gun used in the shooting.

101

The prosecution's gang expert testified that Esquivel, who had a Mob tattoo on his neck, was a member of the Mob. Detective Angel Mina testified that Hernandez was a Mob member in the mid-2000s.

#### c. Oak Street Stabbing

Counsel for Franco elicited testimony from Ruby about his stabbing of an assumed Sureño in January 2007 on Oak Street just off Market Street in San Jose. Ruby saw some Mob members getting out of a car, so he went to assist them. Ruby had a knife and stabbed the Sureño more than once.

### 3. Procedural Background

The trial court instructed the jury that a pattern of criminal gang activity meant: "The commission of, or attempted commission of, or having a juvenile petition sustained for commission of any combination of two or more of the following crimes, or two more occurrences of one or more of the following crimes: murder, attempted murder, assault with a deadly weapon, and shooting at inhabited dwelling. [¶] 2. At least one of those crimes . . . was committed after September 26th, 1988; [¶] 3. The most recent crime occurred within three years of one of the earlier crimes; and [¶] 4. The crimes were committed on separate occasions or personally committed by two or more persons." The court did not instruct the jury as to any specific allegations or alleged offenses that might constitute predicate offenses.

In closing arguments, the prosecutor argued the evidence showed there were "plenty of prior crimes," including all the prior crimes that Ruby admitted. The prosecutor estimated there were about 20 such crimes. He specifically mentioned the stabbing on Forestdale Avenue and Jeanne Avenue, and the Oak Street stabbing, among others. He stated, "Technically the law only requires one to show a pattern. One prior crime. You heard about 20." He also gave as examples some offenses that would not qualify as predicate offenses under the amended statute—e.g., Javier Garcia's prior convictions, and Franco's prior possession of a concealable revolver.

102

In his closing argument, counsel for Franco stated, "The crimes at Reed Street, Dobern and McCreery, they were committed for the benefit of, at the direction of, and in association with a criminal street gang. *That is not in dispute in this case at all.*" (Italics added.) Counsel argued instead that the jury would not have to consider the gang enhancements if the jury did not first find Franco guilty of the substantive offenses.

Counsel for Franco further argued that Ruby was guilty of numerous crimes committed on behalf of the Mob, including the following: "Ruby committed or participated in a killing, a murder on Forestdale/Jeanie, [*sic*] on September 22nd, 2007." "So Ruby confessed here in court, having not produced not one, not two, but three different murders all by November 23rd of 2007 . . . ." In November 2007, "Allen Ruby all by himself gave the Nuestra Familia three murders, three kills." "Early 2007, he commits a stabbing on Oak Street. In June of 2007, he is involved in a stabbing on San Jose Avenue." "We get to September 22nd of 2007, he participated in a premeditated first degree murder where the victim was shot, and a premeditated attempted murder on a second victim who was with the first guy." "He is committed to putting in work. . . . Stabbings shootings, killings, slashing people's throats, robbery . . . Sureños were the enemy. Ruby would hunt them down like animals, ambush them, catch them unaware by sneaking up on them." "We move forward yet to another month, November 23rd of 2007. He is participating in two premeditated first degree-murders . . . . This is one of those Sureno hunting missions, you know, that they go on, that Allen Ruby goes on."

Counsel for Chavez likewise did not contest the gang enhancements in his closing argument. Counsel argued that Chavez was neither a gang member nor guilty of the substantive offenses, and counsel agreed with counsel for Franco about Ruby's motives and criminality, e.g.: "[Ruby]'s personally stabbed at least 10 people with the hope to kill. He shoots people with a hope to kill." "There was testimony from Allen Ruby that he was doing missions with Palmas to hunt and kill Sureno people. There's the Komar, Forestdale/Jeanie, [*sic*] Washington School, Cadillac and others."

103

The jury found all gang allegations true.

### 4. Instructional Errors Based on Assembly Bill No. 333's Amendments to the Gang Enhancement Requirements Were Harmless

Franco contends the jury's findings on the gang allegations must be vacated based on the amendments to the definition of a "pattern of criminal gang activity" under section 186.22, subdivision (e)(1) and the definition of a "criminal street gang" under subdivision (f). He contends errors in the jury instructions allowed the jury: (1) to use the charged offenses as predicate offenses; (2) to find a criminal street gang based in part on members who, whether "acting alone or together," engage in or have engaged in a pattern of criminal gang activity;[26] (3) to find that a predicate offense "commonly benefited" the gang even if the common benefit was not "more than reputational"; and (4) to consider offenses that occurred after the charged offenses.[27]

Franco concedes the evidence in the record establishes nine offenses—including the three offenses summarized above—that meet the requirements for predicate offenses under the amended version of section 186.22. The Attorney General identifies 13 such offenses, including the three summarized above. The Attorney General argues that "targeting a perceived or actual gang rival" is a "common benefit to members of a gang" that is "more than reputational," and he asserts these predicates offenses all involved targeting Sureños. (§ 186.22, subd. (g).) Franco does not dispute this.

Franco nonetheless argues the instructional errors were not harmless beyond a reasonable doubt. He contends that because of the large number of invalid predicate offenses presented to the jury, the Attorney General cannot show, for each and every juror, that the true findings for the gang allegations did not rest, in part, on an invalid

---

[26] On this point, Franco argues the amended statute requires that each predicate offense be committed by two or more gang members. After Franco filed his briefs in this matter, the California Supreme Court rejected that reading of the statute. (*Clark*, *supra*, 15 Cal.5th at p. 749.)

[27] Franco notes other instructional errors in a footnote in his opening brief, but he does not present arguments based on them.

predicate offense. Franco relies on *Sullivan v. Louisiana* (1993) 508 U.S. 275. "Harmless-error review looks, we have said, to the basis on which 'the jury *actually* rested its verdict.' [Citation.] ([E]mphasis added). The inquiry, in other words, is not whether, in a trial that occurred without the error, a guilty verdict would surely have been rendered, but whether the guilty verdict actually rendered in *this* trial was surely unattributable to the error." (*Id.* at p. 279.) The California Supreme Court rejected this argument in *Lopez*, *supra*, 14 Cal.5th at pages 583-584. "*Neder* . . . sharply limited the application of *Sullivan*'s broad language. . . . [W]e made clear in *Aledamat* that the relevant inquiry is not the jury's verdict actually rested on a valid theory, but whether any rational jury would surely have rendered the same verdict had it been properly instructed." (*Lopez*, at p. 584, citing *People v. Aledamat* (2019) 8 Cal.5th 1, 9 (*Aledamat*).)

Franco argues that the standard for harmless error set forth in *Lopez* does not apply here because that case concerned an example of "alternative-theory" instructional error. He argues the appropriate standard is provided by *People v. Flood* (1998) 18 Cal.4th 470 (*Flood*). But the California Supreme Court in *Lopez* and *Aledamat* held the same harmless error standard may apply to instructional error based on either "missing elements" or "alternative-theory" error as these types of error are analytically indistinguishable as a general matter. "In cases where the instructional error at issue is a misdescription or omission of elements with no alternative theory presented, the prosecutor argued and the jury necessarily considered the invalid theory because it was the only one presented. Indeed, in such cases we can be sure the jury *actually* relied on the invalid theory, again because it was the only one presented to it. But this circumstance does not categorically bar a reviewing court from finding the error harmless where any rational jury would have found the defendant guilty notwithstanding the error." (*Lopez*, *supra*, 14 Cal.5th at p. 582, citing *Neder*, *supra*, 527 U.S. at p. 18.)

105

Accordingly, "[N]o higher standard of review applies to alternative-theory error than applies to other misdescriptions of the elements." (*Aledamat*, *supra*, 8 Cal.5th at p. 9.)

*Flood* does not support Franco's argument. In *Flood*, the California Supreme Court held, "One situation in which instructional error removing an element of the crime from the jury's consideration has been deemed harmless is where the defendant concedes or admits that element." (*Flood, supra,* 18 Cal.4th at p. 504.) (See *People v. Merritt* (2017) 2 Cal.5th 819, 824 [error was harmless in part because the defense conceded that a robbery occurred]; *Aledamat*, *supra*, 8 Cal.5th at p. 17 (conc. & dis. opn. of Cuéllar, J.) [harmless error where the element omitted or misdescribed " '*was uncontested and supported by overwhelming evidence*, such that the jury verdict would have been the same absent the error' [citation]"]; *People v. Madrigal* (2023) 93 Cal.App.5th 219, 244 ["The error is harmless 'where a reviewing court concludes beyond a reasonable doubt that the omitted element was uncontested and supported by overwhelming evidence.' [Citation.]"].)

Here, Franco did not contest that the Mob was a criminal street gang, that Ruby was a member of the Mob, or that the offenses were committed for the benefit of, at the direction of, and in association with a criminal street gang under the version of section 186.22 in effect at the time. To the contrary, trial counsel for Franco expressly asserted those facts. More critically, he expressly asserted facts based on evidence he adduced during trial that establish the elements subsequently added by Assembly Bill 333. The central pillar of Franco's defense was that he was misidentified as a suspect in the charged offenses, and that Ruby's allegations of Franco's involvement were not credible. Franco sought to attack Ruby's credibility by proving he had committed numerous violent offenses. Counsel therefore argued that Ruby and other Mob members committed numerous specified murders and attempted murders with the intent to kill rival Sureños,

106

and counsel elicited outright admissions from Ruby that he had committed them.[28] Ruby's admissions were also corroborated in key respects by other evidence.

Under the current version of section 186.22, "targeting a perceived or actual gang rival" constitutes "a common benefit to members of a gang where the common benefit is more than reputational." (§ 186.22, subd. (g).) Evidence of such motives also demonstrates "that the offenses are reflective of the primary activities of the gang, or else adhere to a common goal or plan characteristic of the gang in question," thereby satisfying the collective engagement requirement of section 186.22, subdivision (f). (*Clark*, *supra*, 15 Cal.5th at p. 763.) It is undisputed that Ruby was a Mob member when he committed these murders, attempted murders, and stabbings with the intent to kill rival Sureños, and that he committed them within three years of the dates the charged offenses were alleged to have been committed. The offenses identified above, in addition to others set forth in the record, satisfy those requirements.

Franco's appellate counsel concedes the above offenses meet the requirements for predicate offenses under section 186.22 as amended. The concession is well-taken. We do not rely solely on the assertions and concessions of Franco's trial counsel and appellate counsel. Having conducted a rigorous and thorough examination of the record, we determine the facts and evidence establishing these offenses as qualifying predicates were uncontroverted by any other facts or evidence. On this record, no rational juror could find any reasonable doubt that the required predicate offenses were committed, and no rational juror could find any reasonable doubt that they were committed on separate occasions or by two or more Mob members. In other words, no rational juror who made the findings reflected in the verdict and heard the evidence at trial could have had reasonable doubt regarding the truth of the gang allegations in the absence of

---

[28] Franco's trial counsel also identified a stabbing Ruby committed at Meadowfair in late 2007 or early 2008 as "red-on-red violence"—e.g., an attack on other Norteños. We do not rely on that offense for our harmless error analysis.

instructional error.  We therefore conclude the instructional errors were harmless beyond a reasonable doubt, and we reject the merit of this claim as to Franco.

Franco further contends the jury's findings on the firearms allegations for counts 4 and 5 must be vacated if the jury's findings on the gang allegations are vacated.  Because we do not vacate the jury's findings on the gang allegations as to Franco, we do not reach this claim.

### E.  Jury Instructions on the Kill Zone Theory of Attempted Murder (Count 5)

Franco contends we must vacate his conviction for the attempted murder of Chanda Newton because the trial court erroneously instructed the jury on the kill zone theory of liability.  The Attorney General argues the jury instruction was a correct statement of the law; that Franco forfeited this claim by failing to request clarifying language below; and that there was no reasonable likelihood the jury misapplied it.

#### 1.  Factual and Procedural Background

The evidence presented at trial pertaining to the facts and circumstances of the McCreery Avenue shooting is set forth above in section I.B.5.

The trial court instructed the jury in relevant part as follows:  "To prove that the defendant is guilty of attempted murder, the People must prove that:  [¶]  1. The defendant took at least one direct but ineffective step toward killing another person; and [¶]  2. The defendant intended to kill that person."  The court defined the legal principles applicable to a "direct step" and then gave the following "kill zone" instruction:  "A person may intend to kill a specific victim or victims, and at the same time intend to kill everyone in a particular zone of harm or, quote, 'kill zone.'  [¶]  In order to convict the defendant of attempted murder of Chanda Newton, the People must prove the defendant not only intended to kill Gilberto Medina, but also either intended to kill Chanda Newton or intended to kill everyone within the kill zone.  [¶]  If you have a reasonable doubt whether the defendant intended to kill Chanda Newton or intended to kill Gilberto

108

Medina by killing everyone in the kill zone, you must find the defendant not guilty of the attempted murder of Chanda Newton."

In his closing argument, the prosecutor addressed the attempted murder of Newton based on the kill zone theory of liability as follows: "Chanda is -- there is no evidence at all that she is a gang member. *There is no evidence that she was intended to be shot. There is no evidence that she was associating with Gilberto.* She happened to be out in that driveway late at night with one of the kids. [¶] She was at the wrong place at the wrong time. . . . She was what in the law is I am calling a kill zone, what the law calls a kill zone." (Italics added.) The prosecutor referred the jury to the trial court's instruction on kill zone liability and stated, "A person may intend to kill a specific victim or victims -- in this case the specific victim was Gilberto Medina and the other Sureno he was with – and at the same time intend to kill everyone in a particular zone of harm or kill zone. [¶] In order to convict the defendant of the attempted murder of Chanda Newton, the People must prove the defendant not only intended to kill Gilberto Medina, but also either intended to kill Chanda. There is not evidence of that. No specific plan to kill her. Okay. Take that off. Or intended to kill everyone within the kill zone. So what's the evidence in this case?"

The prosecutor then described the shooting, beginning with Monique's car pulling up in front of the house and the shooters opening fire: "There is a congregation of people out front. They've got so much time to get off as many shots as they can. Two guys get out from the rear, the opposite side of the car, get up and over the car, and *just start spraying the bullets*. People are running everywhere. It is not being indiscriminate about, well, I am only going to be careful and track this person. All the shots are being fired rapidly together at that entire scene. [¶] That scene -- being out in front of that scene with that car with three people shooting into the front of that property, anyone there had the misfortune of being in the kill zone. And that's how Chanda Newton got shot.

*Not because she was being targeted*, but she was in this kill zone in front of this house." (Italics added.)

The prosecutor then described Medina's testimony about how he moved around the white Dodge Stratus when the shooting started. The prosecutor described how bullets struck various locations on the front of the house, the fence and masonry fenceposts in front, the car parked in front of the house, and the tarp over the car, adding, "There was a wide kill zone."

### 2. *Legal Principles Applicable to Multiple Attempted Murders*

"The mental state required for attempted murder has long differed from that required for murder itself. Murder does not require the intent to kill. Implied malice—a conscious disregard for life—suffices." (*People v. Bland* (2002) 28 Cal.4th 313, 327 (*Bland*).) But implied malice cannot support a conviction for an *attempt* to commit murder. (*Ibid.*) Furthermore, the common law doctrine of "transferred intent" does not apply to attempted murder. (*People v. Souza* (2012) 54 Cal.4th 90, 120.) "To prove the crime of attempted murder, the prosecution must establish 'the specific intent to kill and the commission of a direct but ineffectual act toward accomplishing the intended killing.' [Citation.]" (*People v. Canizales* (2019) 7 Cal.5th 591, 602 (*Canizales*).)

The same principles apply when a person attempts to murder multiple persons. "When a single act is charged as an attempt on the lives of two or more persons, the intent to kill element must be examined independently as to each alleged attempted murder victim; an intent to kill cannot be 'transferred' from one attempted murder victim to another under the transferred intent doctrine." (*Canizales*, *supra*, 7 Cal.5th at p. 602.)

In *Bland*, the California Supreme Court recognized the so-called "kill zone" theory of liability for the attempted murders of multiple victims based on "concurrent intent." " 'The intent is concurrent . . . when the nature and scope of the attack, while directed at a primary victim, are such that we can conclude the perpetrator intended to ensure harm to the primary victim by harming everyone in that victim's vicinity.' " (*Bland*, *supra*,

110

28 Cal.4th at p. 329, quoting *Ford v. State* (1993) 330 Md. 682, 716.) "[A] jury may convict a defendant under the kill zone theory only when the jury finds that: (1) the circumstances of the defendant's attack on a primary target, including the type and extent of force the defendant used, are such that the only reasonable inference is that the defendant intended to create a zone of fatal harm — that is, an area in which the defendant intended to kill everyone present to ensure the primary target's death — around the primary target and (2) the alleged attempted murder victim who was not the primary target was located within that zone of harm. Taken together, such evidence will support a finding that the defendant harbored the requisite specific intent to kill both the primary target and everyone within the zone of fatal harm." (*Canizales*, *supra*, 7 Cal.5th at pp. 596-597.) "In determining the defendant's intent to create a zone of fatal harm and the scope of any such zone, the jury should consider the circumstances of the offense, such as the type of weapon used, the number of shots fired (where a firearm is used), the distance between the defendant and the alleged victims, and the proximity of the alleged victims to the primary target." (*Id.* at p. 608.)

"The far more commonplace act of firing one or a few shots at a group may supply the actus reus for a number of crimes. But, standing alone, it does not support a conclusion that the shooter intended to create a kill zone around the primary target in order to ensure that primary target will die." (*People v. Mumin* (2023) 15 Cal.5th 176, 193 (*Mumin*).) "The best protection against a jury's improper application of a concurrent intent theory is to make sure that it receives proper instruction on that theory and only in the narrow and particularized circumstances to which it may legitimately be applied." (*Id.* at p. 203.) "*Canizales* emphasized that only a rare set of circumstances would warrant a concurrent intent instruction and 'there will be relatively few cases in which the theory will be applicable and an instruction appropriate.' [Citation.] Courts should reserve instruction to those fairly unusual cases where the facts fit the theory. They

111

should also take care to 'describe the contours and limits of the kill zone theory . . . .' [Citation.]" (*Ibid.*)

The independent or de novo standard of review is applicable in assessing whether instructions correctly state the law. (*People v. Posey* (2004) 32 Cal.4th 193, 218.)

### 3. *Forfeiture*

The trial was held before the Supreme Court decided *Canizales*, and Franco did not request clarifying language or object to the trial court's kill zone instruction. The Attorney General contends the instruction constituted a correct statement of the law, and that Franco forfeited the claim on appeal by failing to object or request clarifying language. The Attorney General characterizes *Canizales* as holding that the standard instruction based on CALCRIM No. 600 "could have benefited from additional clarifying language," not that it was an incorrect statement of the law. "Generally, a party may not complain on appeal that an instruction correct in law and responsive to the evidence was too general or incomplete unless the party has requested appropriate clarifying or amplifying language." (*People v. Castaneda* (2011) 51 Cal.4th 1292, 1348.)

*Canizales*, which found there was insufficient evidence to support a kill zone instruction, did not squarely hold that the standard instruction was legally invalid if it is supported by substantial evidence. But *Canizales* did not describe the instruction as constitutionally adequate either. The court held, "[W]hen a kill zone instruction is legally warranted and in fact provided, the standard instruction should be revised to better describe the contours and limits of the kill zone theory as we have laid them out here." (*Canizales*, *supra*, 7 Cal.5th at p. 609.) At least in the context of that case, however, *Canizales* characterized the instruction as embodying a "legally inadequate theory." (*Id.* at p. 613.)

Franco argues the instruction itself was legally incorrect, and not merely in need of clarification. Such claims may be reviewable under section 1259: "The appellate court may also review any instruction given, refused or modified, even though no objection

112

was made thereto in the lower court, if the substantial rights of the defendant were affected thereby." (See *People v. Sattiewhite* (2014) 59 Cal.4th 446, 475 ["Defendant failed to object in the trial court, but to the extent he is claiming that the instruction was erroneous (and not merely that the court should have clarified certain terms within it), his claims are reviewable under section 1259."].)

The Attorney General cites no case holding a defendant's failure to object to the pre-*Canizales* version of the instruction constitutes forfeiture. By contrast, numerous courts of appeal have applied *Canizales* retroactively, including courts ruling on habeas corpus petitions where the judgment was final. (*In re Lisea* (2022) 73 Cal.App.5th 1041, 1053 [*Canizales* applied retroactively on habeas corpus because it prevents defendants who did not intend to kill the victim from being convicted of attempted murder, reducing potential liability for a crime]; *In re Sambrano* (2022) 79 Cal.App.5th 724, 731, [*Canizales* applies retroactively on habeas corpus because it substantively changed the law on the kill zone theory], disapproved on another ground by *Mumin*, *supra*, 15 Cal.5th at p. 209, fn. 11; *People v. Booker* (2020) 58 Cal.App.5th 482, 499, fn. 11 [claim of insufficient evidence to support the instruction was reviewable under section 1259]; *In re Rayford* (2020) 50 Cal.App.5th 754, 776, (*Rayford*) [*Canizales* applied retroactively on habeas corpus], disapproved on another ground by *Mumin*, *supra*,15 Cal.5th at p. 203[29]; *People v. Thompkins* (2020) 50 Cal.App.5th 365, 392 [claim reviewable under section 1259 and because *Canizales* was new authority further restricting the use of a kill zone theory], disapproved on another ground by *Lopez*, *supra*, 14 Cal.5th at p. 584; see also *People v. Dominguez* (2021) 66 Cal.App.5th 163, 187 [accepting the Attorney General's concession that reversal was required because the trial court gave a legally

---

[29] *Rayford* concerned former CALJIC No. 8.66.1, which is similar but not identical to the instruction at issue here and in *Canizales*. (*Rayford*, *supra*, 50 Cal.App.5th at p. 765.) The *Mumin* court stated that *Rayford* had correctly determined the kill zone instruction was incorrect, and that habeas relief was therefore properly granted. (*Mumin*, *supra*, 15 Cal.5th at p. 195.)

113

inadequate kill zone instruction based on the standard CALCRIM No. 600 pattern instruction pre-*Canizales*].)

Looking to the weight of these authorities, we conclude Franco did not forfeit this claim by failing to object or request clarifying language in the trial court.

### 4. *The Error Requires Reversal of the Conviction on Count 5*

The parties dispute the proper standard for determining whether reversal is required. Franco contends the prejudice analysis is governed by the standard set forth in *Chapman, supra*, 386 U.S. at page 24 [the reviewing court must reverse the conviction unless, after examining the entire cause, including the evidence, and considering all relevant circumstances, the court determines the error was harmless beyond a reasonable doubt].) The Attorney General argues that because *Canizales* did not hold that CALCRIM No. 600 was legally incorrect as a matter of law, the proper standard is whether there is a reasonable likelihood that the jury misunderstood and misapplied the instruction.[30] (See *People v. Smithey* (1999) 20 Cal.4th 936, 963 ["If a jury instruction is ambiguous, we inquire whether there is a reasonable likelihood that the jury misunderstood and misapplied the instruction."]) Other courts have applied various versions or combinations of these standards, but except for *Mumin*, those cases were all decided prior to *Lopez, supra*, 14 Cal.4th 562, which clarified the application of the *Chapman* standard in cases involving alternative theory error.

In *Canizales*, after concluding the evidence was insufficient to support the instruction, the court looked to whether there was a reasonable likelihood that the jury understood the kill zone instruction in a legally impermissible manner. (*Canizales, supra*, 7 Cal.5th at p. 614.) *Mumin* applied the *Lopez* standard in considering a modified version of the standard CALCRIM No. 600 instruction that was "not legally sound, nor

---

[30] The Attorney General takes this one step further and argues any error was harmless unless there was a reasonable likelihood the jury relied specifically on a theory of transferred intent. For the reasons below, this argument is unavailing.

was the prosecution's argument on that point." (*Mumin*, *supra*, 15 Cal.5th at p. 210.) The *Mumin* court held, "Just as in *Canizales*, 'there is a reasonable likelihood that the jury understood the kill zone instruction in a legally impermissible manner.' " The court then and applied the *Chapman* harmless standard as clarified by *Lopez*. (*Mumin*, at p. 210.)

Based on *Mumin*'s application of the standards, we first consider first whether there was a reasonable likelihood the jury understood the kill zone instruction in a legally impermissible manner based on the court's instruction and the prosecution's argument. The trial court's instruction was identical to that given in *Canizales* except for the names of the victims, and as such it suffered from the same defects. "Beyond its reference to a 'particular zone of harm,' the instruction provided no further definition of the term 'kill zone.' Nor did the instruction direct the jury to consider evidence regarding the circumstances of defendants' attack when determining whether defendants 'intended to kill [the secondary target] by killing everyone in the kill zone.' " (*Canizales*, *supra*, 7 Cal.5th at p. 613.) Furthermore, the instruction did not require a finding that defendant intended to create a kill zone *around* Medina order to ensure his death. As a result, it gave no guidance as to how the jury should determine whether Newton was actually within the kill zone, as *Canizales* requires. (*Mumin*, *supra*, 15 Cal.5th at p. 209.)

And as in *Canizales* and *Mumin*, the prosecution's argument exacerbated these problems. The prosecutor relied entirely on a "kill zone" theory for the attempted murder of Newton. However, he misstated the required findings in a way that likely led the jury to misunderstand the theory. First, the prosecutor told the jury, "*There is no evidence that [Newton] was intended to be shot.*" (Italics added.) Likewise, the prosecutor later stated, "In order to convict the defendant of the attempted murder of Chanda Newton, the People must prove the defendant not only intended to kill Gilberto Medina, but also either intended to kill [Newton]. There is not evidence of that. No specific plan to kill her." The prosecutor then attempted to assert a kill zone theory of liability.

115

The problem, of course, is that a legally proper kill zone theory requires *concurrent* intent: the intent to kill the primary target *and* the intent to kill persons in a zone around the primary target.[31]  If the shooters did not intend to kill Newton, there was no basis for a kill zone instruction.  "The foundation for the concurrent intent theory is that the use of a particularly lethal method of attack to kill a targeted individual can support an inference that the attacker intended to kill the primary target *and concurrently intended to kill everyone near the target* to ensure the target's death.  The distinction is important." (*Mumin*, *supra*, 15 Cal.5th at pp. 212-213, italics added.)  If, as the prosecutor argued, there was no evidence the shooters intended to kill Newton, then the evidence was insufficient to support a kill zone instruction.

By arguing otherwise, the prosecutor may have misled the jury into thinking it was not required to find an intent to kill Newton, and that it was enough to show she was put in danger of being killed.  This was precisely the problem identified in *Canizales*.  "Evidence that a defendant who intends to kill a primary target acted with only conscious disregard of the risk of serious injury or death for those around a primary target does not satisfy the kill zone theory.  . . .  [T]he kill zone theory does not apply where 'the defendant merely subjected persons near the primary target to lethal risk.' " (*Canizales*, *supra*, 7 Cal.5th at p. 607, quoting *People v. Medina* (2019) 33 Cal.App.5th 146, 156.)

The prosecutor further confused the theory by describing the shooters' actions as follows:  "Two guys get out from the rear, the opposite side of the car, get up and over

---

[31] As Justice Liu's concurrence in *Mumin* explains, the problem is that the "either . . . or" language of the instruction implies the intent to kill the secondary target is mutually exclusive of the intent to kill every person in the kill zone, whereas as the former theory is actually subsumed by the latter theory:  "[T]he instruction presents the kill zone theory as an alternative theory of attempted murder liability by informing the jury that the prosecutor must prove either intent to kill the nontarget victim or intent to kill everyone within the kill zone — when in fact the latter (intent to kill everyone within the kill zone) is how a jury finds the former (intent to kill the nontarget victim)." (*Mumin*, *supra*, 15 Cal.5th at p. 223, conc. opn. of J. Liu.)

the car, and *just start spraying the bullets*. People are running everywhere. It is not being indiscriminate about, well, I am only going to be careful and track this person. All the shots are being fired rapidly together at that entire scene. . . . And that's how Chanda Newton got shot. *Not because she was being targeted*, but she was in this kill zone in front of this house." These statements may have led the jury to think the kill zone theory was satisfied if the evidence showed only that Newton was put in danger of being killed.

Second, the prosecutor defined the kill zone irrespective of Newton's location in relation to Medina's location. "[T]he existence *and location* of a primary target is important because those facts help define the extent of the kill zone, which is necessary in order for the jury to determine whether the secondary target was within that zone." (*Mumin*, *supra*, 15 Cal.5th at p. 209, italics added.) The prosecutor did not explicitly describe the boundaries of the kill zone, but he implied it was essentially the area in front of the house simply because that was the area covered by the bullets. He further implied the precise location of Newton relative to Medina was irrelevant. First, he noted, "There is no evidence that [Newton] was associating with [Medina]. She happened to be out in that driveway late at night with one of the kids," implying the distance between Medina and Newton was not relevant to determining whether Newton was in the kill zone. Furthermore, at one point the prosecutor stated, "in this case the specific victim was Gilberto Medina *and the other Sureno he was with*," creating yet more confusion about how the kill zone should be determined. If the prosecutor had defined the kill zone properly—i.e., with respect to the shooters' intent to kill Medina, and hence their intent to kill the people around him—this argument would not have presented a problem. Instead, the prosecutor characterized the kill zone objectively as the area where the shooters' bullets struck.

As in *Mumin*, "The prosecutor's argument did not properly characterize a kill zone as being the area *around [the primary target]*; the extent of which was to be evaluated in terms of the number of shots fired, the distance between defendant and the alleged

117

secondary victim, *and the distance between a secondary victim and [the primary target].*" (*Mumin*, *supra*, 15 Cal.5th at p. 210.)  While the implied kill zone in this case was not as "amorphous" as that described by the prosecutor in *Mumin*, *ibid.*, the prosecutor's argument discouraged the jury from considering circumstances relevant to whether Newton was within a properly defined kill zone.

The prosecutor's argument conflated the kill zone theory with an "indiscriminate killer scenario" in which the defendant does not specifically target a person, but rather applies lethal force indiscriminately to a group of persons.  (See *Mumin*, *supra*, 15 Cal.5th at p. 213.)  Such a scenario may form the basis for attempted murder charges.  "[A] person who intends to kill can be guilty of attempted murder even if the person has no specific target in mind.  An indiscriminate would-be killer is just as culpable as one who targets a specific person."  (*People v. Stone* (2009) 46 Cal.4th 131, 140.)  For example, "[A] terrorist who simply wants to kill as many people as possible, and does not know or care who the victims will be, can be just as guilty of attempted murder."  (*Ibid.*)  But that theory is distinct from a concurrent intent theory—e.g., "a bomber who places a bomb on a commercial airplane intending to kill a primary target but ensuring the death of all passengers."  (*Ibid.*; see *Mumin*, *supra*, 15 Cal.5th at p. 213.)  Here, by arguing both that Medina was the primary target *and* that there was no evidence of an intent to kill Newton, the prosecutor posited a scenario that was incompatible with either a kill zone theory or an indiscriminate killer theory.

Based on the jury instructions as a whole, together with the prosecution's argument, we conclude there was a reasonable likelihood the jury understood the kill zone instruction in a legally impermissible manner.  Indeed, it was quite *unlikely* the jury understood the instruction properly.  "As this case shows, there continues to be confusion as to the proper application of this theory."  (*Mumin*, *supra*, 15 Cal.5th at p. 215, conc. opn. of J. Liu.)  "The fact that courts, prosecutors, and jury instruction authors continue to

118

have trouble properly stating and applying the kill zone theory suggests that a reasonable juror is unlikely to fare better." (*Id.* at p. 224.)

Furthermore, the error was not harmless under the standard supplied by *Lopez*, *supra*, 14 Cal.5th 562. First, as the prosecutor accurately pointed out, there was no evidence to support a conviction based on the most basic theory of attempted murder— that Franco or any of the other shooters specifically intended to kill Newton.

The Attorney General argues the error is harmless because the instruction specifically told the jury it had to find "the defendant not only intended to kill Gilberto Medina, but also either intended to kill Chandra Newton or intended to kill everyone within the kill zone." But the same was true of the instruction in *Canizales*. The problem is that even if we assume the jury understood it had to find the defendants intended to kill everyone in the kill zone, the instruction failed to provide adequate guidance on how the jury should determine the scope of the kill zone and whether Newton was within it.

The Attorney General also points to the objective circumstances of the shooting: the large number of shots fired, and the evidence of numerous bullet strikes over a wide area across the front of the house. These objective circumstances are relevant to the analysis, and the Supreme Court in *Canizales* and *Mumin* identified various such factors, including the number of shots fired, but the ultimate focus is on the defendant's intent. "[T]he essential fact in question remains defendant's intent. This inquiry lies at the heart of the concurrent intent analysis." (*Mumin*, *supra*, 15 Cal.5th at p. 206.) The objective circumstances serve as circumstantial evidence supporting an inference that the defendant intended to kill persons in a zone around the primary target to ensure the primary target's death. (*Id.* at p. 193.)

While such circumstances may well provide sufficient evidence to support the giving of a kill zone instruction or sustain a conviction, the question here is whether the evidence shows the instructional error was harmless beyond a reasonable doubt under the *Lopez* standard. Notwithstanding the lethal nature of the attack as evidenced by the

119

number of shots fired and the wide area covered by the bullet strikes, a rational juror could find the shooters intended to kill only Medina while subjecting others to a risk of death. "To convict of attempted murder on a concurrent intent theory, it is not enough to conclude that the defendant intended to kill the target and simply ran the risk that others might be killed." (*Mumin, supra*, 15 Cal.5th at p. 206.)

The Attorney General points to the testimony of Ruby and Monique, who both stated the plan was to kill Sureños.[32] In response to the prosecutor's questioning, Ruby agreed he was "[t]rying to hit as many of those guys as [he] could," and "that was the plan, to kill." The prosecutor then asked, "Shoot to kill?" Ruby responded, "Yes." And Ruby again responded, "Yes," when the prosecutor asked, "The plan for everybody?" However, both Ruby and Monique repeatedly testified that the plan was to kill *Sureños*, and both testified that they did not see children at McCreery Avenue. Ruby testified that he did not see any women either. He repeatedly insisted that he was shooting only at the men, and that there were no women or children *in the crowd he was shooting at*.

The physical environment as evidenced by photographs is consistent with Ruby's testimony that he did not see women or children. Medina was standing next to the white Dodge Stratus in the front yard when the shooting started. Cabrera testified that she was sitting on the steps of the side door in the driveway with the children around her, and Newton was in the driveway as well. The driveway extended past the front yard area and ran along the side of the house to a garage behind the house. Judging from the photographs, the side door where Cabrera was sitting with the children appears to be

---

[32] The parties do not address the issue whether Ruby's intent to create a kill zone around Medina may be attributed to Franco as an aider and abettor. The Supreme Court in *Canizales* declined to reach this question. (*Canizales*, *supra*, 7 Cal.5th at p. 612, fn. 6.) We do not address it either; even assuming aiding and abetting liability would include that degree of shared intent, the instructional error was not harmless beyond a reasonable doubt.

approximately 20 to 25 feet past the area where Medina said he was standing before the shooting.

The photographs show that a wood fence ran along the side of the driveway opposite the house, separating the driveway from the property to the south. Cabrera testified that the property to the south partially blocked her view of McCreery Avenue, implying it may have likewise blocked the shooters' view down the driveway. Medina testified that the shooters' car was traveling northbound on McCreery Avenue before it stopped in front of the house. A juror could reasonably infer the shooters' view down the driveway was blocked as the car approached the house. Moreover, the shooting occurred at night. Witnesses testified that it was dark or "really dark," and a police officer testified that the area was not well lit. Photographs of the area show there were streetlights shining on the street in front of the house but there was little or no ambient lighting in the driveway area on the side of the house. Furthermore, Monique's car had tinted windows.

Finally, Ruby testified that he was shooting "randomly" and "wildly" at the crowd *in front of the house*. A rational juror could find the shooters intended to shoot only at the men in front of the house, not at the women and children in the driveway area, and that Newton was struck because the shooters acted with reckless disregard for the safety of others outside the group of men. Because a jury could find reasonable doubt as to whether any of the shooters intentionally shot Newton, the instructional error was not harmless beyond a reasonable doubt. Furthermore, although the Attorney General does not argue that jurors could have relied on an "indiscriminate would-be killer" theory of attempted murder, the same analysis would apply because that theory still requires an intent to kill with respect to each alleged victim. "Whether the defendant acted with specific intent to kill 'must be judged separately as to each alleged victim.' " (*People v. Smith* (2005) 37 Cal.4th 733, 740, quoting *Bland*, *supra*, 28 Cal.4th at p. 331.) We conclude Franco's conviction for attempted murder on count 5 must be reversed.

121

### F. *Correction of the Abstract of Judgment for the Sentence on Count 4*

The jury found Franco guilty of premeditated attempted murder on count 4, and the jury found true the gang allegation under section 186.22, subdivision (b)(5). The jury further found true the allegation that Franco was a principal in the offense, and that at least one principal in the offense personally and intentionally discharged a firearm. (§ 12022.53, subds. (c) & (e)(1).) On count 4, the trial court imposed a term of 35 years to life, equal to 15 years to life plus 20 years for the firearm enhancement.

Franco contends the sentence for premeditated attempted murder should have been life in prison, not 15 years to life in prison, because the jury did not find that Franco personally discharged a firearm. He urges us to correct the abstract of judgment to reflect the correct sentence. The Attorney General concedes Franco is correct on the underlying law, but the Attorney General points out that the total term together with the 20-year firearm enhancement should be 27 years to life.

As the Attorney General acknowledges, Franco is correct that the term for premeditated attempted murder on count 4 should have been life in prison, not 15 years to life in prison. Absent the firearm enhancement, Franco would not be parole eligible under count 4 for 15 years because of the gang enhancement. In relevant part, subdivision (b)(5) of section 186.22 provides, "[A] person who violates this subdivision in the commission of a felony punishable by imprisonment in the state prison for life shall not be paroled until a minimum of 15 calendar years have been served." But the jury found true a firearm enhancement, and "[a]n enhancement for participation in a criminal street gang . . . shall not be imposed on a person in addition to an enhancement imposed pursuant to this subdivision, unless the person personally used or personally discharged a firearm in the commission of the offense." (§ 12022.53, subd. (e)(2).) The jury did not find Franco personally discharged a firearm in the commission of the offense, so Franco was not subject to the gang enhancement in addition to the enhancement imposed under section 12022.53, subdivisions (c) and (e)(1). (*People v.*

*Brookfield* (2009) 47 Cal.4th 583, 594 [accomplices to a gang-related offense specified in section 12022.53 in which not the defendant but another principal personally used or discharged a firearm are subject to additional punishment under either section 12022.53 or the gang-related sentence increases under section 186.22, but not both].)

However, as the Attorney General points out, Franco remains subject to the 20-year determinate term under section 12022.53, subdivision (c). "When an enhancement specified in this section has been admitted or found to be true, the court shall impose punishment for that enhancement pursuant to this section rather than imposing punishment authorized under any other law, unless another enhancement provides for a greater penalty or a longer term of imprisonment." (§ 12022.53, subd. (j).) The 20-year term for the firearm enhancement plus the life term for the premeditated attempted murder is longer than then the 15-year minimum parole eligibility period that could be imposed under section 186.22, subdivision (b)(5). Therefore, the 20-year firearm enhancement must be imposed.

The Attorney General further points out that Franco is still subject to the default minimum parole eligibility period of seven years applicable to life sentences under subdivision (a) of section 3046, such that the total term for count 4 should be 27 years to life in prison.

Franco does not dispute this, but he contends the abstract of judgment must be corrected because it incorrectly states a term of 15 years to life on count 4 by listing count 4 in box "6(a)." He requests that we order the abstract of judgment be corrected to reflect that he was sentenced on count 4 to a term of life with the possibility of parole by listing count 4 in box "5" instead of box "6(a)." We will order the trial court to correct the abstract of judgment on remand.

### G. Remaining Issues for Sentencing on Remand

The parties raise additional claims relevant to sentencing on remand that the Attorney General does not dispute.

### 1. *Senate Bill No. 81 Applies Retroactively to Resentencing on Remand*

Both appellants contend the trial court must resentence them in accordance with Senate Bill No. 81, which amended section 1385, subdivision (c)(1) to provide, "Notwithstanding any other law, the court shall dismiss an enhancement if it is in the furtherance of justice to do so, except if dismissal of that enhancement is prohibited by any initiative statute." Furthermore, "This subdivision shall apply to all sentencings occurring after January 1, 2022." (*Id.*, subd. (c)(1).) The Attorney General concedes Senate Bill No. 81 would apply retroactively on remand for resentencing. The concession is well-taken. Because we must remand for the reasons above, and any resentencing hearing will occur after January 1, 2022, section 1385 as amended will apply on remand. (*People v. Sek* (2022) 74 Cal.App.5th 657, 674.) We will order the trial court to conduct resentencing accordingly.

### 2. *Correction of Minutes to Show Any Unpaid Balance on the Criminal Justice Administration Fee is Vacated*

Franco contends the minutes of his sentencing hearing must be corrected to show any balance on the criminal justice administrative fee that remains unpaid as of July 1, 2021 is vacated. Franco waived oral pronouncement of citations at his sentencing hearing, and the abstract of judgment does not reflect this fee, but the minutes of the hearing reflect the imposition of a $129.75 criminal justice administration fee. Franco argues the enactment of Assembly Bill No. 1869 requires that the court vacate any unpaid balance that remained as of July 1, 2021, when the legislation took effect. The Attorney General concedes this claim, and the concession is well-taken. (*People v. Greeley* (2021) 70 Cal.App.5th 609, 626-627 [plain language of section 1465.9, subdivision (a) requires vacatur of balance of unpaid fees on statute's effective date].) We will order the minutes corrected accordingly.

### 3. Additional Day of Actual Custody Credit

Franco contends he is entitled to one additional day of actual custody credit. The record shows he was arrested on November 6, 2012, and he was sentenced on April 12, 2019. The trial court awarded him 2,348 days of actual custody. Franco contends he should have been awarded 2,349 days of actual custody. The Attorney General submits without argument.

We independently review whether a trial court has correctly applied the governing statutes in awarding custody credits. (*People v. Arevalo* (2018) 20 Cal.App.5th 821, 827.) "A sentence that fails to award legally mandated custody credit is unauthorized and may be corrected whenever discovered." (*People v. Taylor* (2004) 119 Cal.App.4th 628, 647.) "Calculation of custody credit begins on the day of arrest and continues through the day of sentencing." (*People v. Rajanayagam* (2012) 211 Cal.App.4th 42, 48.) " ' "The law takes no notice of fractions of a day. Any fraction of a day is deemed a day . . . . [Citation.]" ' " (*People v. Valdes* (2020) 53 Cal.App.5th 953, 955.)

We have independently reviewed the record and determined Franco should have been awarded an additional day of actual custody credit. We will order the court to correct the error on resentencing.

### CASE NO. H047398

### A. Procedural History

In 2010, in case No. C1070209, the trial court granted Franco a three-year term of probation for violating Vehicle Code section 10851 (theft and unlawful driving or taking of a vehicle); Vehicle Code section 23153, subdivision (a) (driving under the influence); section 182, subdivision (a)(5) (conspiracy); and Vehicle Code section 20002, subdivision (a) (leaving the scene of an accident).[33] The court imposed one year in county jail as a condition of probation.

---

[33] We omit the facts of the offense because they are immaterial to the issue raised on appeal.

In 2013, the trial court revoked probation. In 2019, Franco admitted violating the terms of his probation. The trial court imposed a term of eight months to be served consecutive to a four-year term imposed in case No. C1239875 as set forth below in case No. H047442. The trial court found Franco was entitled to 258 days of actual custody credit and 128 days of conduct credit for total credits of 386 days on the violation of probation.

## B. Calculation of Actual Custody Credits

As noted above, the trial court awarded Franco 386 days of total credit based on its finding that he had 258 actual days of custody credit. Based on the record of his time in custody, Franco contends the trial court miscalculated the number of actual days he spent in custody and that he should have received credit for 297 actual days in custody. The Attorney General concedes that "there appears to be evidence in the record supporting Franco's calculation" such that Franco "may" be entitled to additional days of custody credit. But the Attorney General argues other parts of the record support the trial court's award, and that because it is unclear how the parties arrived at 258 days, the record does not present a sufficient basis to resolve the dispute. The Attorney General cites handwritten notes on the probation report and the parties' statements at the sentencing hearing, but he does not show how the trial court's calculation was correct or what it was based on.

Franco points to the following facts in the record: He was booked on the initial charges on August 20, 2009 and released on September 26, 2009, having spent 38 days in custody. He was booked again on February 26, 2010 and released on March 24, 2010, having spent 27 days in custody. He was convicted on September 2, 2010, and the court granted probation on November 2, 2010, on the condition that he serve one year in jail. Franco was remanded into custody at the hearing on November 2, 2010, and he was released on June 21, 2011, having spent 232 days in jail. Based on the sum of these totals, Franco contends he spent a total of 297 days in actual custody.

126

Our review is governed by the standards set forth above in case No. H047195, section II.G.3. We have independently reviewed the record and determined Franco spent a total of 297 days in actual custody, and he therefore should have been awarded 297 days of actual custody credits. We will order the trial court to correct the abstract of judgment accordingly.

## CASE NO. H047442

### A. *Procedural History*

In April 2013, in case No. C1239875, the prosecution charged Franco and two codefendants in a five-count information.[34] Franco was charged in three counts: count 1—making criminal threats (§ 422); count 2—exhibiting a weapon other than a firearm (§ 417, subd. (a)(1)); and count 4—participating in a criminal street gang (§ 186.22, subd. (a)). As to counts 1 and 2, the information alleged Franco committed the offenses for the benefit of, at the direction of, and in association with a criminal street gang. (§ 186.22, subds. (b)(1)(B) & (d).) The information further alleged Franco had suffered a prior felony conviction constituting a serious felony (§ 667, subd. (a)) and a violent or serious felony (§§ 667, subds. (b)-(i), 667.5, subd. (c), 1192.7. subd. (c)). As to count 1, the information alleged Franco was on probation for a serious or violent felony conviction at the time he committed the offense. (§ 1203, subd. (k).)

Franco pleaded no contest to making criminal threats, admitted a prior strike conviction, and admitted a prior serious felony conviction. The trial court imposed a term of four years. Together with the eight-month term imposed in case No. C1070209 as set forth above, the court imposed an aggregate term of four years eight months consecutive to the sentence imposed for the murder and attempted murder convictions in case No. 212692.

---

[34] We omit the facts of the offense because they are immaterial to the issue raised on appeal.

127

Among other fines and fees, the trial court imposed a $129.75 criminal justice administration fee, which the court stayed under *People v. Dueñas* (2019) 30 Cal.App.5th 1157.

### B. *Correction of the Minutes and the Abstract of Judgment*

Franco contends the minutes of his sentencing hearing and the abstract of judgment should be corrected to show any balance on the criminal justice administration fee that remains unpaid as of July 1, 2021 is vacated based on a retroactive application of Assembly Bill No. 1869. The Attorney General concedes for the reasons set forth above in section II.G.2 of case No. H047195, and we accept the concession for the same reasons. We will order the trial court to correct the minutes and the abstract of judgment accordingly.

### III. DISPOSITION

In case No. H047195, the judgments against both appellants are reversed. As to Hugo Chavez, the convictions on all counts are vacated and the sentence is vacated. As to Gabriel Franco, the conviction for attempted murder on count 5 is vacated, the sentence is vacated, and the matter is remanded for further proceedings as follows: If the prosecution elects not to retry Franco on count 5 within 60 days after the filing of the remittitur in the trial court, in accordance with Penal Code section 1382, subdivision (a)(2), the trial court shall resentence Franco forthwith on the remaining counts and enhancements. At any future resentencing, the trial court shall sentence Franco in accordance with Penal Code section 1385 as amended by Senate Bill No. 81. The trial court shall issue a corrected abstract of judgment for Franco to reflect a term of life on count 4 as set forth above in section II.F, and correct the award of actual days in custody from 2,348 days to 2,349 days. The trial court shall correct the minutes of the April 12, 2019 sentencing hearing for Franco to show that any unpaid balance on the $129.75 criminal justice administration fee as of July 1, 2021 is vacated.

128

In case No. H047398 and case No. H047442, the judgments are affirmed. In case No. H047398, the trial court shall correct the abstract of judgment to show Franco was in actual custody for 297 days, and correct the abstract of judgment to show that any unpaid balance on the $129.75 criminal justice administration fee as of July 1, 2021 is vacated. In case No. H047442, the trial court shall correct the minutes of the August 19, 2019 sentencing hearing to show that any unpaid balance on the $129.75 criminal justice administration fee as of July 1, 2021 is vacated.

_____

Greenwood, P. J.


WE CONCUR:


_____

Grover, J.


_____

Bromberg, J.


H047195, H047398, H047442
People v. Franco, et al.